IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SLAMDUNK ENTERPRISES** | § | **CASE NO.  17-60566** |
| **D/B/A SIGNAL WELL SERVICE** | § | **CHAPTER 7** |
| | § | |
| **DEBTOR** | § | |
| | § | |
| **STEPHEN ZAYLER** | § | |
| **CHAPTER 7 TRUSTEE** | § | |
| **PLAINTIFF** | § | **ADVERSARY PROCEEDING** |
| | § | **NO. 18-06006** |
| **vs.** | § | |
| | § | |
| **MIKEN OIL, INC. AND** | § | |
| **LARRY MIKE TATE** | § | |
| **DEFENDANTS** | § | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

COMES NOW, Stephen Zayler, Chapter 7 Trustee ("Trustee" or "Plaintiff") filing this his

Motion for Summary Judgment and Brief in Support Thereof.

# Table of Contents

I. SUMMARY OF MOTION...................................................................................................... 1

II. STATEMENT OF ISSUES. ................................................................................................... 1

III. SUMMARY JUDGMENT EVIDENCE................................................................................ 2

IV. STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................... 2

    A.    Corporate and Financial History ............................................................... 2

    B.    Insolvency, Bankruptcy Planning, and the Events of December 30, 2016. .................... 4

    C.    Other Transfers for the Benefit of Tate and Miken.......................................... 7

V. ARGUMENT AND AUTHORITIES ..................................................................................... 8

    A.    Summary Judgment Standards ..................................................................... 8

    B.    Miken received a preferential transfer that is avoidable under 11 U.S.C. §547, and/or UFTA §24.006(b). .............................................................................................. 10

        1.    *Elements of an avoidance action under §547 and UFTA §24.006(b).* ...................... 10

        2.    *The transfer of $1,550,000 to Miken was of an interest of the Debtor in property....* 11

        (a)    *In re Loggins and Schrödinger's Cat.* ......................................................... 13

        (b)    *Tate is estopped to claim the $1,550,000 paid to Debtor was anything other than a "capital contribution."* ............................................................................................ 14

        3.    *For the benefit of a creditor, and on account of an antecedent debt.* ........................ 17

        4.    *The transfer was made when the debtor was "insolvent."* .................................... 17

        5.    *The transfer was made to an "insider" within one year of the petition date.* ............ 17

        6.    *The enabling and beneficial transfer to Miken.* ................................................. 18

        7.    *The Trustee's cause of action under UFTA §24.006(b).* ...................................... 19

    C.    Mike Tate also received avoidable preferential transfers. .................................. 19

    D.    If the $1,550,000 transfer to Miken is not avoidable as a preference, then the "transfer" of Debtor's tax attributes and losses to Tate are avoidable under §548. ................................. 20

    E.    The pre-petition transfers to Tate totaling $21,917 are also avoidable under §548....... 22

    F.    There was no contemporaneous exchange for new value within the meaning of §547(c)(1). ......................................................................................................... 22

    G.    Tate is not a "transferee" within the meaning of §550(b) for purposes of the Trustee's claims against him under §547(b) and §548. ................................................................... 27

    H.    The "subsequent new value" defense, where applicable, is limited to the extent of new value given by a defendant. .................................................................................... 27

    I.    Multiple claimed defenses arising from Debtor's status as a Subchapter S corporation are not applicable. ................................................................................................. 28

    J.    Limitations. ......................................................................................... 29

    K.    Damages. ............................................................................................. 30

## Index of Authorities

CASES

*Bazan ex. rel. Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001)*.................................. 8

*Begier v. IRS, 496 U.S. 53, 58-59, 110 S.Ct. 2258, 110 L.Ed. 2d. 46 (1990)* ............................... 13

*Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1282 (9th Cir. 1996); S. Rep. No. 989, 95th Cong., 2d Sess. 27 (1978)* ...................................................................................................... 12

*Campbell v. Hanover Ins. Co. (In re ESA Envtl. Specialists) 709 F.3d 388, 398 (4th Cir. 2013)* 23

*Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*................ 8

Davidson v. Davidson, *947 F.2d 1294, 1297 (5th Cir. 1991)* ................................................. 16, 17

*Dill v. Brad Hall & Assocs. (In re Indian Capitol Distrib., Inc.), 2012 Bankr. LEXIS 3725, at \*17-18 (Bankr. D. N.M. 2012).* ...................................................................................................... 24

*FPC v.* Colorado Interstate Gas Co., *348 U.S. 492, 75 S. Ct. 467, 99 L. Ed. 583 (1955)*............. 16

*Giles v. Gen. Elec. Co., 245 F.3d 474, 494 (5th Cir. 2001)* ......................................................... 10

*Gulf Oil Corp. v. Fuel Oil Supply & Terminal Lane, Inc. (In re Full Oil Supply and Terminal Lane, Inc.) 837 F.2d 224, 228 (5th Cir. 1988)*............................................................................ 26

*In re Chase & Sanborn Corp., 904 F.2d 588, 595-96 (11th Cir. 1990)* ....................................... 26

*In re Criswell, 102 F.3d 1411 (5th Cir. 1997)*............................................................................... 28

*In re Davidson, 947 F.2d 1294, 1297 (5th Cir. 1991)* ................................................................... 15

*In re Fabricators, Inc., 926 F.2d 1458, 1465 (5th Cir. 1991)* ...................................................... 18

*In re Liao, 553 B.R. 584, 607 (Bankr. S.D. Tex. 2016)*................................................................. 16

*In re Loggins, 513 B.R. at __* ......................................................................................................... 9

*In re Loggins, 513 B.R. at 696* ...................................................................................................... 11

*In re Majestics Star Casino, 716 F.3d 736 (3rd Cir. 2013)*........................................................... 22

*In re Missionary Baptist Foundation, Inc., 712 F.2d 206, 211 (5th Cir. 1983)* ........................... 18

*In re Prudential Lines, Inc. 928 F.2d 565 (2nd Cir. 1991)*........................................................... 22

*Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir.1991)* ............................... 9

*Jacobs v. City of Port Neches*, 7 F.Supp.2d 829, 833 (E.D. Tex.1998) ........................................ 10

*Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 595 (5th Cir. 1996) ....................................................................................................................... 9, 13

*Kaneb Servs., Inc. v. FSLIC*, 650 F.2d 78, 81 (5th Cir. Unit A July 1981) ................................. 15

*Karafsur v. Scurlock, Permian Corp. (In re El Paso Refinery, LP)* 171 F.3d 249, ___ (5th Cir. 1999) ....................................................................................................................... 19

*Long v. Turner*, 134 F.3d 312, 318 (5th Cir. 1998) ..................................................................... 16

*Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) .............................. 16

*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ........................................................................................................... 10

*Morton v. Kievit (In re Vallecito Gas, LLC)*, 461 B.R. 358, 412 (Bankr. N.D. Tex 2011) ........... 28

*Moser v. Bank of Tyler (In re Loggins)*, 513 B.R. 682, __ (Bankr. E.D. Tex. 2014) ..................... 9

*Neiman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 371 (5th Cir. 1990) ............................... 16

*Official Employment Related Issues Committee of Enron Corp. v. Arnold*, 2005 Bankr. LEXIS 3621, Pg. 99 (Bankr. S.D. Tex. 2005,) ..................................................................................... 18

*Osadon v. C&N Renovation, Inc.*, 2018 Tex. App. LEXIS 3319, pg. 16 (Tex. App. – Dallas, 2018) ............................................................................................................................................. 11

*Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir. 2008) ............ 12

*PDVSA Petroleo S.A. v. Trigeant, Ltd.*, 2012 U.S. Dist. LEXIS 110150 (S.D. Tex. 2012) ........... 11

*Pine Top Ins. Co. v. Bank of America Nat'l Trust & Sav. Ass'n*, 969 F.2d 321, 328 (7th Cir. 1992); 5 Collier on Bankruptcy ¶547.049[1](b) (___ Ed. 2019) ............................................. 24

*Pirani v. Baharia (In re Pirani)*, 579 B.R. 396, 406 (Bankr. E.D. Tex. 2017). ........................... 16

*Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998) .......................................... 10

*Richardson v. IRS (In re Anton Noll, Inc.)*, 277 B.R. 875, 878 (B.A.P. 1st Cir. 2002) ................. 28

*Seagal v. Rochelle* 382 U.S. 375, 380-81, 86 S.Ct. 511, 15 L. Ed 2d 428 (1966) ........................ 22

*Southmark Corp. v. Schulte, Roth and Zadel (In re Southmark Corp)*, 239 F.3d 365 at *3 (5th Cir. 2000) ......................................................................................................................................... 23

*T.B. Westex Foods, Inc. v. FDIC (In re T.B. Westex Foods, Inc.), 950 F.2d 1187, 1192 (5th Cir. 1992)* .............................................................................................................................. 19

*T.B. Westex Foods, Inc. v. FDIC, 950 F.2d 1187, 1195 (5th Cir, 1992)* ....................................... 20

*Theriot v. Smith, 263 S.W.2d 181, 183 (Tex.Civ.App.--Waco 1953, writ dism'd)* ........................ 16

*U.S. Bank N.A. v. Vill.at Lakeridge, LLC, 138 S. Ct. 960, 200 L. Ed. 2d 218 (2018)* .................. 18

*Union Bank v. Wolas, 502 U.S. 151, 154-55, 112 S. Ct. 527, 116 L. Ed. 2d 514 (1991)* ............. 11

*Vessels v. Anshultz Corp., 823 S.W.2d 762, 765-66 (Tex. App. – Texarkana 1992, writ denied)* 16

*Wiley v. State Farm Fire & Cas. Co., 585 F.3d 206, 210 (5th Cir. 2009)* ..................................... 9

## Statutes

§547(c)(1)(B) ............................................................................................................ 24

11 U.S.C. §§ 544, 547, and 548 ............................................................................... 9

11 U.S.C. §101(10) ................................................................................................... 17

11 U.S.C. §101(5) ..................................................................................................... 17

11 U.S.C. §101(54) ................................................................................................... 11

11 U.S.C. §346(i)(1), (3) .......................................................................................... 22

11 U.S.C. §547 ..................................................................................................... 10, 11

11 U.S.C. §547(b)(4)(B) ........................................................................................... 18

11 U.S.C. §547(c)(1)(A) ........................................................................................... 26

11 U.S.C. §550 ........................................................................................................... 30

Bankruptcy Rule 7033 ............................................................................................. 29

FED. R. CIV. P. 56 ....................................................................................................... 8

FED. R. CIV. P. 56(A) ................................................................................................. 8

Fed. R. Civ. P. 56(c) ................................................................................................... 8

TEX. BUS. & COM. CODE §24.006(b) ...................................................................... 11

TEX. BUS. ORG. §1.002(9) ......................................................................................... 12

TEX. BUS. ORG. CODE §1.002(9) .............................................................................. 12

## I. SUMMARY OF MOTION

Trustee filed this adversary proceeding to avoid a preferential transfer of $1,550,000 to Miken Oil, Inc. ("Miken"). Trustee also seeks to avoid other payments "to" and "for the benefit" of Miken and Debtor's primary shareholder, Larry Mike Tate ("Tate"). The defendants' "contemporaneous exchange for new value" defense turns on a characterization of multiple transactions and exchanges as a single "contemporaneous" event – a characterization that is completely at odds with what was reported to the Internal Revenue Service. The defendants' "subsequent new value" defense is limited to the extent new value was actually provided, and the litany of generally plead common law defenses fail on the facts and as a matter of law. If the $1,550,000 payment to Miken is not avoidable as a preference, then the series of transfers and exchanges orchestrated by Tate and Miken were fraudulent and the resulting benefits of the fraud which flowed to Tate in the form of substantial income tax refunds should be paid to the Trustee under §§548 and 550 of the Code.

## II. STATEMENT OF ISSUES.

1.      Was the December 30, 2016, transfer by Debtor of $1,550,000 to Miken a preferential transfer under 11 U.S.C. §547(b), and/or TEX. BUS. & COM. CODE §24.006(b)?

2.      If the $1,550,000 payment to Miken is not avoidable as a preference, was the artificial boost to Tate's stockholder's basis in the stock of Debtor a transfer of Debtor's valuable tax attributes and, therefore, avoidable under 11 U.S.C. §548, and/or TEX. BUS. & COM. CODE §24.005(a)(1) or (2), or §24.006(a)? If so, what is the value of the property transferred to Tate for purposes of §550 of the Code?

3.      Were the payments made by Debtor within a year before the petition date to third-party creditors whose claims were personally guaranteed by Tate and/or Miken, preferential transfers "for the benefit of" those guarantors under 11 U.S.C. §547(b)?

4.      If any transfer is a preference, was the transfer a contemporaneous exchange for new value under §547(c)(1) of the Code?

5.      If any transfer is a preference, to what extent did the defendants provide subsequent new value within the meaning of §547(c)(4) of the Code?

1

6.      Is the Trustee entitled to summary judgment on any or all of the common law defenses alleged by the defendants?

### III. SUMMARY JUDGMENT EVIDENCE

This motion is based on the pleadings and other materials on file with the Court, including Volume 1 and Volume 2 of the *Appendix to Plaintiff's Motion for Summary Judgment* ("<u>Appendix</u>").[1] The Appendix includes the affidavits of Stephen Zayler (the "<u>Zayler Affidavit</u>"), and Scott A. Ritcheson (the "<u>Ritcheson Affidavit</u>"), portions of the deposition testimony of Tate, individually and as corporate representative of Miken, and John C. Pope ("<u>Pope</u>"), the defendants' primary accountant, and exhibits.

### IV. STATEMENT OF UNDISPUTED MATERIAL FACTS

A.      <u>Corporate and Financial History</u>

1.      Slamdunk Enterprises, Inc. ("<u>Debtor</u>") is a Texas corporation.[2] On December 30, 2016, Tate owned ninety percent (90%) of the company's issued and outstanding shares of stock. John C. Pope ("<u>Pope</u>") owned the remaining ten percent (10%).[3] Tate and Pope were the only directors of Debtor, and Tate was its president and only officer.[4] Debtor was formed on December 2, 2010. It is, and has been since its inception, a sub-chapter S corporation for income tax purposes.[5] Debtor did business as "Signal Well Service," and it was primarily engaged in oil field "well servicing and workovers."[6]

2.      Miken is also a Texas corporation.[7] It is, and has been since its formation, owned

---

[1] References to summary judgment evidence included in the Appendix will be cited as "App." followed by the Appendix Volume (1 or 2) and then  the relevant page number. For example, App. 2: 393. Volume 2 is filed under seal. All page numbers are sequential, so Volume 2 begins with page number 308.
[2] Complaint ¶17 (Doc. 1); Tate's Amended Answer ¶17 (Doc. 20).
[3] App. 1:10-11 (Tate Depo. Pg. 15, Ln. 18 to Pg. 16, Ln. 7).
[4] App. 1:11 (Tate Depo. Pg. 16, Lns. 12-18).
[5] App. 1:41 (Tate Depo. Pg. 76, Lns. 9-20).
[6] App. 1:10 18-19; (Tate Depo. Pg. 15, Lns. 3-17, and Pg. 23 Ln. 25 to Pg. 24, Ln. 13).
[7] App. 1:14 (Tate Depo. Pg. 19, Ln. 22 to Pg. 20, Ln. 3).

entirely by Tate.[8] Tate is also Miken's only officer and director.[9] Miken owns and operates oil and

gas properties.[10] Miken periodically engaged Debtor to perform well servicing and workovers on

properties owned or operated by Miken.[11] Tate was, during all times relevant to Trustee's claims, in

sole and exclusive control of Debtor and Miken.[12]

4.     Immediately after Debtor was formed in 2010, it began to lose money. It lost a lot of

money. From the beginning of its operations, Debtor depended on Miken to extend credit and, in

some instances, to pay Debtor's bills.[13] Debtor never had positive earnings. Instead, substantial

losses were reported to the Internal Revenue Service (the "IRS") on Debtor's annual IRS Form

1120S filings.[14] By the end of 2016, Debtor's accumulated losses over its six (6) year history totaled

over $2,200,000.[15]

5.     Shareholder contributions to Debtor's capital before 2016 were negligible. (App

2:318; Exhibit 9, Page 3 ("common stock $1,000")).[16] As a consequence, by the end of 2016

Debtor's accumulated multi-million dollar losses[17] could not be offset against the shareholders'

personal income because no capital of any significance had been contributed by Tate or Pope.[18]

6.     Debtor reported its income and losses on an accrual basis.[19] In other words, Debtor's

accumulated losses represented – in large part – the accumulated debts of Debtor to its unpaid

vendors and suppliers.

7.     On many occasions over the years, Miken advanced loans to and made payments on

---

[8] App. 1:15 (Tate Depo. Pg. 20, Lns. 15-20).
[9] App. 1:15; (Tate Depo. Pg. 20, Ln. 21 to Pg. 21, Ln. 1).
[10] App. 1:15 (Tate Depo. Pg. 20, Lns. 4-14).
[11] App. 1:19 (Tate Depo. Pg. 24, Lns. 7-19).
[12] App. 1:64-65(Tate Depo. Pg. 120, Ln. 21 to Pg. 121, Ln. 10).
[13] App. 1:35 (Tate Depo. Pg. 64, Ln. 6 to Pg. 66, Ln. 10).
[14] App. 2:385 (Exhibit 13, Pg. 2).
[15] App. 1:88 (Pope Depo. Pg. 43, Lns. 12-22).
[16] See also, App. 1:33-34 (Tate Depo. Pg. 61, Ln. 13 to Pg. 62, Ln. 19).
[17] App. 2:393, (Exhibit 13); App. 1:74, 94 (Pope Pg. 21, Lns. 7-21; and Pg. 52, Ln. 21 to Pg. 53, Ln. 7). Exhibit 9 is the year-end balance sheet for Debtor (d/b/a "Signal Well Service") and it shows retained earnings of *minus* $2,330,474.85 through 2015 and net income in 2016 of *minus* $649,342.91.
[18] App. 2:392; (Exhibit 13, Debtor's 2016 Tax Return, "Line 1 Beginning of Year Stock Basis").

behalf of Debtor. Immediately prior to December 30, 2016, the unpaid balance of the debt owed by Debtor to Miken was $1,612,771.07.[20] It was unsecured and there was no promissory note. The debt was carried on Debtor's books as a long-term liability (line item 25004 – "N/P Miken Oil")[21], and on Miken's books as a "note receivable."[22] No person other than Tate was involved in Miken's decisions to loan money to Debtor.[23] Although there was no written agreement between Debtor and Miken describing when or how the debt would be repaid to Miken, on December 30, 2016, Tate, Debtor and Miken knew the debt was past due.[24]

8.    Debtor's directors and shareholders did not make or keep minutes of any of their meetings,[25] including those leading to the events of December 30, 2016.[26]

B.    Insolvency, Bankruptcy Planning, and the Events of December 30, 2016.

1.    In the fall of 2016 it was obvious to Tate and Pope that Debtor could not pay its bills.[27] Creditors were continuously suing Debtor for nonpayment,[28] and judgments were being entered against Debtor.[29] Payroll taxes were delinquent[30] and Pope knew it was time to get out as an owner and director of Debtor. Pope told Tate "I cannot be a party to this due to the fact that I'm a CPA."[31] Pope drafted a stock purchase agreement between him and Tate, and the agreement was signed on December 29, 2016.[32] Pope agreed to sell his 10% stake in the Debtor to Tate for $100,[33]

[19] App. 2:386 (Exhibit 13, Debtor's 2016 Tax Return, Prod. # 1143); App. 1:41 (Tate Depo. Pg. 76, Lns.16-20).
[20] App. 1:110-112 (Exhibit 4 – Debtor's Note Payable Ledger to Miken).
[21] App. 2:317, 1:110 (Exhibit 9, Pg. 2 and Exhibit 4, Pg. 1); App. 1:39 (Tate Dep. Pg. 69, Lns. 19-23).
[22] App. 2:343, 2:376 (Exhibit 11, pg. 24; Exhibit 12, Pg. 27); App. 1:86 (Pope Depo. Pg. 41, Lns. 4-17).
[23] App. 1:38 (Tate Depo. Pg. 68, Lns. 5-9).
[24] App. 1:40 (Tate Depo. Pg. 70, Lns. 3-6).
[25] App. 1:77(Pope Depo., Pg. 25, Lns. 12-25).
[26] App. 1:22 (Tate Depo., Pg. 31, Lns. 11-14).
[27] App. 1:72, 1:92 (Pope Depo., Pg. 19, Lns. 13-20; Pg. 50, Lns. 13-18); App. 1:12-13 (Tate Depo. Pg. 17, Ln. 7 to Pg. 18, Ln. 24).
[28] App. 1:72 (Pope Depo. Pg. 19, Lns. 13-20).
[29] App. 1:129 (Exhibit 21, November 2, 2016 Abstract of Judgment).
[30] App. 1:132 (Exhibit 22, June 29, 2017 Release of Federal Tax Lien); App. 1: 73 (Pope Depo. Pg. 20, Lns. 8-13).
[31] App. 1:72 (Pope Depo. Pg. 19, Lns 13-20); App. 1:12-13 (Tate Depo. Pg. 17, Ln. 21 to Pg. 18, Ln. 3).
[32] App. 1:134 (Exhibit 23, Stock Purchase Agreement); App. 1:13 (Tate Depo. Pg. 18, Lns. 12-21).
[33] App. 1:136 (Exhibit 23, Stock Purchase Agreement Pg. 3, Section 1.2).

and the sale was effective December 31, 2016.[34]

2.      Before Tate purchased Pope's 10%, Tate engaged bankruptcy counsel for Debtor and begin preparing the company's statement of financial affairs and schedules. Those preparations began in October, 2016.[35] However, soon after engaging Debtor's bankruptcy counsel, Tate and Pope were introduced to Robert Pulliam, a certified public accountant and "tax expert in Dallas."[36] Based on Pulliam's input, Tate decided to delay filing Debtor's bankruptcy for a period time in order to take advantage of an opportunity to personally recognize some the huge losses incurred by Debtor and to offset those losses, on a carryback basis, against large amounts of his personal income received in previous years.[37]

3.      After consulting with Pulliam and receiving hand-written instructions from Pope, on December 30, 2016, Tate went to Austin Bank to orchestrate a series of transfers between the bank accounts of Miken, Tate, and Debtor. All of those accounts were at the same bank.[38] The December 30, 2016 sequence of transfers looked something like this:



Diagram 1

---

[34] App. 1:136 (Exhibit 23 Pg. 3, Section 1.3).
[35] App. 1:44-45 (Tate Depo., Pg. 87, Ln. 18 to Pg. 88, Ln. 23).
[36] App. 1:20-21 (Tate Depo. Pg. 28, ln. 18 to Pg. 29, Ln. 1).
[37] App. 1:42-43 (Tate Depo. Pg. 77, Ln. 20 to Pg. 78, Ln. 18).

4.      The first transfer was a loan by Miken to Tate, its sole shareholder.[39] The second

transfer was a $1,550,000.00 capital contribution by Tate to Debtor.[40]  Pope, still a director of

Debtor at the time and also the accountant for Debtor and Tate, testified plainly that this was a "*real*

capital contribution,*" and that it was intended by all concerned to be just that.[41] It was not a loan to

Debtor.[42] The third transfer was Debtor's use of the capital infusion to repay almost all of Debtor's

debt to Miken.[43] No other creditor of Debtor received any part of Debtor's new capital.[44]

5.      Tate's individual return and application for tentative refund on 2016 Form 1045 was

filed with and reported to the IRS, under penalty of perjury. In that return Tate reported that he

contributed (not loaned, but *contributed*) $1,550,000 in capital to Debtor.[45] Pope prepared the return

and refund application for Tate.[46] On Debtor's 2016 filed IRS Form 1120S (also signed under

penalty of perjury) Tate also reported that he personally contributed $1,550,000 in capital to

Debtor.[47] This return was also prepared by Pope.

6.      As for Miken, it recorded receipt of the payment of $1,550,000 by Debtor on Miken's

2016 IRS Form 1120S.[48] The books of the Debtor were also updated to reflect the substantial

payment.[49] When given the opportunity to characterize the transfer of $1,550,000.00 to Miken in any

other possible light, Pope testified it was a payment to Miken by means of transferred cash.[50]

7.      As for Tate personally, he filed new personal returns, amendments to old returns and

---

[38] App. 1:24-25 (Tate Depo. Pg. 42, Ln. 15 to Pg. 43, Ln. 24).
[39] App. 1:114-115 (Exhibit 5); App. 1:26 (Tate Depo. Pg. 46, Lns. 15-20); App. 1:78-79 (Pope Depo. Pg. 28, Ln. 19 to Pg. 29, Ln. 7).
[40] App. 1:99 (Exhibit 1).
[41] App. 1:74-76 (Pope Depo. Pg. 21, Ln. 7 to Pg. 23, Ln. 11).
[42] App. 1:82-83 (Pope Depo. Pg. 35, Ln. 16 to Pg. 36, Ln. 25).
[43] Transfer #3 in Diagram 1. App. 1:102-106 (Exhibits 2 and 3); App. 1:84-85 (Pope Depo. Pg. 37, Ln. 22 to Pg. 38, Ln. 21).
[44] App. 1:74-76 (Pope Depo. Pg. 21, Ln. 7 to Pg. 23, Ln. 11).
[45] App. 2:443 (Exhibit 14, Pg. 32); App 1:41-43 (Tate Depo. Pg. 76, Ln. 22 to Pg. 78, Ln. 19).
[46] App. 1:89 (Pope Depo. Pg. 44, Lns. 8-24).
[47] App. 2:392 (Exhibit 13, Pg. 9); App. 1:29-31, 1:47-48 (Tate Depo. Pg. 55, Ln. 21 to Pg. 57, Ln. 25; and Pg. 91, Ln. 7 to Pg. 92, Ln. 2).
[48] App. 2:343 (Exhibit 11, Pg. 23); App. 1:86-87 (Pope Depo. Pg. 41, Ln. 9 to Pg. 42, Ln. 13).
[49] App. 2:388 (Exhibit 13, Pg. 5; App. 1:87 (Pope Depo. Pg. 42, Lns. 10-13).
[50] App. 1:87 (Pope Depo. Pg. 42, Lns. 5-13).

an application for refund. All of this he did in April, 2017.[51] The IRS relied on the individual filings

and paid a refund to Tate of $407,114 based on his carryback of Debtor's substantial loses.[52]

Because of the transactions, Tate got his refund, Miken got paid the majority of what Debtor owed to

it, and Debtor's other creditors were paid nothing from the capital infusion.

8.      After the events of December 30, 2016, the filing of the various tax returns, and

Tate's receipt of his tax refund, Debtor proceeded with its Chapter 7 petition in this case. The

petition date was August 1, 2017. There was no disclosure of the payment to Miken in Debtor's

Statement of Financial Affairs.[53] When asked in his deposition why the payment was not disclosed,

Tate testified: "We started filling this out [Exhibit 20, the Statement of Financial Affairs] in, I want

to say, October of '16 and then this transaction idea came up in – at the end of the year and I just

forgot about it. I forgot about this question."[54] When asked "do you know why you've not amended

the answer [to Question 4 of Debtor's Statement of Financial Affairs] to this point?" Tate simply

said, "No, I do not."[55] But, more than the payment to Miken was undisclosed.

C.      Other Transfers for the Benefit of Tate and Miken.

1.      Tate guaranteed the payment of many of Debtor's obligations, including two (2) loans

by Austin Bank to Debtor,[56] and two (2) loans by Chase Bank.[57] Miken also guaranteed the loans

from Chase Bank. In the ten (10) months between October 2016 and the petition date, payments

were made by Debtor to these creditors including twenty-three (23) payments to Chase Bank (a total

---

[51] App. 2:412 (Exhibit 14, pg. 2).
[52] App. 2:466, 468. (Exhibit 18); App. 1:90 (Pope Depo. Pg. 47, Lns. 18 to 24). Pope testified that Tate's total loss carryback in the Application for Tentative Refund (Exhibit 14) was $2,034,940, of which a portion was attributable to losses by Miken. App. 1:91 (Pope Depo. Pg. 48, Lns 20-24). At least 65% of the refund ($1,550,000/$2,304,940) is directly related to Tate's increased shareholder basis in Debtor.
[53] App. 1:118 (Exhibit 20, Question 4, pg. 2).
[54] App. 1:44 (Tate Depo. Pg. 87, Lns. 18-25).
[55] App. 1:46 (Tate Depo. Pg. 89, Lns. 17-19).
[56] App. 1:23 (Tate Depo. Pg. 41, Lns. 1-8); App. 1:49 (Pg. 98, Ln. 1 to Pg. 99, Ln. 6); App.1:58 (Pg. 114, Lns. 4-19).
[57] App. 1:221 (Exhibit 34); App. 1:51 (Tate Depo. Pg. 106, Ln. 16 to Pg. 109, Ln. 5); and App. 1:54; (Tate Depo. Pg. 109, Ln. 6 to Pg. 110, Ln. 15).

of $94,537.37)[58] and seven (7) payments to Austin Bank (a total of $70,777.01).[59] Remarkably, Debtor even made distributions to Tate during that period. On January 10, 2017, Debtor transferred $5,000.00 to Tate and on February 13, 2017, it transferred $16,917.00. None of the payments and distributions were disclosed in the Statement of Financial Affairs.[60]

2.    The Trustee and his counsel discovered the transfers after obtaining copies of the Debtor's bank statements for the time period.[61]

### V. ARGUMENT AND AUTHORITIES

**A.    Summary Judgment Standards**

*Bankruptcy Rule 7056* incorporates *FED. R. CIV. P. 56* and provides that summary judgment shall be rendered "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(a)*.

The movant bears the initial responsibility of informing the court of the basis for its motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. As a movant, a party asserting that a fact cannot be genuinely disputed must support that assertion by: (A) citing to particular parts of materials in the record (including depositions, documents, affidavits, interrogatory answers, or other materials) or (B) showing that the materials cited do not establish the ... presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. *FED. R. CIV. P. 56(c)*. "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended or a sham." *Bazan ex. rel. Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001)* (emphasis in original). "A fact is material only if its resolution would affect the outcome of the action . . . " *Wiley v. State Farm Fire & Cas. Co., 585 F.3d 206, 210 (5th Cir. 2009)*.

---

[58] App. 1:229 (Exhibit 35); App. 1:54-56 (Tate Depo. Pg. 109, Ln. 22 to Pg. 111, Ln.16).
[59] App. 1:247 (Exhibit 36) App. 1:56-57 (Tate Depo. Pg. 111, Ln. 13 to Pg. 112, Ln. 18).
[60] App. 1:118, 126 (Exhibit 20, Questions 4 and 30); App. 1:254 (Exhibit 37); App. 1:59 (Tate Depo. Pg. 115, Lns. 2-25).
[61] App. 1:2 (Zayler Affidavit, ¶2)

"The Trustee bears the ultimate burden of proof at trial regarding his claims for affirmative relief under *11 U.S.C. §§ 544, 547, and 548*." *Moser v. Bank of Tyler (In re Loggins), 513 B.R. 682, 694 (Bankr. E.D. Tex. 2014).* When requesting summary judgment on an avoidance action, the trustee "must support its motion with credible evidence—using any of the materials specified in *Rule 56(c)*—that would entitle it to a directed verdict if not controverted at trial." *In re Loggins, 513 B.R. at 694 (citing, Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir.1991)).*

When a complaint is answered with one or more affirmative defenses, the plaintiff should be granted summary judgment on those defenses "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *In re Loggins, 513 B.R. at 694 (Bankr. E.D. Tex. 2014).* Summary judgment on an affirmative defense is appropriate if the plaintiff, as the moving party, satisfies "*Rule 56*'s burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *In re Loggins, 513 B.R. at 694 (Bankr. E.D. Tex. 2014).* By either approach, a plaintiff may demonstrate that it is entitled to summary judgment on all aspects of its complaint only if there exists no genuine issue of material fact as to each element necessary to establish the existence of an avoidable transfer and if the defendant fails to produce sufficient evidence to create a factual issue regarding the defendant's affirmative defenses.

If a motion for summary judgment is supported by a *prima facie* showing that the moving party is entitled to judgment as a matter of law, the party opposing that motion must demonstrate in its responsive pleadings the existence of specific facts constituting a genuine issue of material fact for which a trial is necessary. *In re Loggins, 513 B.R. at 695.* In so demonstrating, "the non-movant

must show more than a 'mere disagreement' between the parties, *Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1413 (5th Cir. 1993)*, or that there is merely 'some metaphysical doubt as to the material facts.'" *In re Loggins, 513 B.R. at 695 (citing, Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*. Unsubstantiated, conclusory assertions in the response are not sufficient to raise a genuine issue of material fact. *Jacobs v. City of Port Neches, 7 F.Supp.2d 829, 833 (E.D. Tex.1998)* (*citing Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir.1998)*).

To determine whether summary judgment is appropriate, the record presented is viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Essentially, if a non-movant fails to set forth specific facts that present a triable issue, its claims or defenses should not survive summary judgment. *Giles v. Gen. Elec. Co., 245 F.3d 474, 494 (5th Cir. 2001)*.

**B.     Miken received a preferential transfer that is avoidable under 11 U.S.C. §547, and/or UFTA §24.006(b).**

*1.    Elements of an avoidance action under §547 and UFTA §24.006(b).*

A cause of action under *11 U.S.C. §547(b)* requires proof of six (6) elements: (1) the transfer of an interest of the debtor in property; (2) the transfer was to or for the benefit of a creditor; (3) the transfer was for or on account of an antecedent debt owed by the debtor before the transfer was made; (4) the transfer was made while the debtor was insolvent; (5) the transfer was either (a) made on or within ninety (90) days before the date of the filing of the bankruptcy petition, or (b) between 90 days and one year before the petition date if the creditor at the time of the transfer was an insider; and (6) the transfer enabled the creditor to receive more than it would otherwise have received if the transfer had not been made and the case had proceeded under Chapter 7. *11 U.S.C. §547(b)*; *Union Bank v. Wolas, 502 U.S. 151, 154-55, 112 S. Ct. 527, 116 L. Ed. 2d 514 (1991)*; *In re Loggins, 513*

*B.R. at 696.* If all six (6) elements are supported by summary judgment evidence, the plaintiff has met its *prima facie* burden to establish a preferential transfer and the analysis shifts to any *§547(c)* defenses raised by the defendant. *In re Loggins, 513 B.R. at 696.*

The elements of a cause of action under §24.006(b) of the Texas Uniform Fraudulent Transfer Act ("UFTA")[62] are similar in many respects to a claim under *11 U.S.C. §547*. The trustee must prove 1) the creditor's claim arose before the transfer was made; 2) the transfer was made to an insider; 3) the transfer was for an antecedent debt, 4) the debtor was insolvent at that time, and 5) the insider had reasonable cause to believe the debtor was insolvent. *Osadon v. C&N Renovation, Inc., 2018 Tex. App. LEXIS 3319, pg. 16 (Tex. App. – Dallas, 2018); PDVSA Petroleo S.A. v. Trigeant, Ltd., 2012 U.S. Dist. LEXIS 110150 (S.D. Tex. 2012).*

2.      *The transfer of $1,550,000 to Miken was of an interest of the Debtor in property.*

The occurrence of a "transfer" cannot be seriously disputed.[63] A "transfer" means, among other things, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." *11 U.S.C. §101(54)*. Exhibits 2 and 3[64] evidence the withdrawal of $1,550,000 from Debtor's account at Austin Bank and the deposit of the same amount into Miken's account at the same bank. "A deposit in a bank account or similar account is a transfer." *Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1282 (9th Cir. 1996); S. Rep. No. 989, 95th Cong., 2d Sess. 27 (1978).* In Pope's description of the events on December 30, 2016, he testified: "Slamdunk then paid the $1,550,000 to Miken Oil as payment on the advances that Miken had made over the years."[65] When asked, "Was there really an amount paid to Miken Oil?" Pope's simple answer was "Yes, there was. There was cash transferred."[66]

---

[62] *Tex. Bus. & Com. Code §§24.001 et. seq.*, made applicable to the Trustee by *11 U.S.C. §544(b)(1)*.
[63] Miken's Answer ¶¶21, 36 and 39 (Doc. 11).
[64] App. 1:102, 107 (Exhibits 2 and 3).
[65] App. 1:76 (Pope Depo. Pg. 23, Lns. 5-7).
[66] App. 1:87 (Pope Depo. Pg. 42, Lns. 5-9).

"For purposes of most bankruptcy proceedings, property interests are created and defined by state law. Once that state law determination is made, however, we must still look to federal bankruptcy law to resolve the extent to which that interest is property of the estate." *Parks v. FIA Card Servs., N.A. (In re Marshall), 550 F.3d 1251, 1255 (10th Cir. 2008)*. Debtor, a Texas corporation, is subject to the Texas Business Organizations Code. TEX. BUS. ORG. CODE §1.002(9), defines a "contribution" to capital as:

> "a tangible or intangible benefit that a person transfers to an entity in consideration for an ownership interest in the entity or otherwise in the person's capacity as an owner or a member. The benefit includes cash, …, but does not include cash or property received by the entity … that the person intends to be a loan to the entity."

Tate's tax basis in the stock of the Debtor was negligible. For his plan to have its intended effect, it was necessary for Tate to contribute capital to Debtor. This is exactly what he did in the form of an intra-bank transfer from his personal account at Austin Bank to Debtor's account at the same bank.[67] The connection between the consideration paid to the Debtor ($1,550,000.00) and Tate's "capacity as an owner" (shareholder) of Debtor is demonstrated by Debtor's 2016 Income Tax Return which identifies the consideration as a "capital contribution" with a resulting "increase" of $1,550,000.00 to Tate's "Shareholder's Basis" and "Stock Basis."[68] The contribution was, in every sense imaginable, "a tangible or intangible benefit" transferred by Tate to Debtor. TEX. BUS. ORG. §1.002(9). When Tate was asked in his deposition "was this a capital contribution by you to Slamdunk Enterprises?," he answered "I believe so, yes."[69] Under Texas law, Debtor had an interest in what was contributed to it by Tate. Thus, it was Debtor's money that paid Miken.

An "interest of the debtor in property" has a meaning that is co-extensive with *§541(a)(1)*'s definition of property of the estate. *Begier v. IRS, 496 U.S. 53, 58-59, 110 S.Ct. 2258, 110 L.Ed. 2d. 46 (1990).* ("For guidance, then, we must turn to §541 of the Bankruptcy Code, which delineates the

---

[67] App. 1:99 (Exhibit 1; see Transfer #2 on Diagram 1, Page 5 above)
[68] App. 2:392 (Exhibit 13, Page 9)

scope of 'property of the estate,' and serves as the post-petition analogue to §547(b)'s 'property of the debtor'"). *See also Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.) 437 F.3d 457,459-60 (5th Cir. 2006).* In general terms, if property cannot be used to pay the debtor's creditors, then the property is not an asset of the debtor's estate for preference purposes. *Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.), 81 F.3d 592, 595 (5th Cir. 1996).* This element of a preference claim does not focus on what the creditor receives, "but, what the bankruptcy estate has lost because it is the diminution of the bankruptcy estate, not the unequal payment to creditors, which is the evil sought to be remedied by the avoidance of a preferential transfer." *Texas Amer. Bancshares, Inc. v. Clarke, 954 F.2d 329, 339 (5th Cir. 1992) quoting Virginia Nat'l Bank v. Woodson, 329 F.2d 836, 840 (4th Cir. 1964).*

Miken denies Debtor "had a property interest in the property alleged[ly] transferred."[70] Miken's argument goes something like this: the *source* of the payment made to Miken can be traced backwards to Tate (individually, as shareholder), who borrowed the money from the defendant, Miken. Therefore, as the reasoning goes, the $1,550,000.00 paid to Miken was never the Debtor's to begin with. Supposedly, the entire sequence of transfers from Miken-to-Tate, Tate-to-Debtor, and Debtor-to-Miken, should be disregarded as a series of separate inconsequential events and, instead, understood only as a single unified transaction of no real substance. "Miken paid itself," or so the story goes. This defense was repeated by Tate at least five (5) times in his deposition when he testified "this was just a paper transaction."[71] The argument fails for several reasons.

### (a)     *In re Loggins and Schrödinger's Cat.*

In many respects, Miken's arguments are similar to those made by the defendant-bank in *In re Loggins, 513 B.R. 682 (Bankr. E. D. Tex 2014).* In *Loggins*, the debtor was obligated to the

---

[69] App. 1:29 (Tate Depo. Pg. 55, Lns. 14-16).
[70] Miken's Answer, pg. 9 ¶64 (Doc. 11).

13

defendant-bank for $2,100,000.00 in over-drafted account obligations. In order to arrange for the payment of the debt, debtor agreed to sell what was otherwise exempt homestead property to the principal owner of the bank, Buddy Lowery. Lowery financed the purchase through a third-party lender. When Loggins sold the homestead to Lowery, $2,100,000.00 in homestead proceeds were delivered directly by the closing agent (a title company) to the bank. Lowery then received his deed. When the bank was sued under §547 for the $2,100,000.00 payment, the bank contended a) the proceeds from the sale of exempt homestead were, themselves, exempt and could not have been "property of the debtor," and b) because the transaction should be viewed as a whole, the funds paid to the defendant-bank were "earmarked" and the debtor possessed no real control over the disposition of the fund. So, according to the bank's defense, one stage of the transaction would not have happened without the other and avoiding the transfer to the defendant-bank was equivalent to disregarding the debtor's lack of any control over the proceeds from the sale of otherwise exempt homestead. Both arguments were rejected by the Court in *Loggins*.

Borrowing from the Court's analogy in *Loggins*, Miken postulates a sort of "Schrödinger's Capital Contribution:" a fund of money that simultaneously exists for purposes of increasing Tate's shareholder's basis in the stock of Debtor, and yet does not exist for purposes of any preferential transfer to Miken. The fund exists for purposes of creating an income tax benefit to Tate, but not for purposes of making any real payment to Miken. The transfer occurred for purposes of reducing the "note receivable" on Miken's books, but not for purposes of reducing the "note payable" on Debtor's books. Schödinger's hypothetical cat presents a paradox. Miken's defense is not a paradox, it's a contradiction.

     (b)    <u>*Tate is estopped to claim the $1,550,000 paid to Debtor was anything other than a "capital contribution."*</u>

---

[71] This exact phrase was used by Tate five (5) times in his testimony found at App.1:27 (Tate Depo. Pg. 49, Ln. 17); App. 1:27 (Pg. 49, Ln. 23); App. 1:28 (Pg. 54, Ln. 15); App. 1:31 (Pg. 57, Ln. 21); App. 1: 34 (Pg. 62, Ln. 19).

Tate made a $1,550,000 "capital contribution" to Debtor. Tate owned the fund the instant it was borrowed or distributed from Miken, then he made an intentional contribution of capital to Debtor.

> Q.    "So that was a capital contribution made by you to Slamdunk Enterprises, right?"
> A.    "Yes."
> Q.    "It was intended to be that way?"
> A.    "Yes."[72]

This is precisely what he represented under penalty of perjury to the IRS.[73]  Tate's characterization of the sequence as a meaningless "paper transaction" glosses over the substance of the contribution for all its important consequences, intended and otherwise. Certainly, Tate intended to accomplish an important tax purpose – the increase of his shareholder's basis in Debtor's stock. Tate's CPA, Pope, intended the same purpose and swore the sequence of events was more than a simple accounting gimmick.[74] Tate is (and should be) estopped to now claim his transfer of $1,550,000 to Debtor was insignificant, or that no real value was contributed to the corporate Debtor, or that it was not really a transfer at all but only a "paper transaction."

"One form of estoppel, 'quasi estoppel,' forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." *In re Davidson, 947 F.2d 1294, 1297 (5th Cir. 1991). See also, Kaneb Servs., Inc. v. FSLIC, 650 F.2d 78, 81 (5th Cir. Unit A July 1981), citing FPC v. Colorado Interstate Gas Co., 348 U.S. 492, 75 S. Ct. 467, 99 L. Ed. 583 (1955)); Neiman-Marcus Group, Inc. v. Dworkin, 919 F.2d 368, 371 (5th Cir. 1990)* (explaining Texas law of quasi estoppel). "[O]ne who retains benefits under a transaction cannot avoid its obligations and is estopped to take an inconsistent position." *Long v. Turner, 134 F.3d 312, 318 (5th Cir. 1998) (quoting, Vessels v. Anshultz Corp., 823 S.W.2d 762, 765-66 (Tex. App. – Texarkana 1992, writ denied); Theriot v.*

---

[72] App. 1:31-32 (Tate Depo. Pg. 57, Ln. 23 to Pg. 58, Ln. 2).
[73] App. 2:443 (Exhibit 14, Tate's 2016 Return, Pg. 32); App. 1:41-43 (Tate Depo. Pg. 76, Ln. 22 to Pg. 78, Ln. 19).

*Smith, 263 S.W.2d 181, 183 (Tex.Civ.App.--Waco 1953, writ dism'd).* "[Q]uasi-estoppel 'forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." *Davidson v. Davidson*, *947 F.2d 1294, 1297 (5th Cir. 1991)* (*internal citations omitted*). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, *22 S.W.3d 857, 864 (Tex. 2000).*

"The elements of quasi-estoppel are: (1) the party being estopped acquiesced to or benefited from a position inconsistent with his present position; (2) it would be unconscionable to allow the party being estopped to maintain his present position; and (3) the party being estopped had knowledge of all material facts at the time of the conduct on which estoppel is based. *See, e.g., In re Liao*, *553 B.R. 584, 607 (Bankr. S.D. Tex. 2016) (citing cases)." Pirani v. Baharia (In re Pirani), 579 B.R. 396, 406 (Bankr. E.D. Tex. 2017).* All of these elements are satisfied and conclusively demonstrated in this case's summary judgment record. Tate knowingly reported to the IRS that he transferred $1,550,000 to Debtor as a "capital contribution." He then received the benefit of a $407,114 income tax refund.[75] Tate's actions were intentional and were informed by (actually, planned with) the advice of two (2) certified public accountants, Pope and Pulliam. Tate's failure to inform Debtor's bankruptcy counsel of the reason for a delay in filing this case and the resulting "paper transaction" (a failure that continued for months after the petition date) is not a defense - it is an implicit admission of wrongdoing. Under such circumstances it would be unconscionable to allow Tate to now contend the fund used to pay Miken was not contributed as capital to the Debtor's pool of assets and resources. *Davidson v. Davidson*, *947 F.2d 1294, 1297 (5th Cir. 1991)* (debtor

---

[74] App. 1:23-24 (Tate Depo. Pg. 41, Ln. 18 to Pg. 42, Ln. 13).
[75] App. 2:466-468 (Exhibit 18) App. 1:90 (Pope Depo. Pg. 47, Lns. 18-24).

was estopped to claim in bankruptcy case that payments previously reported to IRS as alimony were, instead, property settlement payments).

### 3. *For the benefit of a creditor, and on account of an antecedent debt.*

The term "creditor" means, among other things, an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." *11 U.S.C. §101(10)*. A "claim" includes the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *11 U.S.C. §101(5)*. It should be undisputed that on December 30, 2016, Miken was a "creditor." Exhibit "4" is the Debtor's note payable ledger regarding the debt owed to Miken.[76] Immediately before the $1,550,000 payment, Debtor owed Miken $1,612,771.07.[77] On the day following the payment, Miken was owed $62,771.[78] The transfer was for the benefit of a creditor and it was on account of an antecedent debt.

### 4. *The transfer was made when the debtor was "insolvent."*

Pope testified that, in his opinion, Debtor did not have any value over and above its debts.[79] The record clearly shows Debtor was not paying its debts as they came due and even after taking into consideration the $1,550,000 recorded on Debtor's books as a capital contribution, it had a negative net worth on December 31, 2016 of ($1,403,817.76).[80]

### 5. *The transfer was made to an "insider" within one year of the petition date.*

Miken denies it is an insider of Debtor. (Miken's Answer to Complaint, ¶57 (Doc. 11)). The reach-back period for preferential transfers to insiders under *11 U.S.C. §547(b)(4)(B)* is (1) year

---

[76] App. 1:35-36 (Tate Depo., Pg. 64, Ln. 6 to Pg. 65, Ln. 13).
[77] App. 1:35 (Tate Depo. Pg. 64, Lns. 12-17).
[78] App. 1:112 (Exhibit 4); App. 1:38 (Tate Depo. Pg. 68, Lns. 10-20).
[79] App. 1:92-93 (Pope Depo. Pg. 50, Ln. 23 to Pg. 51, Ln. 1).
[80] App. 2:318 (Exhibit 9, pg. 3); App. 1:33 (Tate Depo. Pg. 61, Ln. 13 to Pg. 62, Ln. 19).

before the petition date. The summary judgment evidence is that Miken is a statutory insider of Debtor under *§101(31)(B)*, and a "non-statutory" insider.

First, "the term 'insider' includes … (B) if the debtor is a corporation [a] – (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor…." Tate owned 90% of the Debtor on December 30, 2016. He owned 100% of the Debtor on the following day.[81] Tate also owned 100% of Miken both before and after the December 30th transactions. Tate was the president and director of Miken. Tate was also the president and a director of Debtor. An "affiliate," and an "insider of an affiliate" are also included in the definition of an insider. *§101(31)(E)*. Miken is an "affiliate" of Debtor (100% of its stock is owned by the same person ("entity") who owns and controls Debtor) and is, therefore, a "statutory insider." *11 U.S.C. §101(2)(B); Official Employment Related Issues Committee of Enron Corp. v. Arnold, 2005 Bankr. LEXIS 3621, Pg. 99 (Bankr. S.D. Tex. 2005,); In re Missionary Baptist Foundation, Inc., 712 F.2d 206, 211 (5th Cir. 1983).*

Second, Miken also qualifies as a "non-statutory insider" of Debtor. *U.S. Bank N.A. v. Vill.at Lakeridge, LLC, 138 S. Ct. 960, 200 L. Ed. 2d 218 (2018).* Because the §101(31) definition of an insider is nonexclusive, it is generally understood to include any person whose close relationship with the debtor subjects any transactions made between the debtor and that entity to heavy scrutiny. *In re Fabricators, Inc., 926 F.2d 1458, 1465 (5th Cir. 1991).* A formal relationship between the debtor and the alleged insider is persuasive, but not a necessary factor. In this instance, control is determinative. *Id. at 1465.* Tate controlled Debtor, and he controlled Miken.

### 6.   *The enabling and beneficial transfer to Miken.*

The trustee must also prove the creditor received more than it would have recovered if the case were a chapter 7 liquidation case, the transfer had not been made, and the creditor received payment of the debt to the extent provided by the provisions of the Code. *Karafsur v. Scurlock,*

---

[81] App. 1:134 (Exhibit 23, Stock Purchase Agreement between Tate and Pope).

*Permian Corp. (In re El Paso Refinery, LP), 171 F.3d 249, 253-54 (5th Cir. 1999)* ("if the unsecured creditor received more than he would have if the payments had been retained by the estate and then distributed to all the unsecured creditors after paying the secured creditors in a bankruptcy proceeding, the unsecured creditor impermissibly received a greater percentage by preference."). Miken was a general unsecured creditor. It had no collateral. If the net result of the analysis is that the distribution to all general unsecured creditors in this case would be less than 100%, then <u>any</u> payment "on account" to Miken as an unsecured creditor during the preference period enables it to receive more than it would have received in liquidation had the payment not been made. *T.B. Westex Foods, Inc. v. FDIC (In re T.B. Westex Foods, Inc.), 950 F.2d 1187, 1192 (5th Cir. 1992)* (unsecured creditors' claim against Debtor will rarely be worth 100 cents on the dollar). Debtor's Schedules evidence the fact that Miken received more on account of the $1,550,000 than it would have received if the fund had been retained by the estate and distributed under the Code.[82]

       7.    <u>*The Trustee's cause of action under UFTA §24.006(b).*</u>

The five (5) elements of a UFTA §24.006(b) claim are proven by the record and the summary judgment evidence described in (B)(1) to (6) above. *Osadon v. C&N Renovation, Inc., 2018 Tex. App. LEXIS 3319, pg. 16 (Tex. App. – Dallas, 2018).*

**C.    Mike Tate also received avoidable preferential transfers.**

A guarantor of the debtor's debts is also a creditor under the Code. Guarantors hold contingent claims against the debtor that become fixed when the guarantor pays the creditor whose claim was guaranteed. Consequently, assuming all other elements of a preference exist, payments by a debtor directly to the obligee of a guaranteed obligation, may be avoidable as transfers "to the creditor/guarantor" to whose "benefit" the transfers inure. In this fashion, *§547(b)(1)* reaches transfers "*to*" a creditor and "*for the benefit of*" a creditor. The logic is straightforward – the

guarantor's obligation was reduced by the amount of the transfer made to the creditor/obligee. For example, in *T.B. Westex Foods, Inc. v. FDIC, 950 F.2d 1187, 1195 (5th Cir, 1992),* payments made by the debtor (Westex) to a bank in satisfaction to a debt owed by the debtor and guaranteed by an insider of the debtor were recoverable as preferences within the insider lookback period because the payments benefited the insider/creditor/guarantor.

Tate individually guaranteed Debtor's debts to Chase Bank.[83] Miken guaranteed the same debt.[84] Tate and Miken, both of whom are insiders, benefited from all payments made by Debtor to Chase Bank during the critical preference period. Those payments are evidenced by Exhibit 35, (App. 1:229) and totaled $94,537.37. All of the suspect payments were made during that critical period of time between Tate's decision to delay Debtor's bankruptcy and the petition date. In each instance, it is clear that the payments made to Chase Bank came either from Debtor's account at Austin Bank, or its checking account at Chase Bank.[85] All of the payments were made for the benefit of Tate and Miken. The summary judgment record on all of the other essential elements under *§547(b)* and *UFTA §24.006(b)* discussed in (B)(1) to (7) above proves the Trustee's claims.

Tate also guaranteed all of Debtor's obligations to Austin Bank. Within one (1) year prior to the Petition Date, Debtor made $70,777.01 in payments to Austin Bank. Evidence of those payments includes Exhibit 36 (App. 1:247) and, in each instance, the payment came from the Debtor's account at Austin Bank. These, too, are avoidable under *§547(b)* and *UFTA §24.006(b).*

**D.     If the $1,550,000 transfer to Miken is not avoidable as a preference, then the "transfer" of Debtor's tax attributes and losses to Tate are avoidable under §548.**

If, as Miken suggests, the $1,550,000 paid to it was not paid with property of the Debtor but was, in fact, only a "paper transaction," then the entire scheme was a fraud on a creditor – the IRS.

---

[82]  App. 1:188 (Exhibit 24); see also App. 2:318 (Exhibit 9).
[83]  App. 1:51-54 (Tate Depo. Pg. 106, Ln. 16 to Pg. 109, Ln. 5); App. 1:54 (Tate Depo. Pg. 109, Ln. 6 to Pg. 110, Ln. 15); App. 1:186 (Exhibit 24, Schedules).
[84]  App. 1:54 (Tate Depo. Pg. 109, Lns. 1-3); App. 1:186 (Exhibit 24, Schedules).
[85]  App. 1:229 (Exhibit 35).

In its most favorable light, it was a transfer of Debtor's valuable tax attributes to Tate for "less than reasonably equivalent value." In that circumstance, the transfer of those tax attributes are avoidable under §548. To avoid a transfer under §548(a)(1)(A), the trustee must prove: (1) a transfer of an interest in debtor's property occurred; (2) the transfer was made with actual intent to hinder, delay or defraud any entity to which the Debtor was indebted at the time; and (3) the transfer occurred within two (2) years of the date of the filing of the bankruptcy petition. To establish a constructively fraudulent transfer under §548(a)(1)(B), the trustee must show (1) the debtor transferred an interest in property; (2) the transfer of that interest occurred within two (2) years prior to the filing of a bankruptcy petition; (3) the debtor was insolvent on the date of the transfer or became insolvent as a result thereof; and (4) the debtor received less than reasonably equivalent value in exchange for the transfer.

The Trustee believes the summary judgment evidence supports a finding on all elements of the Trustee's claims under §548. Tate increased his stockholder's basis in the stock of Debtor by making the $1,550,000.00 capital contribution to the corporation. If no such contribution was actually made then Tate's act of reporting otherwise to the IRS and his failure to disclose the transaction in the Debtor's Statement of Financial Affairs suggest an intent to defraud. Net operating loss carry forwards attributable to a debtor are property of the estate and belong to the debtor's estate. *In re Prudential Lines, Inc. 928 F.2d 565 (2nd Cir. 1991); 11 U.S.C. §346(i)(1), (3).* Clearly, the tax attributes of a debtor pass to the bankruptcy estate and therefore, would be property of the estate.

In this instance, the value of the property obtained by Tate is reasonably measured by the benefit Tate received from offsetting any inappropriately utilized net operating losses on a carryback basis. That value was $407,114.[86] Even a finding under §548(a)(1)(A) is not necessary for the

---

[86] App. 2:466 (Exhibit 18); App. 1:90 (Pope Depo. Pg. 47, Lns. 18 to 24). Pope testified that Tate's total loss carryback in

Trustee to prevail on his claim because, clearly, if Tate did not actually contribute $1,550,000.00 in capital to the Debtor, then he received the benefit of the valuable net operating losses at a time when the Debtor was insolvent and for less than "reasonably equivalent value." See also *In re Majestics Star Casino, 716 F.3d 736 (3rd Cir. 2013); Seagal v. Rochelle 382 U.S. 375, 380-81, 86 S.Ct. 511, 15 L. Ed 2d 428 (1966).*

### E.   The pre-petition transfers to Tate totaling $21,917 are also avoidable under §548.

The evidence conclusively establishes the fact that Debtor made distributions to Tate in the year prior to the petition date. On January 10, 2017, Debtor transferred $5,000.00 to Tate and on February 13, 2017, it transferred $16,917.00. None of the payments were disclosed in the Statement of Financial Affairs.[87] Those distributions are avoidable under §548(a)(1)(B), because (1) each distribution was of an interest in debtor's property; (2) occurred within two (2) years if the filing of a bankruptcy petition; (3) made when the debtor was insolvent; and (4) the debtor received less than reasonably equivalent value in exchange. Those distributions, like so many of Debtor's important transactions, were not disclosed by Debtor.

### F.   There was no contemporaneous exchange for new value within the meaning of §547(c)(1).

Miken alleges the payment of $1,550,000.00 is not a preference because the transfer was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."[88] It is a §547(c)(1) defense. Tate similarly invokes (without reference

---

[87] App. 1:118, 1:126 (Exhibit 20, Questions 4 and 30); App. 1:254 (Exhibit 37); App. 1:59 (Tate Depo. Pg. 115, Lns. 2-25).

the Application for Tentative Refund (Exhibit 14) was $2,034,940, of which a portion was attributable to losses by Miken. App. 1:91 (Pope Depo. Pg. 48, Lns 20-24). For purposes of this motion the Trustee does not believe it is important to determine the precise amount of the benefit to Tate, although it is clear from the summary judgment record that at least 65% of the refund ($1,550,000/$2,304,940) is directly related to Tate's increased shareholder basis in Debtor.

[88] Miken's Answer, ¶56 (Doc. 11).

to the Code) the same defense.[89] The Trustee will first address the defense as it is claimed by Miken, then turn to Tate.

>    *1.    The contemporaneous new value defense.*

To establish a contemporaneous new value defense, a defendant is required to demonstrate "intent, contemporaneousness, and new value." *Southmark Corp. v. Schulte, Roth and Zadel (In re Southmark Corp), 2000 U.S. App. LEXIS 41279 at \*3 (5th Cir. 2000)*(unpublished). The defendant must prove: (1) the transfer was for new value given to the debtor; (2) the parties intended the new value and the reciprocal transfer by the debtor to be a contemporaneous exchange; and (3) the exchange was in fact substantially contemporaneous. *Campbell v. Hanover Ins. Co. (In re ESA Envtl. Specialists) 709 F.3d 388, 398 (4th Cir. 2013); In re Loggins, 513 B.R. at 711.* The defense "is grounded in the principle that the transferred new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors." *In re Loggins, 513 B.R. at 711.* A contemporaneous exchange of new value that meets all required elements of the defense is protected from avoidance because it caused "no net economic harm to the bankruptcy estate." *Id.*

>    *2.    Miken cannot meet its burden to prove essential elements to the contemporaneous exchange of new value defense.*

The summary judgment evidence, including the testimonies of Tate and Pope, is that multiple transactions and exchanges occurred on and before December 30, 2016. The evidence is illustrated by this diagram:

---

[89] Tate Amended Answer ¶69, Pg. 7 (Doc 20).



Diagram 2

The first part of Exchange #1 was the accumulated debt of Debtor and the corresponding claim of Miken. The credit extended to Debtor (Part #1A) arose over three and one-half (3½) years. Part #1B of the exchange (the payment) is what the Trustee contends was an avoidable transfer on December 30, 2016. As a matter of law, the payment (Part #1B) was not "substantially contemporaneous" with the accrued debt (Part #1A). There is some flexibility in determining whether an exchange is "substantially contemporaneous" within the meaning of *§547(c)(1)(B)* and the inquiry is necessarily fact intensive (*Pine Top Ins. Co. v. Bank of America Nat'l Trust & Sav. Ass'n, 969 F.2d 321, 328 (7th Cir. 1992);* but, no facts in this case support a conclusion that a one-time payment of an accumulated 3 ½ year old debt falls within any acceptable range of contemporaneity. Miken must, in order to succeed with this defense, stretch the boundaries of the "exchange" and disregard the Defendants' repeated characterizations of the transactions when reporting to the IRS. Miken must also unravel two (2) other substantive exchanges, each of which were contemporaneous in their respective contexts. Diagram 2 thus illustrates Miken's dilemma.

Exchange #2 is the loan and distribution of $1,550,000 to Tate (individually) and his corresponding promise/commitment to repay the loan to Miken. Part #2A was the advance by Miken to Tate. By the time the company filed its 2016 income tax return, a part of the loan was offset by a reported $600,000 dividend from Miken to Tate.[90] Part #2B, Tate's obligation to repay the loan to Miken, was then carried on Miken's books as a receivable.[91] To satisfy the burden of proving a contemporaneous exchange, Miken must prove that both parts of Exchange #2 did not occur – they were a ruse, gimmick, or mere "paper transaction" intended only to cause Tate to recover a substantial income tax refund. Miken and its principal agent/officer, Tate, are estopped on this point. But, Miken's problem with the facts does not end there.

Exchange #3 was Tate's capital contribution to Debtor (Part #3A in Diagram 2), and the correspondingly increased "stockholder's basis" received by Tate (Part #3B in Diagram 2). The contribution and increased stock basis were each reported as such to the IRS.[92] This, too, must be disregarded in order to support Miken's argument that *it* advanced new money (directly or indirectly) to Debtor in order for Debtor to make a contemporaneous payment to Miken. Put simply, Miken urges the Court to disregard the multiple transactions that occurred on and before December 30, 2016 and to, instead, collapse all of the facts into a single exchange-event between itself and Debtor. Even if Miken and Tate – for his part – were not equitably estopped to make such a claim, the summary judgment evidence is that Miken, Tate and Debtor did *not* intend a single contemporaneous exchange. They intended six (6) transactions that formed the necessary components to three (3) separate exchanges (#1, #2, and #3 in Diagram 2), and only two (2) of those exchanges (#2 and #3) were intended to be contemporaneous. Exchange #1 was not contemporaneous in fact, or intended to be so.

---

[90] App. 2:323 (Exhibit 11, pg. 3); App. 1:78-79 (Pope Depo. Pg. 28, Ln. 19 to Pg. 29, Ln. 7).
[91] App. 2:324 (Exhibit 11, pg. 5) App. 2:481 (Exhibit 43, Pg. 1); App.1:79-81 (Pope Depo. Pg. 29, Ln. 4 to Pg. 31, (Ln. 13).
[92] App. 2:388, 392 (Exhibit 13); App. 1:31 (Tate Depo. Pg. 57, Lns. 14-25).

Second, to qualify for the contemporaneous defense, new value must have been given by Miken *to* Debtor. *11 U.S.C. §547(c)(1)(A)*. It was not. Miken transferred $1,550,000 to Tate, not to Debtor. Although Miken can trace the source of the funds used to pay its claim against Debtor, tracing is not a substitute or stand-in for the statutory requirement that new value be exchanged between the creditor and the debtor. "New value" is defined in *§547(a)(2)*. An extension of credit by the defendant (Miken) to a third-party (Tate) does not fall within the definition. *See, e.g., In re Chase & Sanborn Corp., 904 F.2d 588, 595-96 (11th Cir. 1990)*.

Finally, Miken did not have any collateral to secure its claim against Debtor. It was purely an unsecured loan.[93] Tate did not even guarantee its payment[94] and the facts in this case do not fit neatly (or otherwise) within those of *Gulf Oil Corp. v. Fuel Oil Supply & Terminal Lane, Inc. (In re Fuel Oil Supply and Terminal Lane, Inc.) 837 F.2d 224, 228 (5th Cir. 1988)* (where §547(c)(1) "new value" to the debtor was provided by a third-party, a bank that released collateral securing a letter of credit). In *Fuel Oil Supply*, the Fifth Circuit clearly stated that its ruling would be different if the paid creditor had been unsecured. *837 F.2d at 230-31*.

> *3.* *Essential elements to the contemporaneous exchange of new value defense cannot be satisfied by Tate or Miken as creditor/guarantor beneficiaries of payments to banks.*

The Trustee's claims against Tate and Miken as creditor/guarantors under §547(b) arise from the series of payments made by the Debtor to Austin Bank and Chase Bank. Each defendant pleads the equivalent of §547(c)(1) as a defense to those claims,[95] but when asked in written discovery to describe all contemporaneous new value given by him, Tate answered "Defendant has paid debts which would otherwise be owed by the Debtor."[96]

---

[93] App. 1:39 (Tate Depo. Pg. 69, Lns. 19-23)
[94] App. 1:39-40 (Tate Depo. Pg. 69, Ln. 24 to Pg. 70, Ln. 2)
[95] Tate's Answer ¶69, Pg. 7 (Doc. 20).
[96] App. 1:283 (Exhibit 48, Answer to Interrogatory No. 14).

The preferential transfers included payments to Chase Bank[97] and Austin Bank[98]. However,

other than a broad conclusory statement in response to an Interrogatory, the Defendants produced no

evidence in discovery that suggests contemporaneous new value was exchanged with the Debtor at

the time each of the Debtor's multiple payments to Chase Bank and Austin Bank were paid.[99]

**G.    Tate is not an "transferee" within the meaning of §550(b) for purposes of the Trustee's claims against him under §547(b) and §548.**

Tate contends he "acted in good faith and/or for fair value,"[100] invoking §550(b) of the Code.

There is no genuine dispute that Tate was an initial transferee in the sense that he received the

benefit of the Debtor's multiple payments to Debtor's creditors for debts and obligations guaranteed

by Tate. He, of course, also received the two (2) distributions from Debtor described in Exhibit 37.

(App. 1:254). Because Tate received those distributions and because he was also a

"creditor/guarantor" of Debtor, Tate is an initial transferee under §550(a)(1) of the Code, but that

does not mean he is entitled to a §550(b)(1) defense. Initial transferees are not entitled to a §550(b)

defense. *Morton v. Kievit (In re Vallecito Gas, LLC), 461 B.R. 358, 412 (Bankr. N.D. Tex*

*2011)(citing In re Criswell, 102 F.3d 1411 (5th Cir. 1997)); Richardson v. IRS (In re Anton Noll,*

*Inc.), 277 B.R. 875, 878 (B.A.P. 1st Cir. 2002).*

**H.    The "subsequent new value" defense, where applicable, is limited to the extent of new value given by a defendant.**

*11 U.S.C. §547(c)(4)* states a trustee cannot avoid a transfer under §547 to "the extent" the

transferee gave "new value to or for the benefit of the debtor." *11 U.S.C. §547(c)(4)*. The new value

must be given on an unsecured basis and after the transferee's receipt of an otherwise preferential

transfer. *In re Prescott, 805 F.2d 719, 731-732 (7th Cir. 1986); In re Loggins, 513 B.R. 713*. In this

---

[97] App. 1:229 (Exhibit 35).
[98] App. 1:247 (Exhibit 36).
[99] The Trustee thinks Tate's invocation of §547(c)(1) conflates that defense with the entirely different "subsequent new value" of §547(c)(4). The subsequent new value defense is addressed in Section H.
[100] Tate Amended Answer ¶70, Page 7 (Doc. 20). Miken did not raise a §550(b) defense.

fashion, a creditor that received a preference may offset against the preference claim any subsequent unsecured credit extended to the debtor. Miken pleads §547(c)(4) as an affirmative defense. The summary judgment evidence includes a record of ten (10) subsequent transfers of funds from Miken to Debtor, each in the form of checks or inter-bank transfers out of Miken's account at Austin Bank. The total new value is $78,036.78. The net preference owed by Miken (before taking into consideration Miken's liability as a guarantor/creditor of the JP Morgan Chase Bank) is $1,471,963.22. [101]

Tate also pleads a subsequent new value defense.[102] Importantly, Tate is not listed as a creditor in Debtor's Schedule F – which was prepared by him[103] – and Tate did not file a proof of claim in the case. As a matter of law, he did not provide subsequent new value.

### I.        Multiple claimed defenses arising from Debtor's status as a Subchapter S corporation are not applicable.

The Defendants separately plead multiple common law affirmative defenses including *in pari delicto*, unclean hands, unjust enrichment, release, waiver, ratification, accord and satisfaction, estoppel and judicial estoppel. The defenses are stated differently by each of the Defendants, but by Defendants' own characterization they all generally fit within a contention that the Trustee lacks standing because he seeks to recover on claims under §548 for tax benefits or attributes that were not and could not be owned by the Debtor or this bankruptcy estate.[104] In response to the Trustee's written interrogatories under *Bankruptcy Rule 7033*, the Defendants provided basically identical responses. They were asked to describe "with as much specificity and detail as possible, all of the facts, information, records and documentation supporting, relating to or concerning" those alleged defenses. The Answers generally follow the text of Tate's answer to Interrogatory No. 8:

---

[101] App. 1:262 (Exhibit 47). A calculation of the net preference is on the last page of Exhibit 47 at App. 1:273.
[102] Tate's Amended Answer ¶76.
[103] App. 1:163 (Exhibit 24, Schedules).
[104] Tate's Amended Answer, ¶¶67, 68 and 70 (Doc. 20); Miken's Answer, ¶¶52, 53 and 54 (Doc. 11).

"ANSWER: The claims in this case seek to recover for alleged damages which did not accrue to the bankruptcy or the creditors of the estate (sic) and for which the Plaintiff has no standing because they seek to recover for tax benefits which are not owned by the estate and thus not owned by the Trustee. Further, the tax benefits which were exercised, not by the estate, but by defendant, were used in their entirety to pay creditors of the estate, thus benefiting the estate and its creditors. Had defendant not legitimately exercised those tax benefits, the estate and all creditors would have suffered a substantial net detriment that has resulted from the transactions sued upon...."[105]

When Tate (speaking individually and as the representative of Miken), testified in his deposition about the claimed *in peri delicto* defense, he deferred any answer to the question to his attorneys. When asked what the Trustee had done wrong, his answer was that the Trustee requested too much money from him and Miken.[106] When asked what facts or circumstances supported his defense that the Trustee released him or Miken, he said he was not aware of any.[107] He also was not aware of any facts supporting the defenses of waiver,[108] ratification,[109] accord and satisfaction,[110] estoppel,[111] recoupment, or offset.[112]

### J.    Limitations.

Miken alleged that "some or all of the alleged claims may be barred by any applicable state or federal statute of limitations and/or latches."[113] When asked to elaborate on the facts supporting a limitations defense in written discovery, Miken simply stated "this is a potential legal defense which may be applicable as facts are developed."[114] 11 U.S.C. §546(a) establishes a statute of limitations for avoidance actions brought under Sections 544, 547, 548 and other provisions of the Code. Debtor filed its voluntary petition on August 1, 2017. The Trustee filed the complaint in this adversary proceeding on September 19, 2018. As a matter of law, the Trustee's claims were brought within the

---

[105] App. 1:218 (Tate's Answer to Interrogatory No. 8); App. 1:299 (Exhibit 49, Miken Interrogatories. 8 and 9).
[106] App. 1:60-61 (Tate Depo. Pg. 116, Ln. 1 - Pg. 117, Ln. 8).
[107] App. 1:61 (Tate Depo. Pg. 117, Lns. 17-21).
[108] App. 1:61 (Tate Depo. Pg. 117, Lns. 22-24).
[109] App. 1:61 (Tate Depo. Pg. 117, Ln. 25 to Pg. 118, Ln. 2).
[110] App. 1:62 (Tate Depo. Pg. 118, Ln. 3 to Pg. 119, Ln. 8).
[111] App. 1:63 (Tate Depo. Pg. 119, Lns. 9-21).
[112] App. 1:63 (Tate Depo. Pg. 119, Ln. 22 to Pg. 120, Ln. 7).
[113] Miken Answer ¶55 (Doc. 11).

applicable limitations period.

### K.     Damages.

11 U.S.C. §550 permits a Trustee, after avoidance of a transfer under any of its avoiding powers, to recover the property transferred or its value. The value of each transfer is recoverable from the initial transferees for whose benefit the transfers were made. In every instance relevant to the Trustee's avoidance actions under §547, the "value" of the property transferred is measured in dollars. Miken received a net preference of $1,471,963.22.[115] Tate and Miken, jointly and severally, received $94,537.37 as the benefited guarantors of payments made by Debtor to Chase Bank[116]. Tate received $70,777.01 as the benefited guarantor of the transfers made by the Debtor to Austin Bank.[117] The two (2) distributions to Tate which are avoidable under §548[118] totaled $21,917.00. As for the Trustee's alternative claim that the "paper transaction" was fraudulent, $407,411 (Tate's income tax refund) is the Trustee's measure of damages. Awards of interest on avoidance actions will usually be from the date of the demands made. In this instance, the Trustee made its written demand on June 12, 2018.[119] This court ordinarily applies the federal judgment rate.

WHEREFORE PREMISES CONSIDERED, Stephen Zayler, Chapter 7 Trustee respectfully requests that summary judgment be granted on his behalf in all respects and for such other and further relief to which he may be justly entitled to receive.

---

[114] App. 1:299 (Exhibit 49, Answer to Interrogatory No. 10).
[115] App. 1:273 (Exhibit 47).
[116] App. 1:229 (Exhibit 35).
[117] App. 1:247 (Exhibit 36).
[118] App. 1:254; (Exhibit 37).
[119] App. 1:258; (Exhibit 46); App. 1:6 (Ritcheson Affidavit ¶5).

Respectfully submitted,

RITCHESON, LAUFFER & VINCENT, P.C.
821 ESE Loop 323, Suite 530
Tyler, Texas  75701
(903) 535-2900
(903) 533-8646  (Facsimile)

*/s/ Scott A. Ritcheson*

By:_____
   Scott A. Ritcheson
   State Bar No. 16942500

## CERTIFICATE OF SERVICE

I certify that a copy of this document was served electronically or 1st class mail to the following:

Joshua Searcy
P.O. Box 3929
Longview, Texas 75606
Email: joshsearcy@jrsearcylaw.com

Patrick Kelley
112 E. Line Street, Ste. 203
Tyler, Texas 75703
Phone: 903/630-5151
Email: Pat@patkelleylaw.com

on this the 14th day of November, 2019.

*/s/ Scott A. Ritcheson*

_____

Scott A. Ritcheson