**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **IN RE:** | * | |
| | * | |
| **SLAMDUNK ENTERPRISES** | * | **CASE NO.  17-60566** |
| **D/B/A SIGNAL WELL SERVICE** | * | **CHAPTER 7** |
| | * | |
| **DEBTOR** | * | |
| | * | |
| | * | |
| **STEPHEN ZAYLER** | * | |
| **CHAPTER 7 TRUSTEE** | * | |
| **PLAINTIFF** | * | **ADVERSARY PROCEEDING** |
| | * | **NO. 18-06006** |
| **vs.** | * | |
| | * | |
| **MIKEN OIL, INC. AND** | * | |
| **LARRY MIKE TATE** | * | |
| **DEFENDANTS** | * | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Stephen Zayler, Chapter 7 Trustee ("Trustee" or "Plaintiff") filing this his

Response to Defendants' Motion for Summary Judgment, (Doc 34) filed November 14, 2019

("Defendants' MSJ").

# Table of Contents

I. SUMMARY OF RESPONSE..................................................................................... 1

II. RESPONSE TO STATEMENT OF ISSUES. ............................................................. 1

III. OBJECTIONS TO DEFENDANTS' SUMMARY JUDGMENT EVIDENCE ............................. 3

    1.    Objection to Statements Contained in Tate Affidavit. ............................. 3

    2.    Objection(s) to Portions of Defendants' Exhibit P........................................ 4

    3.    Objection(s) to Defendants' Exhibit T. ....................................................... 5

    4.    Objection(s) to Defendants' Exhibit X.......................................................... 5

    5.    Objection(s) to Defendants' Exhibit Z. ....................................................... 5

IV. TRUSTEE'S SUMMARY JUDGMENT EVIDENCE .................................................... 5

V. TRUSTEE'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ................ 6

  A.    Defendants' Statement of Undisputed Material Facts...................................... 6

  B.    Defendants' Statement About How Tate Used His Tax Refund is Disputed.................. 8

  C.    The Accumulated Receivable Owed by Debtor Was, and Remained, Miken's Property.9

  D.    The Other Avoidable Transfers to Tate and Miken Are Not Disputed in the Defendants' Statement of Facts................................................................................. 10

VI. ARGUMENT AND AUTHORITIES .......................................................................... 12

  A.    The December 30, 2016, transfer by Debtor of $1,550,000 to Miken is a preferential transfer under 11 U.S.C. §547(b), and/or TEX. BUS. & COM. CODE §24.006(b). ............. 12

  B.    If the $1,550,000 payment to Miken is not avoidable as a preference, it was a fraudulent boost to Tate's stockholder's basis in the stock of Debtor and transfer of Debtor's valuable "losses," making it avoidable under 11 U.S.C. §548, and/or TEX. BUS. & COM. CODE §24.005(a)(1) or (2), or §24.006(a)....................................................... 17

  C.    The $1,550,000 preferential payment was not a contemporaneous exchange for new value under §547(c)(1) of the Code. ............................................................... 20

  D.    Defendants provided limited subsequent new value after preferential payments and within the meaning of §547(c)(4) of the Code........................................................ 22

  E.    The Trustee is entitled to recover the property made the subject of the avoidable transfers, or that property's value. ............................................................... 25

# Index of Authorities

**CASES**

*Affiliated Bank/Morton Grove v. Hartford Accident & Indem. Co., 1992 WL 91761, at \*6 (N.D. Ill. Apr. 22, 1996)* ................................................................................................. 18

*Bellard v. Gautreaux, 675 F.3d 454, 460 (5th Cir. 2012)* ............................................. 4

*Bergquist v. Anderson-Greenwood Aviation (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1284 (8th Cir. 1988)* ................................................................................... 25

*Brown v. Commissioner, 706 F.2d 755 (6th Cir. 1983)* ................................................ 20

*Clark v. Frank B. Hall & Co., 179 B.R. 669, 678 (Bankr. D. Colo. 1995)* ................... 25

*Contractors Source, Inc. v. Amegy Bank N.A., 462 S.W. 3d 128, 133 (Tex. App. Houston [1st Dist.] 2015)* ................................................................................................ 17

*Estate of Leavitt v. Commissioner, 90 T.C. 206, 210 (T.C. 1988)* ............................... 20

*First Texas Sav. Ass'n v. Reliance Ins. Co., 950 F.2d 1171, 1177 (5th Cir. 1992)* ...... 18

*Gitlitz v. Commissioner 531 U.S. 206, 209, 121 S.Ct. 701, 148 L.Ed. 2d 613 (2001)* ................. 21

*In re Bellanca Aircraft Corp., 850 F.2d 1275, 1284 (8th Cir. 1988)* .......................... 24

*In re Chase & Sanborn Corp., 904 F.2d 588, 597 (11th Cir. 1990)* ............................ 26

*In re Davidson, 947 F.2d 1294 (5th Cir. 1991)* ........................................................... 14

*In re Ford, 98 B.R. 669, 683 (Bankr. D.Vt. 1989)* ...................................................... 25

*In re Jet Florida System, Inc., 59 B.R. 886, 890 (Bankr. S.D.Fla. 1986)* .................... 25

*In re Loggins, 513 B.R. 682, 699 (Bankr. E.D. Tex. 2014)* ......................................... 14

*In re Loggins, 513 B.R. at 711* .................................................................................... 29

*Official Bondholders' Committee v. Eastern Utilities Assoc., 147 B.R. 634, 645 (Bankr. N.H. 1992)* ............................................................................................................... 25

*Robinson v. United States 335 F.3d 1365, 1366 (Fed. Cir. 2003)* ............................... 20

*Taproot Admin. Srvs. v. Comm'r, 133 T.C. 202, 204 (Tax Court 2009)* ..................... 21

*U.S. Bank, N.A. v. Indian Harbor Ins. Co., 68 F. Supp. (D. Minn. 2014)* ................... 18

*United States v. Cordell, 912 F.2d 769, 773-74 (5th Cir. 1990)* ................................. 18

Statutes

11 U.S.C. §541(a) ......................................................................................... 22

11 U.S.C. §547(b) ........................................................................................... 2

11 U.S.C. §547(c)(4) ..................................................................................... 19

11 U.S.C. §548 ................................................................................................ 2

26 U.S.C. §1363(a) ....................................................................................... 21

26 U.S.C. §1366(d) ....................................................................................... 19

26 U.S.C. §1366(d)(1) ................................................................................... 20

FED R. CIV. P. 56(c)(4) ................................................................................... 3

TEX. BUS. & COM. CODE §24.005(a)(1) or (2), or §24.006(a) ...................... 2

TEX. BUS. & COM. CODE §24.006(b) ............................................................. 2

TEX. BUS. & COM. CODE §4A.101 ............................................................... 16

TEX. BUS. & COMM. CODE §4A.104 ............................................................ 17

**TREATISES**
WHITE AND SUMMERS, *THE UNIFORM COMMERCIAL CODE* pg. 947, §20-1 (6th Ed. 2010)............ 17

## I. SUMMARY OF RESPONSE

Trustee filed this adversary proceeding to avoid a preferential transfer of $1,550,000 to Miken Oil, Inc. ("Miken"). Trustee also seeks to avoid other payments "to" and "for the benefit" of Miken and Debtor's primary shareholder, Larry Mike Tate ("Tate"). The Defendants' "contemporaneous exchange for new value" defense turns on a characterization of multiple transactions and exchanges as a single "contemporaneous" event – a characterization that is completely at odds with what was reported to the Internal Revenue Service. The Defendants' "subsequent new value" defense is limited to the extent new value was actually provided, and the litany of generally plead common law defenses fail on the facts and as a matter of law. If the $1,550,000 payment to Miken is not avoidable as a preference, then the series of transfers and exchanges orchestrated by Tate and Miken were fraudulent and the resulting benefits of the fraud which flowed to Tate in the form of substantial income tax refunds should be paid to the Trustee under §§548 and 550 of the Code.

## II. RESPONSE TO STATEMENT OF ISSUES

Defendants' Motion for Summary Judgment (Doc. 34) ("Defendants' MSJ") argues no genuine issue of material fact exists in connection with four (4) issues which, when applied to the causes of action alleged by Trustee, supposedly defeat the Trustee's claims as a matter of law. The contentions of Defendants are: (1) Debtor had no interest in the property transferred to Defendants; (2) the "tax attributes" of Debtor are owned by shareholders of the Subchapter S corporation and are not (nor would they have been) property of the bankruptcy estate; (3) the "circular" December 30, 2016 transactions were contemporaneous exchanges of equivalent value; and (4) Debtor was not harmed by the December 30, 2016 transactions, and it ultimately benefitted from them.[1] As Defendants' Statement of Issues suggests, the issues presented are either questions of law or mixed

1

questions of law and fact. When Defendants' contentions are overlaid with those of the Trustee (see

the Trustee's "Statement of Issues" in Plaintiff's Motion for Summary Judgment filed November 14,

2019 (Doc. 33) (the "Trustee's MSJ")) in this setting of competing summary judgment motions, the

result is something like this:

1.    ***Trustee's Contention***:  The December 30, 2016, transfer by Debtor of $1,550,000 to Miken is a preferential transfer under 11 U.S.C. §547(b), and/or TEX. BUS. & COM. CODE §24.006(b).

    ***Defendants' Contention***: Debtor had no interest in the $1,550,000 transferred to Miken.

2.    ***Trustee's Contention***: If the $1,550,000 payment to Miken is not avoidable as a preference, it was a fraudulent boost to Tate's stockholder's basis in the stock of Debtor and a transfer of Debtor's interest in its valuable "losses," making it avoidable under 11 U.S.C. §548, and/or TEX. BUS. & COM. CODE §24.005(a)(1) or (2), or §24.006(a). In that event, the Trustee claims the value of the property transferred to Tate for purposes of §550 of the Code was the corresponding tax refund received by Tate.

    ***Defendants' Contention:*** The "tax attributes" of Debtor are owned by shareholders of the Subchapter S corporation and are not (nor would they be) property of the bankruptcy estate.

3.    ***Trustee's Contention***: Payments made by Debtor within a year before the petition date to third-party creditors whose claims were personally guaranteed by Tate and/or Miken, are preferential transfers "for the benefit of" those guarantors under 11 U.S.C. §547(b).

    ***Defendants' Contention:*** None presented in Defendants' MSJ.

4.    ***Trustee's Contention***:  $21,917.00 transferred by Debtor to Tate in the year prior to the petition date are avoidable under 11 U.S.C. §548.

    ***Defendants' Contention:*** None presented in Defendants' MSJ.

5.    ***Trustee's Contention***: The $1,550,000 preferential payment was not a contemporaneous exchange for new value under §547(c)(1) of the Code.

    ***Defendants' Contention:*** The "circular" December 30, 2016 transactions were contemporaneous exchanges for equivalent value.

6.    ***Trustee's Contention***: Defendants provided limited subsequent new value after preferential payments and within the meaning of §547(c)(4) of the Code.

---

[1] Defendants' MSJ Section III, pgs. 7-8.

> *Defendants' Contention*: Although not included in Defendants' Statement of Issues, some of Defendants' summary judgment evidence suggests the extent of subsequent new value to be offset against Trustee's claim against Miken may need to be adjusted.

7.    ***Trustee's Contention:*** The Trustee is entitled to summary judgment on all of the common law and limitations defenses alleged by the Defendants in their pleadings.

> ***Defendants' Contention:*** None presented in Defendants' MSJ.

8.    ***Trustee's Contention:*** The Trustee is entitled to recover the property made the subject of the avoidable transfers, or that property's value.

> ***Defendants' Contention:*** Debtor was not harmed by the December 30, 2016 transactions, and it ultimately benefitted from them. Thus, there was no damage to Debtor.

### III. OBJECTIONS TO DEFENDANTS' SUMMARY JUDGMENT EVIDENCE

1.    <u>Objection to Statements Contained in Tate Affidavit</u>**.**

FED R. CIV. P. 56(c)(4) specifies that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated." Underlying several of the Trustee's objections to Defendants' summary judgment evidence (in particular, Exhibits T, X and Z) is the failure of Defendants to properly authenticate the exhibits, or to predicate the admissibility of the exhibits by the affidavit of Tate. (Defendants' Exhibit AA, Tate Affidavit). The Tate Affidavit states "I have reviewed the Motion [for Summary Judgment] including the section titled 'II. Statement of Undisputed Material Facts,' and the statements and factual descriptions contained therein are true and correct to the best of my knowledge." (Defendants' Exhibit AA, Tate Affidavit pg. 2). Such a broadly worded single sentence purporting to affirm the truthfulness of twenty-one paragraphs of Defendants' contentions a) is not proper summary judgment evidence, b) is not properly predicated or demonstrated by sufficient facts to establish Tate's personal knowledge as to all those subjects, c) in many instances is hearsay or double hearsay, and d) is conclusory. Many of the statements attempted to be authenticated by this single statement

in the Tate Affidavit are, themselves, conclusory. Therefore, the broadly worded statement by Tate is inadmissible and should be stricken as summary judgment evidence. Evidence proffered by a party in the summary judgment process must be "competent and admissible at trial." *Bellard v. Gautreaux, 675 F.3d 454, 460 (5th Cir. 2012).*

        2.        <u>Objection(s) to Portions of Defendants' Exhibit P.</u>

Exhibit P is the expert report of James Gomillion. Gomillion, a certified public accountant, prepared the first three-pages of Exhibit P as his report. The fourth page of Exhibit P is Gomillion's *curriculum vitae*. The remaining five (5) pages of Exhibit P are not a part Gomillion's report, work-product, analysis or conclusions. Instead, those five (5) pages appear to be what Gomillion described as part of the "information reviewed by him." Gomillion did not state in his report that he based his opinion(s) on those five (5) pages. He only "reviewed them" as "summary information regarding the utilization of previously suspended losses prepared by John Pope, and a letter from Meadows Collier providing preliminary conclusions regarding this and other matters related to the bankruptcy." The "information reviewed" is not admissible in and of itself under Evidence Rule 703. Several predicates are required. First, the information must be in the nature of "facts or data in the case that the expert has been made aware of or personally observed." Those five (5) pages are, themselves, either summaries of another person's review (John C. Pope, for example), or another person's "preliminary conclusions," or a copy of forwarding correspondence. They are not "facts or data." Second, facts and data which may otherwise be inadmissible as evidence may still be the basis on which an expert formulates an opinion, but only if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." No such predicate is included in Exhibit P. Third, the conclusory statements by John Pope on Page 6 of Exhibit P (beginning with the phrase "now, let's assume the following….") are speculative. Pope's statements are hypothetical and do not even rise to the level of inferences. The statements by Pope are only conclusions which are drawn from a hypothetical set of facts. Finally, those five (5) pages are

4

hearsay. In all, neither Evidence Rule 703 nor any other established exception under Rules 803 or 804 permit the admissibility of the last five (5) pages of Exhibit P.

      3.      <u>Objection(s) to Defendants' Exhibit T.</u>

Trustee objects to the admission of Exhibit T because it is not authenticated as a business record, and it appears to be a summary of other information submitted to prove the content thereof. Therefore, it does not comply with Evidence Rule 1006 and no effort is made in the record to establish an exception to Evidence Rule 802's general rule that hearsay is inadmissible.

      4.      <u>Objection(s) to Defendants' Exhibit X.</u>

Trustee objects to the admission of Exhibit X because it is not authenticated as a business record, and it appears to be a summary of other information submitted to prove the content thereof. Therefore, it does not comply with Evidence Rule 1006 and no effort is made in the record to establish an exception to Evidence Rule 802's general rule that hearsay is inadmissible.

      5.      <u>Objection(s) to Defendants' Exhibit Z.</u>

The handwritten notes identified as Exhibit Z are not authenticated and are hearsay. Trustee objects to the admission of Exhibit Z. Moreover, the statements in Exhibit Z are speculative and clearly intended as such with this introductory phrase: "if the $1,550,000.00 Transaction had not Occurred, then: …." By means of that introduction, Exhibit Z could probably be attributed to John Pope, but nothing in the summary judgment evidence would indicate as much or otherwise qualify Mr. Pope as an expert for this purpose.

## IV. TRUSTEE'S SUMMARY JUDGMENT EVIDENCE

This response is based on the pleadings and other materials on file with the Court, including Volume 1 and Volume 2 of the *Appendix to Plaintiff's Motion for Summary Judgment* ("<u>Appendix</u>")[2] filed with Trustee's MSJ on November 14, 2019 (Doc. 33). The Appendix includes

---

[2] References to summary judgment evidence included in the Trustee's Appendix will be cited as "App." followed by the Appendix Volume (1, 2 or 3) and then the relevant page number. For example, App. 2: 393. Volume 2 is filed under seal.

the affidavits of Stephen Zayler (the "Zayler Affidavit") and Scott A. Ritcheson (the "Ritcheson Affidavit"), portions of the deposition testimony of Tate, individually and as corporate representative of Miken, and John C. Pope ("Pope"), the defendants' primary accountant, and exhibits. With this Response, the Trustee also files Volume 3 of Trustee's Appendix. Where appropriate, the Trustee relies on some of the summary judgment evidence submitted by Defendants and filed with Defendants' MSJ.[3]

## V. TRUSTEE'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

A.      Defendants' Statement of Undisputed Material Facts.

1.      Defendants' Statement of Undisputed Material Facts is largely correct, but incomplete in many critical respects. For a more complete Statement of Undisputed Material Facts, the Trustee presents to the Court the facts and summary judgment evidence set forth in the Trustee's MSJ.[4] In the few instances described below in this Section V, the Trustee believes the Defendants' statements of facts are properly disputed by the summary judgment evidence.

2.      In Section 2.4 of Defendants' MSJ it is alleged "Tate is the majority owner of Debtor and Miken." That's not entirely correct. On December 29, 2016, Tate owned ninety percent (90%) of the company's issued and outstanding shares of stock.  John C. Pope ("Pope") owned the remaining ten percent (10%).[5] On that date, Tate and Pope signed a stock purchase agreement[6] under the terms of which Pope agreed to sell his 10% stake in the Debtor to Tate for $100.[7] That sale closed and was effective December 31, 2016.[8] So, as of the Petition Date, Tate owned 100% of Debtor. Tate also

---

All page numbers are sequential, so Volume 2 begins with page number 308 and Volume 3 begins with page number 487.
[3] References to summary judgment evidence included in the Appendix in Support of Defendants' Motion (Doc. 34-1) are cited by reference to the relevant exhibit, followed by the page number (for example, "Defendants' App. Ex. AA, pg. 1").
[4] See, Trustee's MSJ Section IV, pgs. 2-8 (Doc. 33) which are incorporated herein by reference.
[5] App. 1:10-11 (Tate Depo. Pg. 15, Ln. 18 to Pg. 16, Ln. 7).
[6] App. 1:134 (Exhibit 23, Stock Purchase Agreement); App. 1:13 (Tate Depo. Pg. 18, Lns. 12-21).
[7] App. 1:136 (Exhibit 23, Stock Purchase Agreement Pg. 3, Section 1.2).
[8] App. 1:136 (Exhibit 23 Pg. 3, Section 1.3).

owned 100% of the stock of Miken.[9]

3.    In Section 2.6 of Defendants' MSJ it is alleged Debtor's operations "were not generally profitable." (Doc. 34, pg. 3). That statement does not go far enough. Debtor never made a profit. [10] By the end of 2016, Debtor's accumulated losses over its six (6) year history totaled over $2,979,818.[11]

4.    In Section 2.12 of Defendants' MSJ it is alleged that Miken "made a shareholder distribution to Tate in the amount of $1,550,000.00" on December 31, 2016. (Defendants' MSJ, pg. 4). No evidentiary citation is given to support a characterization of the December 31, 2016 transfer by Miken to Tate as a "shareholder distribution." Elsewhere, however, the record makes it clear this transaction was actually a loan by Miken to Tate, its sole shareholder.[12] Months after December 31st, when Miken's income tax return was prepared, a portion ($600,000.00) of the $1,550,000.00 loan by Miken to Tate was recharacterized by those parties as a distribution.[13]

5.    In at least four (4) instances in Defendants' Statement of Undisputed Material Facts the sequence of significant transfers, transactions and exchanges from Miken-to-Tate, Tate-to-Debtor and Debtor-to-Miken are characterized as "circular."[14] The Trustee objects to that reference as a statement of fact. The Trustee also disagrees with the legal conclusion it suggests.

6.    Defendants' contend that the portion of Tate's sizeable income tax refund which resulted from the Debtor's accumulated losses and Tate's December 31, 2016 capital contribution, was $304,981.00. The Trustee does not dispute this stipulation of fact.[15]

---

[9] App. 1:15 (Tate Depo. Pg. 20, Lns. 15-20).

[10] App. 1:35 (Tate Depo. Pg. 64, Ln. 6 to Pg. 66, Ln. 10).

[11] App. 1:88 (Pope Depo. Pg. 43, Lns. 12-22); Defendants' App. Ex. P, pg. 2 top paragraph (Gomillion's Report). The Trustee stated in Trustee's MSJ that Debtor's accumulated losses were over $2,200,000. (Trustee's MSJ, Doc. 33 pg. 3). Gomillion goes further and specifically states the extent of Debtor's losses in his Expert Report attached as Exhibit P to Defendants' MSJ.

[12] App. 1:114-115 (Exhibit 5); App. 1:78-79 (Pope Depo. Pg. 28, Ln. 19 to Pg. 29, Ln. 7).

[13] App. 1:78-79 (Pope Depo. Pg. 28, Ln. 19 to Pg. 29, Ln. 7).

[14] Defendants' MSJ, Sections 2.12, 2.13, 2.14 and 2.15.

[15] The Trustee's MSJ stated the $407,114 refund was paid to Tate based on his carryback of Debtor's substantial losses. (Trustee's MSJ, Doc. Pg. 7, ¶7 and n.52)

B.      Defendants' Statement About How Tate Used His Tax Refund is Disputed.

1.      In Section 2.18 of the Defendants' Statement of Undisputed Material Facts, Defendants contend it is undisputed that "Tate also used the refund to satisfy various other outstanding debts of Debtor including to ETOS, Inc. ($10,803.29), Lafarge North America ($69,812.48), Oil Patch Pipe and Supply, Inc. ($18,956.05), and United Rentals (North America), Inc. ($14,004.00)." (Defendants' MSJ, pg. 5).[16] Even if the Trustee's objections to some of the evidence offered in support of this statement are overruled, the posited facts are not supported by the cited exhibits.

2.      Exhibit T, which purports to be a kind of summary of other records, states "Miken Oil/Tate Pay on Behalf" and "Miken Oil/Mike Tate Paid." No attempt is made to differentiate between which Defendant paid what debt or what amount.

3.      The cancelled checks attached to Exhibits U, V and Y are clearly from Miken, not from Tate as the Defendants contend in ¶2.18 of Defendants' MSJ. Moreover, almost all of those payments were made after the Petition Date and there is no effort by Defendants to trace Tate's receipt of his income tax refunds in 2017 to the payment of these creditors' claims many months (and in some cases, years) later.

4.      The canceled checks attached to Exhibit W are, indeed, from Tate. But those checks evidence payments made by Tate to a creditor of Debtor *after* the Petition Date. There is, again, no effort to demonstrate how the source of these payments can be attributed to the tax refund received by Tate many months or years earlier.

5.      The documents attached as Exhibit X, even if admissible, do not indicate who made the alleged payments to United Rentals.

6.      These are potentially material facts because, in some instances, the alleged payments

---

[16] The Trustee has objected to the admissibility of Exhibits T and X. See, Objections to Evidence above.

may be relevant to a determination of the Defendants' "subsequent new value" defenses.[17]

        C.      <u>The Accumulated Receivable Owed by Debtor Was Miken's Property</u>.

        1.      From the beginning of operations in 2010, Debtor depended on Miken to extend credit and, in some instances, to pay Debtor's bills.[18] Tate did not fund the shortfall with any meaningful investment or capital contribution to Debtor until December 31, 2016. Instead, he directed Miken to extend credit to Debtor and to become Debtor's largest creditor.[19] As a consequence, by the end of 2016 Debtor's accumulated multi-million-dollar losses[20] could not be offset against the shareholder's personal income because no capital of any significance had been contributed by Tate.[21] Immediately prior to December 30, 2016, the unpaid balance of the debt owed by Debtor to Miken was $1,612,771.07.[22] It was unsecured and there was no promissory note. The debt was carried on Debtor's books as a long-term liability (line item 25004 – "N/P Miken Oil")[23], and on Miken's books as a "note receivable."[24] No person other than Tate was involved in Miken's decisions to loan money to Debtor.[25] Although there was no written agreement between Debtor and Miken describing when or how the debt would be repaid to Miken, on December 30, 2016, Tate, Debtor and Miken knew the debt was past due.[26]

        2.      At all times relevant to this adversary proceeding, the unpaid receivable remained Miken's property. It was never transferred or assigned to Tate individually.[27] Thus, when the

---

[17] The Trustee contends that payments made to a creditor by the guarantor of the debtor's obligation are not "new value," and that payments made after the petition date do not qualify for purposes of the §547(c)(1) defense. See Section VI (D)(2) below.

[18] App. 1:35 (Tate Depo. Pg. 64, Ln. 6 to Pg. 66, Ln. 10).

[19] See, e.g., App 2:318; Exhibit 9, Page 3 ("common stock $1,000" was Tate's only capital contribution before the end of 2016.) See also, App. 1:33-34 (Tate Depo. Pg. 61, Ln. 13 to Pg. 62, Ln. 19).

[20] App. 2:393, (Exhibit 13); App. 1:74, 94 (Pope Pg. 21, Lns. 7-21; and Pg. 52, Ln. 21 to Pg. 53, Ln. 7). Exhibit 9 is the year-end balance sheet for Debtor (d/b/a "Signal Well Service") and it shows retained earnings of *minus* $2,330,474.85 through 2015 and net income in 2016 of *minus* $649,342.91.

[21] App. 2:392; (Exhibit 13, Debtor's 2016 Tax Return, "Line 1 Beginning of Year Stock Basis").

[22] App. 1:110-112 (Exhibit 4 – Debtor's Note Payable Ledger to Miken).

[23] App. 2:317, 1:110 (Exhibit 9, Pg. 2 and Exhibit 4, Pg. 1); App. 1:39 (Tate Dep. Pg. 69, Lns. 19-23).

[24] App. 2:343, 2:376 (Exhibit 11, pg. 24; Exhibit 12, Pg. 27); App. 1:86 (Pope Depo. Pg. 41, Lns. 4-17).

[25] App. 1:38 (Tate Depo. Pg. 68, Lns. 5-9).

[26] App. 1:40 (Tate Depo. Pg. 70, Lns. 3-6).

[27] App. 3:493-494 (Tate Depo. Pg. 39, Ln. 4 to Pg. 40, Ln. 8); App. 3: 505-506 (Pope Depo. Pg. 26, Ln. 25 to Pg. 26, Ln.

$1,550,000.00 was paid by Debtor on December 31, 2016, it was paid to Miken. The significance of this fact will be demonstrated in the Argument that follows.

> D.    The Other Avoidable Transfers to Tate and Miken Are Not Disputed in the Defendants' Statement of Facts.

1.    Tate guaranteed the payment of many of Debtor's obligations, including two (2) loans by Austin Bank to Debtor,[28] and two (2) loans by Chase Bank.[29] Miken also guaranteed the loans from Chase Bank. In the ten (10) months between October 2016 and the petition date, payments were made by Debtor to these creditors including twenty-three (23) payments to Chase Bank (a total of $94,537.37)[30] and seven (7) payments to Austin Bank (a total of $70,777.01).[31] Remarkably, Debtor even made distributions to Tate during that period. On January 10, 2017, Debtor transferred $5,000.00 to Tate and on February 13, 2017, it transferred $16,917.00. None of the payments and distributions were disclosed in the Statement of Financial Affairs.[32]

2.    Tate also guaranteed Debtor's obligations to East Texas Oilfield Service,[33] Lafarge North America,[34] Oil Patch Pipe and Supply,[35] United Rentals[36], Western Marketing, Inc.[37], Debtor's state court counsel, Charles H. Clark[38], and Texas Lehigh.[39] Even the ad valorem tax obligations owed by Debtor to Gregg County (which were significant) were within the scope of his personal guaranty of all debt to JPMorgan Chase Bank because the equipment and personal property of the Debtor secured Chase Bank's loans.[40]

---

10).

[28] App. 1:23 (Tate Depo. Pg. 41, Lns. 1-8); App. 1:49 (Pg. 98, Ln. 1 to Pg. 99, Ln. 6); App.1:58 (Pg. 114, Lns. 4-19).
[29] App. 1:221 (Exhibit 34); App. 1:51 (Tate Depo. Pg. 106, Ln. 16 to Pg. 109, Ln. 5); and App. 1:54; (Tate Depo. Pg. 109, Ln. 6 to Pg. 110, Ln. 15).
[30] App. 1:229 (Exhibit 35); App. 1:54-56 (Tate Depo. Pg. 109, Ln. 22 to Pg. 111, Ln.16).
[31] App. 1:247 (Exhibit 36) App. 1:56-57 (Tate Depo. Pg. 111, Ln. 13 to Pg. 112, Ln. 18).
[32] App. 1:118, 126 (Exhibit 20, Questions 4 and 30); App. 1:254 (Exhibit 37); App. 1:59 (Tate Depo. Pg. 115, Lns. 2-25).
[33] App. 1:048 (Tate Depo. Pg. 92, Lns. 3-25)
[34] App. 3:499 (Tate Depo. Pg. 94, Lns. 7-11)
[35] App. 3:500 (Tate Depo. Pg. 95, Lns. 2-9)
[36] App. 3:502 (Tate Depo. Pg. 97, Lns. 9-16)
[37] App. 3:502 (Tate Depo. Pg. 97, Lns. 18-24)
[38] App. 3:503 (Tate Depo. Pg. 104, Lns. 1-5)
[39] App. 3:503 (Tate Depo. Pg. 104, Ln. 16 to Pg. 105, Ln. 1)
[40] App. 3:500 (Tate Depo. Pg. 95, Ln. 11 to Pg. 96, Ln. 12).

3.      Defendants state that "Tate paid part of the refund to Debtor for use to satisfy Debtor's then outstanding payroll tax obligations of $182,218.73. See Appendix Exhibit S." (Defendants' MSJ pg. 5, §2.17).  A more complete statement of the facts requires the additional summary judgment evidence offered in this Response by Trustee. By July, 2017, the Debtor was delinquent on its 941a wage withholding obligations to the IRS.[41] On November 21, 2016, Debtor was assessed $12,601.42 for unpaid 941 taxes. On December 5, 2016, the IRS made a second assessment of $73,144.96.[42] A notice of federal tax lien was soon filed in Gregg County. (App. 1:132 (Exhibit 22)). The Debtor and Tate received notice of the defaults by the IRS and an IRS agent even met with Tate, in person, at Debtor's place of business to discuss the unpaid trust fund taxes.[43] Tate was the officer acting on behalf of Debtor when it came time to sign payroll checks and quarterly 941 IRS reports.[44]

4.      One of the Debtor's last transfers was the payment of $182,218.73, by cashier's check dated June 14, 2017, to the Department of Treasury.[45]  At the time the payment was made to the IRS to discharge Debtor's payroll tax obligation, Tate knew he would be personally liable for the debt.[46] When asked in his deposition "How did you see this transaction [the payment to the IRS] benefiting companies that Slamdunk Enterprises owed money to," Tate answered "I was able to pay them what Slamdunk owed and I owed. I was a personal guarantee on some of it." App. 3:490-491  (Tate Depo. Pg. 30, Ln. 22 to Pg. 31, Ln. 6).

5.      Immediately before Debtor paid the IRS, Tate deposited an identical sum of money into Debtor's account at Austin Bank. (See Defendants' App. Ex. S). Eventually, this payment would be reported as another pre-petition capital contribution by Tate to Debtor and thereby allow him to

---

[41] App. 1:132 (Exhibit 22)
[42] App. 1:41-42 (Tate Depo. Pg. 70, Ln. 7 to Pg. 72, Ln. 1).
[43] App. 3 : 495 (Tate Depo. Pg. 74, Lns. 17-20).
[44] App. 3:496 (Tate Depo. Pg. 75, Lns. 7-19).
[45] Defendants' App. Ex. S; App. 3:497-498 (Tate Depo. Pg. 84, Ln. 6 to Pg. 85, Ln. 14).
[46] App. 3: 498 (Tate Depo. Pg. 85, Lns. 6-10).

report a further increase in his stockholder's basis and to then use that increase to obtain post-petition refunds on his personal 2017 and 2018 tax returns.[47]

## VI. ARGUMENT AND AUTHORITIES

**A.     The December 30, 2016, transfer by Debtor of $1,550,000 to Miken is a preferential transfer under 11 U.S.C. §547(b), and/or TEX. BUS. & COM. CODE §24.006(b).**

A cause of action under 11 U.S.C. §547(a) requires proof of six (6) elements. The Trustee alleged claims against both Defendants under §547 and under its state law quasi-equivalent, TEX. BUS. & COM. CODE §24.006(b). The Trustee's seek to recover the December 30, 2016 transfer to Miken of $1,550,000.00, and other claims against both Defendants for smaller amounts paid under different circumstances.[48] Debtor's MSJ only addresses the large transfer, and it only addresses one (1) required element of the Trustee's claim to that fund. Did Debtor have an interest in the $1,550,000 paid to Miken?

1.     *Debtor's interest in the $1,550,000 fund transferred to Miken was not illusory. It was a real property right to newly infused capital.*

Defendants' MSJ states "Debtor never transferred $1,550,000 to" "Miken.[49]   The summary judgment evidence offered by Defendants to support this contention is that Miken did not have $1,550,000 in its account with Austin Bank in the first instance. That is, when the first transfer (Ex. 5, App. 1:114) was made on December 30, 2016, Miken did not have the money. Miken's account balance immediately before its transfer to Tate was about $20,000.00 and the resulting increase to Tate's account balance at the same bank (Defendants' App. Ex. M) was, so the argument goes, fictional. The ensuing transfer from Tate (individually) to Debtor (Ex. 1, App. 1:099) was, as the Defendants tell the story, non-existent and thus the

---

[47] See, Gomillion Report, Defendants' App. Ex. P, pg. 2 ("Tate continued to have suspended losses due to the lack of stock basis in Debtor of $568,687 following 2016, a significant portion of which has been utilized on Tate's 2017 and 2018 tax returns as Tate has personally paid obligations of Debtor.").

[48] See, Trustee's MSJ, pgs. 19-20. Payments made by Debtor to Chase Bank and Austin Bank during the statutory look-back period totaling $94,537.37 and $70,777.01, respectively. See, e.g., Exhibit 35 (App. 1:229) and Exhibit 36 (App. 1:247).

[49] Defendants' MSJ pg. 9, ¶4.7 ("Debtor never transferred $1,550,000 to Defendants"). The Trustee does not contend $1,550,000 was transferred to Tate and Miken. To be clear, the Trustee contends $1,550,000 was transferred to Miken..

following payment to Miken (Ex. 2, App. 1:101) did not actually occur. It never happened. It was illusory.[50] Therefore, as the Defendants put it repeatedly in Defendants' MSJ, the "circular transactions" could not have been real and, if not real, there was no transfer. The Trustee contends otherwise and for several reasons, two (2) of which are briefed in the Trustee's MSJ and will only be summarized in this Response. Three (3) other reasons why the Defendants' argument should fail are urged below.

First, the fund invested in Debtor by Tate on December 30, 2016 cannot be argued to be real for purposes of increasing Tate's stockholder's basis in Debtor, but fictional for purposes of making a preferential payment to Miken. It cannot simultaneously be real capital contributed for purposes of accomplishing an income tax benefit to Tate, but false capital for purposes of providing funds to Debtor which are then deployed to pay a creditor. Defendants' argument is self-contradicting. It imagines a sort of "Schrödinger's Capital Contribution."  (See, Trustee's MSJ pgs. 13-14). The Court's logic in *In re Loggins, 513 B.R. 682, 699 (Bankr. E.D. Tex. 2014)* soundly rejects that form of argument.

Second, Tate is estopped to claim the fund paid by him to Debtor was anything other than a "capital contribution." That is precisely the way he and his accountants reported the event to the IRS in order to obtain his substantial income tax refund. (See, Trustee's MSJ pgs. 14-17). *In re Davidson, 947 F.2d 1294 (5th Cir. 1991)* is well-established jurisprudence in the Fifth Circuit. In *Davidson* an ex-husband claimed on his income tax return that payments to his ex-wife were alimony. By reporting the payments to the IRS as alimony, he received deductions to his taxable income and the benefit of a correspondingly lower income tax obligation. *In re Davidson, 947 F.2d at 1297*. However, when the ex-husband filed bankruptcy and attempted to discharge his debts to his ex-wife, he re-characterized the previous payments to her as "mere property settlements." *Id.* The Fifth Circuit ruled he was estopped to do so. "Mr. Davidson has accepted the benefits of his agreement: he has taken tax deductions for the payments to Mrs. Davidson. He now tries to escape the bankruptcy effects of his election to treat the payments as alimony."

---

[50] Elsewhere in Defendants' MSJ, the contention is stated this way: "Neither Debtor, Tate, nor Miken had $1,550,000.00 in cash at Austin Bank to transfer on December 30, 2016 as Trustee alleges." (Defendants' MSJ, Pg. ¶2.13, pg. 5).

*Id.* A similarly unconscionable outcome is proposed by the Defendants when they re-characterize the capital contribution as nothing more than a "paper transaction," or a "circular" and meaningless event. Tate evidently did not understand the bankruptcy effects of his decision to contribute new capital to the Debtor. That much is clear. But accepting his attempt to remediate or revise important personal representations to the IRS would reward "an admitted manipulation tantamount, at best, to deception." *Id. at 1297*. Doing so would be unconscionable as a matter of law.

Third (and this argument was only touched on in Trustee's MSJ), *intrabank* transfers from one account to another are real. They are real for regulatory purposes, they are real debits and credits to the customers' accounts, and they are real for the bank's customers. The Defendants offer summary judgment evidence that – by itself – establishes that the fund paid to Miken was a real financial transaction and that it was measurable in American dollars. That evidence is a part of Defendants' Exhibits L, M and N. Exhibit L plainly demonstrates a transfer of $1,550,000 was made *by* Miken to Tate on December 30th. The proof appears in two (2) places on Exhibit L and is highlighted below:



If the money transferred to Tate by Miken as a loan[51] was not real, why does the Defendants' own evidence include the sizeable transfer in its total of all "debits?" Why would the exhibit describe the transfer as a "check" on "12/30"? Clearly, Defendants are not suggesting that any of the other transactions reflected in the Miken bank statement for the month of December, 2016 were illusory or fake.

---

[51] App. 1:114-115 (Exhibit 5); App. 1:78-79 (Pope Depo. Pg. 28, Ln. 19 to Pg. 29, Ln. 7).

As the events were directed on that day by Tate, each of the other two (2) accounts he owned or controlled also reflected the occurrence of real transfers. Exhibit M is the December, 2016 statement for Tate's account. It evidences the transfer by Tate to Debtor of the much needed $1,550,000.00 capital contribution. It, too, appears twice on the face of the exhibit:

```
MINIMUM BALANCE              639.14   LAST STATEMENT 12/06/16     864.14
AVERAGE BALANCE           3,721.60        4 CREDITS          1,559,261.82
                                         15 DEBITS          1,558,262.75
                                    THIS STATEMENT 01/03/17       1,863.21

- - - - - - - - - DEPOSITS - - - - - - - - -
REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT
       12/12    4,817.46        12/23    4,444.16        12/30  1550,000.00

- - - - - - - OTHER CREDITS - - - - - - - -
DESCRIPTION                                          DATE        AMOUNT
INTEREST                                             01/03          .20

- - - - - - - - - CHECKS - - - - - - - - -
CHECK #..DATE......AMOUNT CHECK #..DATE......AMOUNT CHECK #..DATE......AMOUNT
     *12/30 1550,000.00     8741 12/12    179.60     8743 12/22    252.14
 8740 12/07    225.00       8742 12/13    328.07     8744 12/23  2,000.00
```

Then, Exhibit N (which is the Debtor's December, 2016 account statement for Debtor's account at Austin Bank) evidences the actual transfer to Miken which is made the subject of this part of Trustee's complaint:

```
                                LAST STATEMENT 11/30/16    34,369.26
MINIMUM BALANCE       3,558.89-      11 CREDITS        1,681,167.85
AVERAGE BALANCE      18,679.95      106 DEBITS         1,696,395.22
                                THIS STATEMENT 12/30/16    19,141.89

- - - - - - - - - - DEPOSITS - - - - - - - - - -
REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT
      12/07    8,117.50        12/12    4,169.00        12/29   15,500.00
      12/08    8,000.00        12/15   26,277.69        12/30    4,500.00
      12/09    2,000.00        12/20   15,000.00        12/30 1550,000.00
      12/09   22,603.66        12/22   25,000.00

- - - - - - - - - - CHECKS - - - - - - - - - -
CHECK #..DATE......AMOUNT CHECK #..DATE......AMOUNT CHECK #..DATE......AMOUNT
    *12/30 1550,000.00     2551 12/05    349.29     2561 12/12    182.00
 2525 12/05    1,065.00     2552 12/05    671.55     2562 12/13  1,000.00
```

None of these exhibits show that the capital contribution to Debtor, or that the preferential payment to Miken, was rescinded, canceled, reversed or returned. Why? Because the capital contributed to Debtor was not reversed, and Debtor's payment to Miken was not returned. All of which leads to the Trustee's fourth point.

The Defendants' contention disregards the entirety of Article 4A of the Uniform Commercial Code, which is entitled "Uniform Commercial Code – Funds Transfers." TEX. BUS. & COM. CODE §4A.101. TEX. BUS. & COM. CODE §4A.101 *et. seq*, regulates a bank's relationship with its Texas customers. This includes the regulation of how banks handle electronic transfers of funds. *Contractors Source, Inc. v. Amegy Bank N.A., 462 S.W. 3d 128, 133 (Tex. App. Houston [1ˢᵗ Dist.] 2015).* Article 4A addresses interbank transactions, but it also governs *intrabank* transactions like those made the subject of this adversary proceeding. Comment 1 to TEX. BUS. & COMM. CODE §4A.104, explains it this way: "a one-payment-order funds transfer is usually referred to as a 'book transfer' because the payment is accomplished by the receiving bank's debiting the account of the sender and crediting the account to the beneficiary in the same bank." Interbank and intrabank transfers are generally referred to as "electronic funds transfers" (EFTs), and thirty-eight (38) sections in UCC Article 4A address these common financial transactions.

> "In general, all types of EFTs share one common theme – they consist of an order by one person typically to a bank or other financial institution, either to credit or charge the bank account of another person. A transaction is usually conducted between the banks by way of a system that is set up to handle such interbank transfers, although intrabank transfers that do not use such systems are also possible." WHITE AND SUMMERS, *THE UNIFORM COMMERCIAL CODE* pg. 947, §20-1 (6ᵗʰ Ed. 2010).

The Defendants essentially reason that an intrabank transfer (or, "book transfer") is not a transfer at all. That reasoning is at odds with all of Article 4A. It is simply not correct.[52]

Fifth, the Defendants' argument turns on the fact that Miken did not – in the first instance – have $1,550,000.00 in its account with Austin Bank to loan by intrabank transfer to Tate. The balance in the Miken account was about $20,000 immediately before and immediately after the sequence of transactions and exchanges. (Defendants' MSJ pg. 9, ¶4.7; Defendants' App. Ex. L, pg. 1). Then, as the Defendants

---

[52] Acceptance of a payment order occurs when a receiving bank executes the order. §4A.209(a). §4A.406(a) and (b) state the originator of a funds transfer pays the beneficiary of the originator's payment order at the time a payment order for the benefit of the beneficiary is accepted by the beneficiary's bank. When made, it satisfies or discharges the underlying obligation. That is the Article 4A characterization of the significance of the transfer from Debtor (the "payment order"), and the receipt by the same bank for the benefit of Miken – the underlying obligation (the antecedent debt) is satisfied or discharged to the extent of the payment.

state the facts, if Miken did not have the money, Tate received nothing in the form of a loan from Miken and Debtor did not actually receive a capital contribution from Tate. In that characterization, Debtor had none of the money it supposedly transferred to Miken at the end of the series of exchanges on December 30th. Perhaps it is on the basis of this logic that Defendants contend the avoidable transfer never happened. Again, such a conclusion ignores well-established law. It has been long understood that if a bank's payment of a transaction overdraws the customer's account, then the bank has made a loan to its customer. *First Texas Sav. Ass'n v. Reliance Ins. Co., 950 F.2d 1171, 1177 (5th Cir. 1992)* ("Because it is uncontroverted that [bank] relied solely on [depositor's] promise to repay overdrafts when it granted him immediate access to the funds represented by his check deposits, we find that [bank] made a 'loan or transaction in the nature of a loan or extension of credit' as a matter of law."); *United States v. Cordell, 912 F.2d 769, 773-74 (5th Cir. 1990); U.S. Bank, N.A. v. Indian Harbor Ins. Co., 68 F. Supp. (D. Minn. 2014); Affiliated Bank/Morton Grove v. Hartford Accident & Indem. Co., 1992 WL 91761, at *6 (N.D. Ill. Apr. 22, 1996).* The evidence presented by the Defendants on this point does not support a conclusion that Debtor had nothing to transfer to Miken. Instead, it clearly proves that Austin Bank extended credit to Miken – even if it was only for that day – of $1,550,000.00. The extension of credit was real. In fact, the extension of credit and its eventual re-payment to Austin Bank by Miken when the intrabank transfer from Debtor was accepted on the same date further undermines Miken's "contemporaneous exchange of new value" defense under 11 U.S.C. §547(c)(4). That point will be discussed below.[53]

> **B.     If the $1,550,000 payment to Miken is not avoidable as a preference, it was a fraudulent boost to Tate's stockholder's basis in the stock of Debtor and transfer of Debtor's valuable "losses," making it avoidable under 11 U.S.C. §548, and/or Tex. Bus. & Com. Code §24.005(a)(1) or (2), or §24.006(a).**

To be clear, the Trustee's claims against Tate under 11 U.S.C. §548 and its state law equivalents are made in the alternative. If the transfer of $1,550,000 to Miken is not avoidable as a preference then the plan implemented by Tate and his accountant(s) to capture the benefits of the Debtor's net operating

---

[53] See Section VI(C) below.

losses was a sham. It would have been a fraud. It is in response to this alternative claim of the Trustee that

Defendants challenge one (1) of the essential elements of the §548(a)(1)(A) or (B) claims. Defendants

contend "no transfer of Debtor's tax attributes occurred because by operation of law such tax attributes are

owned by its shareholders." (Defendants' MSJ ¶4.8, pg. 9). Defendants miss the point and miss the

meaning of the 26 U.S.C. §1366(d) and §1367**.**

First, either the capital contributed by Tate became the Debtor's property which was, in turn, paid

as a preferential payment to the insider Miken, *or* the benefit of the newly contributed capital flowed

through Tate to the extent of his sizeable tax refund. It is not just the tax attributes of the Debtor that are at

issue, it is the benefit of the Debtor's newly received capital which, beyond doubt or dispute, freed what

Tate's tax advisors (Pope and Pulliam) characterized as "suspended losses" to pass-through to Tate's

individual return. As Tate's accountant, Pope testified:

> "Consequently, all of the losses that came out of Slamdunk, 2011 through 2015, were suspended
> meaning Mike [Tate] could not deduct those losses on his personal tax return because he did not
> have basis."[54]

From where did the suspended losses come? "[O]ut of Slamdunk." At whose cost? If there was no

real capital contributed by Tate, then the losses were at the expense of Debtor's creditors. If real

capital was contributed by Tate, then the losses were at Tate's cost and were his to deduct. Thus, the

capital contributed and its concomitant increase in stockholder's basis are inseparable from Tate's

eventual and successful effort to deduct the suspended losses. This is confirmed by provisions in the

Internal Revenue Code that set parameters for determining a subchapter S corporation stockholder's

basis.

26 U.S.C. §1366(d)(1) states "the aggregate amount of losses and deductions taken into

account by a shareholder under subsection (a) for any taxable year shall not exceed the sum of (A)

the adjusted basis of the shareholder's stock in the S corporation…, and (B) the shareholder's

adjusted basis of any indebtedness of the S corporation to the shareholder…." Therefore, it is not accurate to say that all tax attributes of a subchapter S corporation are owned by the shareholders. More precisely, the tax *consequences* of an S corporation election flow through to shareholders, but only to the extent permitted by the Internal Revenue Code. And that means, in this situation, only to the extent of (and thus limited by) the shareholder's basis in the corporation's stock. *Robinson v. United States 335 F.3d 1365, 1366 (Fed. Cir. 2003).*

To increase basis in stock of a subchapter S corporation, "there must be an economic outlay or a realization of income on the part of the shareholder." *Estate of Leavitt v. Commissioner, 90 T.C. 206, 210 (T.C. 1988); Brown v. Commissioner, 706 F.2d 755 (6th Cir. 1983), affirming T.C. Memo. 1981-608, 1981 Tax Ct. Memo LEXIS 142 (1981).* The term "basis," for purposes of 26 U.S.C. §1367, is defined in Section 1012 of the same Title: "basis of property shall be the *cost* of such property" (emphasis added). 26 CFR §1.1012-1(a) further provides that "cost" means the "amount paid for" property "in cash or in other property." It follows that if Tate increased the "cost" of his stock in Debtor, then (and only then) would he be entitled to recognize the Debtor's losses on his individual return. Why would he be allowed to do so? Because then, and only then, the Debtor's losses would be his own. This is exactly what Tate did. It is what he intended to do. It is what he reported to the IRS, and it is what the summary judgment evidence conclusively establishes. If the losses could not, in fact, pass-through to him because the $1,550,000 never really became the property of Debtor, then it was all a sham.

Defendants' argue "S corporations are not subject to federal income tax at the entity level," citing 26 U.S.C. §1363(a). (Defendants' MSJ ¶4.11, pg. 10). This is not exactly correct. "An S corporation is not *generally* subject to federal income taxes…. like a partnership, it is a conduit through which income flows to its shareholders. *Taproot Admin. Srvs. v. Comm'r, 133 T.C. 202, 204 (Tax Court 2009).* "Subchapter S allows shareholders of qualified corporations to elect a pass-

---

[54] App. 1:075 (Pope Depo. Pg. 22, lns. 15-21).

19

through taxation system under which income is subjected to only one level of taxation." *Gitlitz v. Commissioner 531 U.S. 206, 209, 121 S.Ct. 701, 148 L.Ed. 2d 613 (2001).* However, the pass-through taxation system does not mean the Subchapter S corporation is disregarded as an entity, that its assets are owned by the stockholders, or that its losses are automatically "passed through" to those stockholders. The latter is specifically conditioned on the extent to which the stockholder has basis. Defendants' own expert, James Gomillion, expresses his accountant's understanding of 26 U.S.C. §1366(d) in similar terms:

> "Section 1366(d) provides that the aggregate amount of losses taken into account by a shareholder cannot exceed the sum of the shareholder's basis in his S corporation stock and his basis and any indebtedness of the S corporation to the shareholder. If losses are suspended due to Section 1366(d), there is an indefinite carryover of the disallowed loss. According to Section 1366(d)(2)(A), any loss disallowed is treated as incurred by the corporation in the succeeding taxable tax year with respect to that shareholder."[55]

Gomillion affirms what is clear from the plain text of 26 U.S.C. §1366(d) – that is, *if* the corporation's loss cannot pass through to the shareholder because the shareholder lacks basis in his S corporation stock, the loss is "suspended" and is treated as incurred by the corporation in the succeeding taxable year with respect to that shareholder. Thus, the suspended loss itself is a "legal or equitable interest of the debtor" as of the commencement of the case and would have therefore been property of the estate under 11 U.S.C. §541(a). It is only if or when Tate had basis in his S corporation stock that the loss passes through to him. In this sense, the Defendants incidentally affirm the Trustee's primary contentions.

**C.   The $1,550,000 preferential payment was not a contemporaneous exchange for new value under §547(c)(1) of the Code.**

Miken raises a §547(c)(1) defense to the $1,550,000 preferential payment claim. The Trustee addressed this defense in Trustee's MSJ. (See, Trustee's MSJ Section F, pgs. 22-27). What the Trustee argued in his motion is incorporated in this Response by reference. It is important to notice,

however, that some of Defendants' summary judgment evidence supports one of the Trustee's primary contentions. There was not a single "contemporaneous exchange of new value," as the Defendants contend. Drawing a circle around all the events that took place between Miken and Tate, Tate and Debtor, and Debtor and Miken in an effort to collapse the multiple transactions and exchanges into a single "contemporaneous exchange for new value" is complicated by the Defendants' addition of a fourth (4) exchange documented in the evidence they offer. Austin Bank was also involved in its own separate exchange with Miken. Austin Bank loaned Miken the money for Miken to, in turn, loan to Tate. Diagram 2 on page 24 of Trustee's MSJ is modified below to capture the point of this fourth (4th) exchange:



Exchange #4 is the transaction Defendants prove is the source of Miken's financing for its loan to Tate. Part #4A is the extension of credit by Austin Bank to Miken on December 30th. Part #4B is the repayment of that loan by Miken to the bank on the same date. So, in order to prevail on the

---

[55] Defendants' App. Ex. P, Pg. 3.

Defendants' defense that a single contemporaneous exchange for value occurred, Miken must also collapse Exchange #4 into Miken's single "circular exchange" event. But, doing so also interjects a fourth (4th) entity – Austin Bank -  and the separate components to that transaction (Parts #4A and 4B). There are now eight (8) separate events Miken claims should be treated as a single exchange. To qualify for the defense, new value must have been given by Miken to Debtor. It was not. Miken made a loan to Tate and Miken can trace its source of funding to an extension of credit from Austin Bank. That is all Miken proves.

> **D.      Defendants provided limited subsequent new value within the meaning of §547(c)(4) of the Code.**

11 U.S.C. §547(c)(4) states a trustee cannot avoid a transfer under §547 to "the extent" the transferee gave "new value to or for the benefit of the debtor." This defense is raised by the Defendants in their respective answers. It is also pre-emptively addressed in the Trustee's MSJ. (See, Trustee's MSJ Section H, pgs. 27-28).[56] Defendants' MSJ makes two (2) possible references to the §547(c)(4) defense in the context of 1) a statement that "Tate also used the [tax] refund to satisfy various outstanding debts of Debtor," and 2) a contention there was "no damage to the Debtor." (Defendants' MSJ ¶2.18, pgs. 5 and ¶4.30, pg. 16, respectively). No argument in support of the defense is presented but, in an abundance of caution, the Trustee will further address each point. Also, the admissible evidence produced by the Defendants supports a re-calculation of the Trustee's largest preferential transfer claim (net of subsequent new value) against Miken. The Trustee will first address the apparent attempt to claim non-permissible offsets to the $1,550,000 preferential transfer claim.

> *1.      Post-petition payments or advances for the "benefit of the debtor" do not qualify as subsequent new value under §547(c)(4).*

Admissible portions of Defendants' summary judgment evidence contained in Exhibits U and

---

[56] The summary judgment evidence and argument set out in the Trustee's MSJ that limits the application of this defense is incorporated herein by reference.

V reflect periodic payments by Miken to East Texas Oilfield Services, Inc. ("ETOS") and LaFarge

North America, Inc. ("LaFarge"), each of whom were owed money by Debtor. Those payments

(highlighted on Table 1, App. 3:489) were made after the petition date. Can a post-petition payment

or advance to or for the benefit of the debtor qualify as subsequent new value for purposes of

§547(c)(4)? The answer is "no." *In re Bellanca Aircraft Corp., 850 F.2d 1275, 1284 (8th Cir. 1988);*

*See also In re Ford*, 98 B.R. 669, 683 (Bankr. D.Vt. 1989); In re Jet Florida System, Inc., 59 B.R.

886, 890 (Bankr. S.D.Fla. 1986); and Official Bondholders' Committee v. Eastern Utilities Assoc.,

147 B.R. 634, 645 (Bankr. N.H. 1992). Subsequent new value "to or for the benefit of the debtor"

implies that new value is only given prepetition because any post-petition advance is given for the

benefit of the debtor's estate, not the debtor. *Clark v. Frank B. Hall & Co.*, 179 B.R. 669, 678

*(Bankr. D. Colo. 1995) (citing Bergquist v. Anderson-Greenwood Aviation (In re Bellanca Aircraft*

*Corp.), 850 F.2d 1275, 1284 (8th Cir. 1988)).* Allowing otherwise would also disrupt the Code's

system of priorities for the distribution of estate assets. 11 U.S.C. §726. If a preference defendant

could offset its liability by making post-petition payments to creditors it selects, then doing so would

circumvent the regime of Chapter 7 priorities. Why would a defendant pick-and-choose to whom a

post-petition "new value" payment or advance would be made? Because, in some instances, the

recipient of the payment may also have a claim against a non-debtor guarantor. That is exactly what

happened in this instance. LaFarge and ETOS had claims against the Debtor. The payment of those

claims was guaranteed by Tate.[57]

    2.    *Payment by a defendant to a third-party whose claim against the debtor was also*
*guaranteed by the defendant is not subsequent new value.*

    Courts have looked at similar questions regarding new value in the form of credit against

antecedent debt guaranteed by third parties, reasoning that the guarantor/defendant had a pre-existing

obligation or duty to pay the guaranteed debt. If that pre-existing obligation is discharged or partially

---

[57] ETOS was guaranteed by Tate. App. 1:048 (Tate Depo. Pg. 92, Lns. 3-25). LaFarge was guaranteed by Tate. App.

23

discharged by the guarantor - Miken in some instances and Tate in all instances - that payment cannot be said to constitute new value. "New" means "new." The guarantees by Tate of claims against the Debtor occurred long before the disputed preferences. Those guarantees were old. If Tate paid one, he was only discharging his pre-existing obligation.

> "Any rights existing under the guarantee agreement were part and parcel of that agreement from the outset. They came into existence as contingent rights at the same time as did the contingent obligation represented by the guarantee itself; thus, they simply defined the nature and extent of that obligation. Treating the maturation of such contingent rights as 'new value' would disserve the policies underlying section 547, because a debtor's preferential payment of actual monetary value to a creditor under a guarantee agreement, in return for nothing more than the pre-existing right to assert a claim for reimbursement against the party whose debt was guaranteed, depletes the tangible assets of the estate to the detriment of the other creditors." *In re Chase & Sanborn Corp.*, *904 F.2d 588, 597 (11th Cir. 1990).*

It may be argued that depriving a §547 defendant of the right to offset a payment clearly made "for the benefit of the debtor" merely because the defendant also guaranteed the debt would leave that defendant without the ability to recapture all or part of what was paid to the common creditor. That, too, is incorrect. The defendant could file a claim under §502(h) for the amount recovered by the trustee. Or, the defendant could file a contingent or unliquidated claim under §502(c)(1). The Defendants in this adversary took advantage of neither alternative.

2.    *A partial adjustment to the §547 claim against Miken is appropriate.*

The Trustee does not dispute that a partial adjustment to its §547 claim against Miken is justified by Defendants' summary judgment evidence. The revised calculation, with references to supporting evidence in the record, are included on Table 1 filed with the Appendix to this Response. (App. 3:489).[58] The Trustee's claim arising from the December 30, 2016 payment to Miken, as adjusted, is $1,462,635.88.

3.    *Tate's additional capital contribution of $182,218.73 on June 14, 2017 is not "subsequent new value."*

---

3:499 (Tate Depo. Pg. 94 Lns. 7-11).
[58] The non-permissible post-petition amounts paid by Miken are highlighted in Table 1.

It is not clear from Defendants' MSJ that Tate contends his $182,218.73 deposit into Debtor's account on June 14, 2017 should offset the Trustee's claims against him, personally, under §547(c)(4). Based on the amount and the proximity (the same date) of Debtor's payment to the IRS, the two (2) transactions (the deposit and the IRS payment) are related. But, it is equally clear from the evidence that Tate did not make a loan or advance to the Debtor of the amount needed to pay the IRS. Defendants' MSJ states "Tate paid part of the refund to Debtor for use to satisfy Debtor's then outstanding payroll tax obligations of $182,218.73." (Defendants' MSJ ¶2.17, pg. 5). That payment was then also reported to the IRS as an additional capital contribution to the Debtor – a further investment in equity – to increase Tate's stockholder's basis that resulted in a further deduction of the remaining "suspended losses" from Tate's personal 2017 and 2018 income tax obligations.[59] Even if Tate's payment of a debt to the IRS for which he was otherwise personally obligated under applicable provisions of the Internal Revenue Code could be considered "new value," a further investment in the equity of Debtor (stockholder's basis) cannot. It is also not clear from Defendants' MSJ that they claim any new value offset to Tate's individual liability for the preferential transfers made to Austin Bank and Chase Bank. Those claims of the Trustee are not even mentioned in Defendants' MSJ.  If Defendants intended to claim the IRS payment as an offset to Tate's personal liability under §550 for the preferential transfers that benefitted him, the Defendants did not meet their burden of proof in this summary judgment context.

**E.      The Trustee is entitled to recover the property made the subject of the avoidable transfers, or that property's value.**

Defendants contend the Debtor suffered no damages and was no worse off after the December 30, 2016 series of transactions. (Defendants' MSJ ¶4.30, pg. 16). This defense presupposes the court should view all of what transpired on that date and in the years before as a single collapsible event. The defense alternatively works outward from a hypothetical set of

---

[59] Gomillion Report, Defendants' App. Ex. P, pg. 2.

circumstances in which Tate did not contribute $1,550,000 in capital. From that hypothetical, the Defendants reason the Debtor was not harmed.[60] First, the Trustee is not attempting to avoid all four (4) of the separate exchanges with their corresponding subparts that are illustrated in Diagram 3 above. He only attempts to avoid the payment to Miken. It is a much narrower view of the claim than what Defendants contend is required. Once the needed capital was contributed to Debtor, was the use of the fund to pay an insider-creditor a preferential transfer? That is the question.

Second, the weakness of the Defendants' argument from a hypothetical can be demonstrated by a slight variation to the proposed scenario. What if Tate had made his capital contribution three (3) months earlier, when he was convinced Debtor was insolvent and should file bankruptcy?[61] Does Miken contend that payment of the same $1,550,000 to Debtor in December, 2016 would have caused "no harm?" That is unlikely. What if Tate contributed the capital when Debtor began business in 2010, rather than the meager $1,000 he actually contributed?[62] Would the use of Debtor's capital six (6) years later to pay Miken cause "no harm?" This, too, is unlikely. So, Defendants want to both claim the advantage of a large stockholder's basis in the Debtor by reason of the capital contribution, but utilize Tate's delay in making the needed investment to the advantage of Miken – the insider. Rewarding that kind of behavior should not be allowed.

Third, transfers may be protected from avoidance if they cause no net economic harm to the debtor or the bankruptcy estate. *See, In re Loggins, 513 B.R. at 711.* Here, the sole and exclusive use of capital (whether contributed in timely or tardy fashion and which was much needed by Debtor for the operation of a risky business venture) to pay its largest creditor and its predominant insider/creditor is, without doubt, harmful to the Debtor and to all creditors for whose benefit capital

---

[60] The Trustee's remedy under §550 of the Code is essentially a claim of restitution, not necessarily the legal remedy of "damages." "For the most part, Section 550, since it targets property or the value of property, involves a restitutionary remedy. … there are indications that Congress meant to retain an emphasis on restitution in Section 550. For example, the term 'damages' was deleted from early drafts of the statute which became section 550." 5 COLLIER ON BANKRUPTCY ¶550.02 n.1.

[61] App. 1:44-45 (Tate Depo., Pg. 87, Ln. 18 to Pg. 88, Ln. 23).

[62] App 2:318; Exhibit 9, Page 3

otherwise would inure.

WHEREFORE PREMISES CONSIDERED, Stephen Zayler, Chapter 7 Trustee respectfully

requests that Defendants' Motion for Summary Judgment be denied, and for such other and further

relief to which he may be justly entitled to receive.

Respectfully submitted,

RITCHESON, LAUFFER & VINCENT, P.C.
821 ESE Loop 323, Suite 530
Tyler, Texas 75701
(903) 535-2900
(903) 533-8646 (Facsimile)

*/s/ Scott A. Ritcheson*

By: _____
    Scott A. Ritcheson
    State Bar No. 16942500

## CERTIFICATE OF SERVICE

I certify that a copy of this document was served electronically or 1st class mail to the
following:

Joshua Searcy
P.O. Box 3929
Longview, Texas 75606
Email: joshsearcy@jrsearcylaw.com

Patrick Kelley
112 E. Line Street, Ste. 203
Tyler, Texas 75703
Phone: 903/630-5151
Email: Pat@patkelleylaw.com

on this the 13th day of January, 2020.

*/s/ Scott A. Ritcheson*

_____

Scott A. Ritcheson