


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SLAMDUNK ENTERPRISES, INC. | § | Case No. 17-60566 |
| d/b/a SIGNAL WELL SERVICE | § | |
| | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| STEPHEN J. ZAYLER | § | |
| Chapter 7 Trustee | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 18-6006 |
| | § | |
| MIKEN OIL, INC., and | § | |
| LARRY MIKE TATE | § | |
| | § | |
| | § | |
| Defendants | § | |

**MEMORANDUM OF DECISION**

On this date the Court considered the competing Motions for Summary Judgments which have been filed in the above-referenced adversary proceeding:

(1) the Plaintiff's Motion for Summary Judgment **[dkt #33]** filed by the Plaintiff, Stephen J. Zayler (the "Trustee" or "Plaintiff"), in his official capacity as the duly-appointed Chapter 7 Trustee of the Bankruptcy Estate of Slamdunk Enterprises, Inc., to which a joint response in opposition was filed **[dkt #41]** by the Defendants, Miken Oil, Inc. and Larry Mike Tate, (collectively, the "Defendants"), followed by the Trustee's reply **[dkt #43]**;

(2) the Defendants' Joint Motion for Summary Judgment **[dkt #34]**, to which a response in opposition was filed by the Trustee **[dkt #42]**, followed by the Defendants' reply **[dkt #44]**;

(3) the Plaintiff's Supplemental Motion for Summary Judgment **[dkt #59]**,[1] to which a joint response in opposition was filed by the Defendants **[dkt #62]**; and

(4) the Defendants' Joint Supplemental Motion for Summary Judgment **[dkt #60]**, to which a response in opposition was filed by the Trustee **[dkt #61].**

The complaint in this action alleges that the Chapter 7 bankruptcy estate is entitled to recover the sum of approximately $1.55 million from Miken Oil, Inc. and approximately $187,000 from Larry Mike Tate based upon transfers which the Trustee asserts were either preferential transfers under 11 U.S.C. § 547 or fraudulent transfers under 11 U.S.C. §§ 544 or 548, or both.[2] Based upon the Court's consideration of the competing Motions, the memoranda in support and opposition thereto, the proper summary judgment evidence tendered to the Court,[3] and for the reasons stated in this Memorandum, the Court concludes that the Trustee's Motion for Summary Judgment as supplemented should be granted in part and denied in part, such that a summary judgment shall be awarded to the

---

[1] The parties were allowed to supplement their respective submissions to address additional issues regarding what is characterized herein as the "Guaranteed Lender Payments" arising from the filing of the Plaintiff's First Amended Complaint for which leave was granted by the Court. Though they were filed as independent pleadings, the Court will address the issues on a consolidated basis as a motion for summary judgment as supplemented.

[2] The Plaintiff's *First Amended Complaint* also seeks the declaration of the Debtor's ownership of certain *unspecified* personal property allegedly in possession and control of either Miken Oil or Tate and prays, in the alternative, either for the turnover of such property or a money judgment against the two Defendants equivalent to the fair market value of such property. However, the Plaintiff's summary judgment as supplemented its motion does not seek summary judgment on that particular count.

[3] The Plaintiff's summary judgment evidence is presented in four volumes which are sequentially paginated and the page citations herein are based thereon. The Defendants' summary judgment evidence is also presented in four volumes but was not sequentially paginated. While the Court has engaged its own consecutive pagination scheme, references to the particular exhibit are also supplied. Any page reference to a pleading refers to the CM-ECF pagination scheme at the top of a page.

Trustee for the recovery of a preferential transfer and/or a constructive fraudulent transfer received by Miken Oil, Inc., in the amount of $1,462,635.88 and the recovery of a fraudulent transfer made to Larry Mike Tate in the amount of $21,917.00. The Trustee's motion as supplemented will also be granted so as to deny: (1) the Defendants' asserted affirmative defense pertaining to the Miken Payment and the Guaranteed Lender Payments based upon an alleged contemporary exchange for new value; and (2) the Defendants' claims regarding the applicability of any of the following defenses: (i) a failure to assert a claim upon which relief can be granted; (ii) a failure to plead with sufficient specificity; (iii) inequitable recovery; (iv) the doctrines of *in pari delicto*, unclean hands, unjust enrichment, and any other equitable doctrine; (v) the doctrines of release, waiver, ratification, accord and satisfaction, estoppel, judicial estoppel, setoff, recoupment, and/or equitable estoppel; and (vi) any state or federal statute of limitations or the doctrine of laches. The remainder of the Trustee's motion as supplemented will be denied. The Defendants' joint motion as supplemented shall be granted so as to deny the Trustee's claim that any of the Guaranteed Lender Payments can be recovered as constructive fraudulent transfers under § 24.006(b) of the Texas Uniform Fraudulent Transfer Act. The remainder of the Defendants' joint motion as supplemented will be denied. This memorandum disposes of all issues currently before the Court.[4]

[4] This Court has jurisdiction to consider the complaint pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(E), (F), (H), and/or (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

## I. Factual and Procedural Background [5]

The Debtor, Slamdunk Enterprises, Inc. ("Slamdunk" or the "Debtor"), is a Texas oil and gas service company which was owned and operated by the Defendant, Larry Mike Tate ("Tate"). Slamdunk was formed and organized on December 2, 2010 in accordance with the state laws of Texas. At all relevant times, Tate was one of two shareholders and he owned ninety (90%) percent of the Debtor's outstanding shares of stock.[6] Tate further directed the Debtor's day-to-day operations as its president and sole officer.[7] The Slamdunk shareholders elected under 26 U.S.C. § 1362 for their corporation to be treated as a subchapter S corporation for federal income tax purposes,[8] thereby freeing the corporation from any obligation to pay taxes on its earnings, with such obligation passing through to each shareholder in proportion to his/her ownership percentage.

Tate has also simultaneously owned all of the equity interests in, and served as the sole director and officer of, another Texas oil and gas company— the Defendant, Miken Oil, Inc. ("Miken")—which owns and operates various oil and gas properties under Tate's

---

[5] The facts presented are those which stand uncontested between the parties and are presented only as a general factual background to the legal claims asserted in this case. This section is not intended to resolve any disputed or contested facts between the parties.

[6] PL'S. APP. I: 10-11 (Tate depos.). The company's certified public accountant, John C. Pope, served as a Slamdunk director and owned the remaining ten (10%) percent interest from its inception in 2010 until December 31, 2016. *Id*.

[7] *Id*. at 64-65 (Tate depos.).

[8] *Id*. at 41 (Tate depos.); DEFS'. APP. I: 5 (EX. A).

exclusive direction and control.[9] Neither of the sister companies owned any ownership interest in the other.[10]

Through the years, there was a growing debtor-creditor relationship between Slamdunk and Miken.[11] Slamdunk was always the poorer sibling. Though Tate would occasionally direct Miken to utilize the services of Slamdunk to perform workovers or to provide other well services for its properties,[12] Slamdunk accumulated significant indebtedness from its inception. It struggled to address that debt and yet it kept operating despite repeated annual losses. Tate would direct Miken at certain times to extend credit to Slamdunk, and Miken occasionally paid the financial obligations of Slamdunk directly.[13]

By the end of 2016, Slamdunk's accumulated business losses totaled more than $2.2 million[14] and its unsecured debt to Miken was $1,612,771.07.[15] Tate, as the controlling officer of both Slamdunk and Miken, knew that the indebtedness was past

---

[9] PL'S. APP. I: 14-16 (Tate depos.).

[10] *Defendants' Motion for Summary Judgment* ("DEFS.' MOTION") ¶ 2.4 at 3

[11] PL'S. APP. I: 19 (Tate depos.).

[12] *Id*. at 19.

[13] *Id*. at 75, 88; DEFS'. APP. I: 6 (Ex. E).

[14] PL'S. APP. I: 110-12. Slamdunk reported losses of <$565,278> in 2014, <$587,182> in 2015, and <$621,468> in 2016. DEFS'. APP. II: 72-98 (Ex. B)[2014]; DEFS'. APP. II: 99-125 (Ex. C) [2015]; and DEFS'. APP. II: 126-151 (Ex. D) [2016].

[15] PL'S. APP. I: 88; DEFS'. APP. I: 6-8 (Ex. E). This indebtedness was carried on the Debtor's books as a long-term liability, PL'S. APP. I: 110; PL'S. APP. II: 317, while Miken Oil scheduled the asset as a note receivable. *Id*. at 343, 376.

due,[16] although there was no actual promissory note that evidenced that unsecured indebtedness to Miken,[17] nor any specific written agreement that specified how and when the indebtedness owed by Slamdunk to Miken would be paid. Notwithstanding Slamdunk's growing financial distress, Tate never made capital contributions to Slamdunk after his initial capital investment in the company in 2010.[18]

By the fall of 2016, Slamdunk was in financial peril. Certain creditors had obtained judgments against it and others were seeking the entry of such judgments.[19] Payroll taxes were delinquent.[20] Tate engaged bankruptcy counsel and preparations began in October 2016 for a bankruptcy filing for Slamdunk.[21] Drafts of bankruptcy schedules and statements were prepared.[22] Meanwhile, Tate became acquainted with a gentleman named Robert Pulliam, a certified public accountant from Dallas. After meeting with Pulliam, Tate decided to delay the bankruptcy filing for Slamdunk and to engage instead in a series of financial transactions designed to solve his prior individual inability, as a Subchapter S shareholder with an insufficient basis in the company, to

---

[16] PL'S. APP. I: 40 (Tate depos.).

[17] *Id*. at 86 (Pope depos.).

[18] PL'S. APP. II: 318.

[19] PL'S. APP. I: 72, 129.

[20] *Id.* at 132.

[21] *Id.* at 45.

[22] *Id*.

access the significant loss carryforwards which Slamdunk had accumulated over the years of its existence and to deduct those losses against the amounts of personal income which Tate had previously recognized on his individual income tax returns.

After the Pulliam consultation, and carrying specific instructions regarding the designated series of events to accomplish from John Pope,[23] Tate went to Austin Bank on December 30, 2016, to orchestrate a series of transfers involving the respective bank accounts of Miken, Tate, and Slamdunk.[24] Tate obtained a loan of $1.550 million in his individual capacity from Miken[25] and, then acting as the sole officer of Miken, transmitted the loan proceeds from the Miken account into his personal bank account.[26] Tate then transferred the entire $1.550 million which had been credited to his individual account to the Slamdunk bank account.[27] Tate, then acting as the sole officer of Slamdunk, took the $1.550 million credited to Slamdunk and immediately transferred it to Miken in satisfaction of almost the entire amount of the unsecured indebtedness which was then owed by Slamdunk to Miken (the "Miken Payment").[28] Each of the

---

[23] *Id.* at 24-25, 76.

[24] *Id*. All of those bank accounts resided at Austin Bank.

[25] *Id.* at 78-79 (Pope depos.) Mr. Pope testified that when the 2016 tax return was prepared, a portion of the loan amount ($600,000) was recharacterized as shareholder distribution from Miken to Tate. *Id*. at 79.

[26] *Id.* at 114-15; DEFS'. APP. II: 152-53 (Ex. I) .

[27] *Id.* at 154-55 (Ex. J).

[28] *Id.* at 156-57 (Ex. K); DEFS'. APP. I: 8 (Ex. E). *See also*, DEFS' MOTION ¶ 2.12 at 5 [referencing as the third step in the transaction "a reduction in the accounting on the 'N/P' ledger from

aforementioned transactions were all effectuated on December 30, 2016, within a relatively short span of time, and notwithstanding the fact that, at the beginning of that particular business day, none of the referenced bank accounts reflected an account balance exceeding the transfer amount. No portion of the capital contribution tendered to Slamdunk was used to address any other indebtedness owed by Slamdunk to any other creditor.[29] Miken recorded its receipt of the $1.55 million payment on its books[30] and reported it in its tax return.[31] Slamdunk also noted the Miken Payment in its books and noted it on its return.[32]

Because that capital contribution increased his basis in his Slamdunk stock, Tate became eligible to deduct the accumulated losses sustained by Slamdunk that he had been unable to deduct on his personal tax returns in prior years.[33] He accordingly filed his 2016 personal federal income tax return for 2016, as well as some amended personal returns for prior years, based upon this newly-acquired eligibility.[34] As a result, Tate eventually received an aggregate federal tax refund of $407,114 from the IRS based upon

---

Debtor to Miken in the amount of $1,550,000"].

[29] PL'S. APP. I: 76 wherein Mr. Pope confirmed that "Slamdunk then paid that $1,550,000 to Miken Oil as payment on the advances that Miken had made over the years." [Pope depos. 23:5-7].

[30] *Id*. at 112.

[31] PL'S. APP. II: 343; PL'S. APP. I: 86.

[32] PL'S. APP. II: 388, 392; PL'S. APP. I: 86.

[33] PL'S. APP. I: 23, 76.

[34] PL'S. APP. II: 411-64 (EX. 14).

the pass-through of Slamdunk's previously-suspended losses which had been liberated due to the additional basis triggered by Tate's December 30, 2016 capital contribution to Slamdunk.[35]

In addition to the substantial reduction of its note payable to Miken, Slamdunk also tendered several payments in the pre-petition period to particular creditors on obligations that had been personally guaranteed by Tate and/or Miken. Between October 2016 and the petition date in August 2017, a period which notably was subsequent to its retention of bankruptcy counsel, Slamdunk tendered twenty-three (23) payments to Chase Bank totaling $94,537.37 on secured indebtedness[36] which had been guaranteed by both Tate and Miken.[37] In a similar vein, Slamdunk tendered seven (7) payments to Austin Bank totaling $70,777.01 on secured indebtedness[38] which Tate had guaranteed (collectively, the "Guaranteed Lender Payments").[39] Slamdunk also tendered shareholder distributions to Tate in early 2017 totaling $21,917.00.[40]

---

[35] *Id*. at 466-69. However, a portion of this refund was attributable to losses sustained by Miken. PL'S. APP. I: 91. The Trustee concedes that the refund portion attributable to the December 30, 2016 transactions was $304,981.00. *Plaintiff's Response to Defendants' Motion for Summary Judgment* ("*P'S RESP.*") ¶ 6 at 7.

[36] DEFS'. APP. IV: 276-78 (Ex. II) for the Chase promissory note and pp. 279-82 (Ex. JJ) for the corresponding security agreement.

[37] PL'S. APP. I: 229-45.

[38] DEFS'. APP. IV: 291-92 (Ex. MM) for the Austin Bank promissory note and pp. 293-97 (Ex. NN) for the corresponding security agreement.

[39] PL'S. APP. I: 247-52.

[40] PL'S. APP. I: 254-56 (Ex. 37).

On August 1, 2017, approximately 215 days following the series of sequential transfers at Austin Bank, Slamdunk became a bankruptcy debtor by filing its voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court.[41] Stephen Zayler was appointed as the interim trustee of the Chapter 7 bankruptcy estate. In fulfillment of its statutory duties as a bankruptcy debtor, the Debtor filed its required schedules and statements on August 15, 2017.[42] Neither Miken nor Tate is listed as a creditor therein.[43] With specific reference to the issues in this dispute, the Debtor's schedules made no reference to the Miken Payment, did not disclose the 2017 shareholder distributions to Tate, nor did they disclose the Guaranteed Lender Payments which the Debtor made within the insider preference period on debts guaranteed by Miken and/or Tate.[44]

The Trustee subsequently initiated this adversary proceeding and has filed the present motion for summary judgment as supplemented, asserting that there are no genuine disputes of material fact and that, under such established facts, the chapter 7 estate is entitled to: (1) a recovery of an adjusted amount of $1,462,635.88 from Miken arising from the Miken Payment; (2) a recovery of $94,537.37 from Miken and Tate, jointly and severally, arising from the Guaranteed Lender Payments to Chase Bank; and (3) a recovery of $70,777.01 from Tate arising from the Guaranteed Lender Payments to

---

41 *Voluntary Petition* filed by the Debtor on August 1, 2017 [dkt #1] in case no. 17-60566.

42 Dkt. #6 in case no. 17-60566.

43 PL'S. APP. I: 159-83 (Ex. 24).

44 *Id*. at 118, 126 (Ex. 20).

Austin Bank, which the Trustee claims are all avoidable as preferential transfers under 11 U.S.C. § 547. In the event that the Miken Payment is not avoided, the Trustee contends in the alternative that the Miken Payment was an illusory and fraudulent boost to the stockholder basis which Tate held in the Debtor which triggered a fraudulent transfer of the Debtor's accumulated loss carryforwards to Tate as the Subchapter S shareholder under 11 U.S.C. § 548 and/or § 544, as such invokes state fraudulent transfer law under Texas Business & Commerce Code §§ 24.005 and 24.006. The Trustee further seeks an additional recovery of $21,917.00 from Tate (the "Slamdunk Shareholder Distribution") as a fraudulent transfer under § 548 of the Bankruptcy Code arising from shareholder distributions taken from Slamdunk approximately six months prior to the bankruptcy filing.

The Defendants, Miken and Tate, have jointly filed a competing motion for summary judgment, together with a supplement. They contend that, under the undisputed facts, they are each entitled to a judgment that denies all relief to the Trustee as a matter of law because the Trustee is precluded from establishing at least one essential element of his case or that any avoidance of any transaction determined to constitute a preferential transfer is precluded by one of their affirmative defenses.

## II. Summary Judgment Standards and Process

The parties bring their respective motions for summary judgment in this adversary pursuant to Federal Rule of Bankruptcy Procedure 7056.[45] That rule incorporates Federal Rule of Civil Procedure 56 which provides that summary judgment shall be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Where, as here, parties have filed cross-motions for summary judgment, each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Am. Int'l. Specialty Lines Ins. Co. v. Rentech Steel, LLC*, 620 F.3d 558, 562 (5th Cir. 2010) (citing *Shaw Constructors v. ICF Kaiser Engr's, Inc.*, 395 F.3d 533, 538–39 (5th Cir.2004)). The court "must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Byerly v. Standard Ins. Co.*, 2020 WL 1451543, at *16 (E.D. Tex. Mar. 25, 2020).

Any party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As a movant, a party asserting that a fact cannot be or is genuinely disputed must support that assertion by:

---

[45] Pursuant to the scheduling order issued in this adversary proceeding, motions for summary judgment are required to comply in format and content with Local District Court Rule CV-56 and such motions shall be decided under the procedures stated therein.

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).

The manner in which the necessary summary judgment showing can be made depends upon which party will bear the burden of persuasion at trial. The Trustee bears the ultimate burden of proof at trial regarding his claims for affirmative relief under 11 U.S.C. §§ 544, 547, and 548. *See* 11 U.S.C. § 547(g) [providing that "the trustee has the burden of proving the avoidability of a [preferential] transfer" under 11 U.S.C. § 547(b)]; *Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.),* 81 F.3d 592, 596 (5th Cir. 1996) ["[T]he trustee has the burden of proving the elements of a fraudulent transfer."]. In seeking summary judgment to establish the existence of a recoverable avoidable transfer, the Trustee "must support its motion with credible evidence— using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting); *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). That standard also applies to the Defendants' attempt to establish the existence of any claimed affirmative defense for which they carry the burden of persuasion.

As to all other aspects of the Defendants' joint motion for summary judgment, as well as that particular portion of the Trustee's motion which seeks a summary judgment as to all of the Defendants' affirmative defenses, summary judgment is properly awarded "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Under that scenario, "the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* at 331 (Brennan, J., dissenting); *Fret v. Melton Truck Lines, Inc.*, 706 F. App'x. 824, 827 (5th Cir. 2017).

Accordingly, if either motion for summary judgment is supported by a *prima facie* showing that the moving party is entitled to judgment as a matter of law, the party opposing that motion may not rest upon the mere allegations or denials in its pleadings, but rather must demonstrate in specific responsive pleadings the existence of specific facts constituting a genuine issue of material fact for which a trial is necessary. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *E.E.O.C. v. Steel Painters LLC*, 433 F. Supp.3d 989, 998 (E.D. Tex. 2020). "A fact is material only if its resolution would affect the outcome of the action. . . . " *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210

(5th Cir. 2009); *accord Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). In so demonstrating, the nonmovant must show more than a "mere disagreement" between the parties, *Calpetco 1981 v. Marshall Exploration, Inc*., 989 F.2d 1408, 1413 (5th Cir. 1993), or that there is merely "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Factual disputes over issues not germane to the claim are simply irrelevant because they are not outcome determinative. *Garza v. Briones*, 943 F.3d 740, 747–48 (5th Cir. 2019) (citing *Int'l Shortstop*, 939 F.2d at 1264). Neither are unsubstantiated, conclusory assertions in the response sufficient to raise a genuine issue of material fact. *McCarty v. Hillstone Rest. Group, Inc*., 864 F.3d 354, 357 (5th Cir. 2017). However, "[t]he issue of material fact which must be present in order to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (*citing First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).

The record presented is reviewed in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. Further, "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Essentially, if a nonmovant fails to set forth specific facts that present a triable issue on any relevant issues, his claims should not survive summary judgment. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 494 (5th Cir. 2001). In addition to the Rule 56 procedures outlined above, the content and determination of summary judgment motions in this Court are governed by Local District Court Rule CV-56.[46]

## III. TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AS SUPPLEMENTED

### A. The Miken Payment

As a portion of his supplemented motion, the Trustee has moved for summary judgment that he is entitled to avoid and recover the Miken Payment from Miken in the adjusted amount of $1,462,635.88 pursuant to 11 U.S.C. § 547 and Tex. Bus. & Com.

---

[46] Local District Court Rule CV-56 is specifically incorporated by Local Rule of Bankruptcy Procedure 7056(d). Rule CV-56, in relevant part, directs a summary judgment movant to include a Statement of Undisputed Material Facts and to support such a statement with "appropriate citations to proper summary judgment evidence." It directs a respondent that any response "should be supported by appropriate citations to proper summary judgment evidence." With regard to the disposition of the motion, the rule states:

> (c) **Ruling**. In resolving the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the response filed in opposition to the motion, as supported by proper summary judgment evidence. The court will not scour the record in an attempt to unearth an undesignated genuine issue of material fact.

Thus, any failure by a respondent to controvert the material facts set forth in any of the motions or to support such a challenge by references to proper summary judgment evidence, results in the facts as claimed and supported by admissible evidence by the movant "admitted to exist without controversy." E.D. TEX. LOCAL R. CV–56(c).

Code § 24.006(b).

**1. Preference Analysis - 11 U.S.C. § 547(b) [Miken Payment]**

Section 547 of the Bankruptcy Code authorizes a trustee to avoid certain preferential transfers of property made from a debtor's estate in a designated time period prior to the filing of a bankruptcy case. As the Fifth Circuit has stated:

> The purpose of the preference section is two-fold. First, by permitting the trustee to avoid pre-bankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section is to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution.

*Coral Petroleum, Inc. v. Banque Paribas—London*, 797 F.2d 1351, 1355 (5th Cir. 1986).

A trustee must prove six elements in order to successfully establish the existence of a preferential transfer under 11 U.S.C. § 547(b). Those elements are: (1) a transfer of an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of antecedent debt;[47] (4) made while the debtor was insolvent;[48] (5) made on or

[47] A debt is "antecedent" for purposes of § 547(b) if it was incurred before the alleged preferential transfer. *Baker Hughes Oilfield Operations. v. Cage (In re Ramba, Inc.),* 416 F.3d 394, 399

within 90 days before the date of the filing of the bankruptcy petition; and (6) that enabled the creditor to receive more than it would otherwise have received if the transfer had not been made and the case had proceeded under Chapter 7. 11 U.S.C. § 547(b).

There is no material factual dispute about what events transpired on December 30, 2016. The dispute over the $1.55 million transfer to Miken (the "Miken Payment") pertains to the proper legal construction of those events. Framed in the context of the § 547(b) elements, the Defendants challenge the Trustee's characterization of the $1.55 million Miken Payment as a preferential transfer from the Debtor solely upon the basis of the first element — whether there was a transfer of an interest of the Debtor in property. The Defendants did not otherwise contest the existence of the remaining five elements of § 547(b) regarding this transaction and, upon review of the summary judgment evidence, there is no material factual dispute that Miken was an unsecured creditor of the Debtor,[49] that it recorded on its books the receipt of $1.55 million from the Debtor[50] which was applied to an antecedent debt owed to it by the Debtor.[51] Further, there is no material factual dispute that such an event occurred within the one-year insider period prior to the

(5th Cir. 2005).

[48] The Bankruptcy Code defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation ..." 11 U.S.C. § 101(32).

[49] PL'S. APP. I: 112.

[50] *Id*.

[51] *Id*.

Debtor's bankruptcy,[52] at a time when the Debtor was insolvent,[53] and that the transaction resulted in a commensurate reduction in the indebtedness owed to Miken by the Debtor.[54] Thus, if the funds received by Miken constituted a transfer of the Debtor's property, then the Trustee has met his *prima facie* burden to establish the existence of a preferential transfer, and the analysis would then shift to the preference defenses asserted by the Defendants in order to determine the avoidability of that transfer.

---

[52] There is no genuine dispute that the December 30, 2016 transaction occurred within one year of the Debtor's bankruptcy filing. There is also no factual dispute that, at the time of the transaction, Tate owned 90% of the outstanding shares of the Debtor and 100% of the Miken stock. Thus, Miken had a horizontal affiliate relationship with the Debtor under § 101(2)(B) of the Bankruptcy Code, *In re Reichmann Petroleum Corp*., 364 B.R. 916, 921 (Bankr. E.D. Tex. 2007), and its affiliated status makes Miken a statutory insider of the Debtor under § 101(31)(E) of the Bankruptcy Code. *See, e.g., In re Nilhan Developers, LLC*, 620 B.R. 385, 400 (Bankr. N.D. Ga. 2020); *Redmond v. Ellis County Abstract & Title Co.* (*In re Liberty Livestock Co*.), 198 B.R. 365, 371 (Bankr. D. Kan. 1996).

[53] PL'S. APP. II: 318 (EX. 11). *See also*, PL'S. APP. I: 92-93 (Pope depos. 50:14-51:13) wherein this insightful exchange occurred with the Debtor's accountant:

> Q: (by Mr. Ritcheson): So in December of 2016, was Slamdunk Enterprises able to pay its debts as they were coming due?
> A: (by Mr. Pope): To my knowledge, no.
> Q: (by Mr. Ritcheson): All right.
> A: (by Mr. Pope): Not all debts.
> Q: (by Mr. Ritcheson): Not all of its debts. Was – and, of course, you have a 10 percent stake in the company until December 31, 2016?
> A: (by Mr. Pope): Correct.
> Q: (by Mr. Ritcheson): In your opinion as a stockholder, was the company, did it have any value over and above its debts?
> A: (by Mr. Pope): No, sir.
> Q: (by Mr. Ritcheson): In your opinion as the stockholder and owner of the company, were its — was the company's assets, if fairly valued, worth more than the amount of its debts?
> A: (by Mr. Pope): I do not know what the value of the assets were.
> Q: (by Mr. Ritcheson): You were willing to give up your 10 percent for a hundred bucks and get out, right?
> A: (by Mr. Pope): Yes, that's correct.
> Q: (by Mr. Ritcheson): That's some indication what you thought it was worth, correct?
> A: (by Mr. Pope): Correct.

[54] PL'S. APP. I: 112.

Despite acknowledging the accuracy of such facts, the Defendants deny that any funds were actually received by Miken. The Defendants instead contend that, as a matter of law, no interest in the Debtor's property was transferred to Miken in December 2016 because those activities constituted what they characterize as a "circular contemporaneous transaction." According to the Defendants, it is imperative to view the December 30 activities as a singular, simultaneous event, and they assert that it is improper to view and/or to ascribe legal significance to the activities as distinct, separate actions.[55] Finally, the Defendants contend that, notwithstanding the fact that Miken recorded the receipt of a payment from the Debtor in its books and records and the application of that payment to an antecedent debt owed by the Debtor to Miken, no money actually changed hands in this circular contemporaneous transaction.[56] Thus, according to the Defendants, "[u]nder the facts of this case, no transfer of property *of the Debtor* occurred as required and so the Trustee's causes of action must fail."[57] The Trustee essentially describes such distinctions are contrived and artificial, and argues that such a construction blatantly ignores the factual and legal realities arising from the December 30 transaction. An

---

[55] *See also, Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment* ("*DEFS.' REPLY*") ¶ 3.2 at 3 ["The contemporaneous circular transactions are three interrelated parts of a single circle, none of which which be considered alone as urged by the Trustee. There could not have been and was in fact not a single one way transfer of Debtor's property."]

[56] DEFS'. MOTION ¶ 4.7 at 9 ["Debtor never transferred $1,550,000 to Defendants. ... [Because of existing account balances], Debtor did not have the ability on December 30, 2016 to transfer that which it did not own or possess. None of the Debtor's account balance was transferred to or for the benefit of either of the Defendants."].

[57] *Id*., ¶ 4.6 at 9 (emphasis in original).

evaluation requires a review of the applicable legal standard, together with an examination of the nature and purpose of the Debtor's subchapter S tax status and the legal impact of Tate's activities to increase his basis in the Debtor's stock by making an additional capital contribution in order to authorize a greater deduction of Slamdunk's losses on his personal tax return.

*An Interest of the Debtor in Property*

In order to prevail in his preference claim regarding the Miken Payment, the Trustee must establish that a transfer[58] of "an interest of the debtor in property" occurred. What constitutes "an interest of the debtor in property" is not precisely defined in the Bankruptcy Code. However, the United States Supreme Court has declared that the phrase "interest of the debtor in property" is coextensive with the term "property of the debtor" found in § 541(a)(1) of the Bankruptcy Code, *Begier v. Internal Revenue Svc.*, 496 U.S. 53, 58-59 (1990), thereby restricting the reach of a trustee's avoidance powers only to "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Id.* at 58 (cited in *Stettner v. Smith (In re IFS Fin.Corp.*), 669 F.3d 255, 261 (5th Cir. 2012)). For guidance, therefore, we must turn to § 541 of the Bankruptcy Code, which delineates the scope of "property of the estate," and which serves as the post-petition analog to § 547(b)'s 'property of the

[58] The definition of a "transfer" under the Bankruptcy Code is "expansive," *Barnhill v. Johnson*, 816 U.S. 393, 400 (1992) and encompasses "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." 11 U.S.C. § 101(54)(D).

debtor.'"[59] As one recent case reminds us,

> Section 541(a)(1) provides that the property of the estate includes 'all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case' wherever located and by whomever held. The scope of § 541 is broad and should be generously construed; an interest may be property of the estate even if it is novel or contingent.

*Walters v. Stevens, Littman, Biddison, Tharp & Weinberg, LLC* (*In re Wagenknecht*), 971 F.3d 1209, 1213 (10th Cir. 2020) (citations and internal quotations omitted). In expounding upon this required element of a § 547(b) preference, the Fifth Circuit has noted that:

> A debtor has an interest in property if that property would have been a part of the debtor's bankruptcy estate had the transfer not occurred. A trustee cannot avoid transfers of property unless the property would have been in the estate and therefore available to the debtor's general creditors. Essentially, a voidable preference must have depleted the estate. A trustee bears the burden of proving that the debtor had an interest in the transferred property.

*Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.),* 437 F.3d 457, 459-60 (5th Cir. 2006). In other words, "[i]f funds cannot be used to pay the debtor's creditors, then they generally are not deemed an asset of the debtor's estate for preference purposes." *Jenkins*, 81 F.3d at 595.

[59] The term "property of the estate" is generically defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). *See generally, United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983). The interchangeability of the phrases "interest of the debtor in property" and "property of the debtor" also applies in fraudulent transfer jurisprudence construing 11 U.S.C. §§ 548 and 544. *Aurzada v. Jenkins* (*In re Jenkins*), 617 B.R. 91, 104–05 (Bankr. N.D. Tex. 2020).

*Subchapter S Elections*

A corporation is generally liable for federal income tax on its taxable income. However, the revenue of such a "C-corporation," as it is known, is subject to double taxation: once at the corporate level at corporate tax rates, then again on the shareholder's tax returns upon the distribution of dividends. In order to avoid that double taxation, the shareholders of certain types of small corporations[60] may elect to be taxed as an "S-corporation." *See generally*, 26 U.S.C. §§ 1361-79, *et seq*. (2018). Congress created the S-corporation status to promote organizational flexibility for shareholders, intending "to limit the influence of tax considerations on choice of entity used to own a business." *Arrowsmith v. United States* (*In re Health Diagnostic Lab., Inc*.), 578 B.R. 552, 565 (Bankr. E.D. Va. 2017). Thus, an S-corp election can only be made by a unanimous decision of the corporation's shareholders. 26 U.S.C.A. § 1362(a)(2). After such an election, the corporate entity itself pays no tax, but its income, deductions, losses, and credits flow-through to its shareholders who must report those amounts in their personal income tax returns "in a manner akin to the tax treatment of partnerships." *Bufferd v. Comm'r.*, 506 U.S. 523, 525 (1993) (citing 26 U.S.C. § 1366(d)(1)). Thus, an S-corp is sometimes referred to as a "pass-through" or "flow-through" entity. *Majestic Star Casino, LLC v. Barden Development, Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 742 n.4 (3d Cir. 2013). As described by the Supreme Court,

---

[60] *See* 26 U.S.C.A. § 1361(b) (West 2011).

> To prevent double taxation of income upon distribution from the corporation to the shareholders, § 1367(a)(1)(A) [of Title 26, U.S. Code] permits shareholders to increase their corporate bases by items of income identified in § 1366(a). Corporate losses and deductions are passed through in a similar manner and the shareholders' bases in the S corporation's stock and debt are decreased accordingly. However, a shareholder cannot take corporate losses and deductions into account on his personal tax return to the extent that such items exceed his basis in the stock and debt of the S corporation. If those items exceed the basis, the excess is "suspended" until the shareholder's basis becomes large enough to permit the deduction.

*Gitlitz v. Comm'r.*, 531 U.S. 206, 209–10 (2001) (citations omitted). In other words, "the Internal Revenue Code places a limitation on the pass-through loss deductions that an individual may take on his tax return. The deductions cannot exceed the shareholder's adjusted basis in stock and debt." *Maloof v. Comm'r*., 456 F.3d 645, 647 (6th Cir. 2006); 26 U.S.C. § 1366(d)(1). However, the basis of an S-corp shareholder in the stock of the corporation may be increased in subsequent years by making additional capital contributions to the corporation. *Id.* at 648 (citing 14A WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 6970.205 (p. 524) (West 2000)) and 26 C.F.R. § 1.118-1 ["A shareholder's basis in the stock of an S corporation is subject to adjustment from year to year. . . . Generally, the adjusted basis of S corporation stock is increased by income passed through to the shareholder and is decreased by losses and deductions passed through to the shareholder. . . . The basis of an S corporation shareholder in the stock of the corporation may also be increased by capital contributions made to the corporation."].

That is precisely the circumstance Tate faced in the fall of 2016. Slamdunk had accumulated business losses of more than $2 million,[61] but Tate had been unable to enjoy the pass-through benefits of the S-corp election to deduct those suspended losses on his personal tax return because he had exhausted his adjusted tax basis in the Slamdunk stock.[62] That would not change without an increase in that basis. Having already taken preparatory steps to initiate a bankruptcy filing for Slamdunk, time was of the essence. Thus, Tate initiated the "circular contemporaneous transaction" as a means of increasing his adjusted basis in his Slamdunk stock.

Though jurisprudence exists which rejects the legitimacy of various taxation strategies involving a brief, circular flow of funds that begins and ends with the same party and is designed solely to generate bases in an S corporation, *see, e.g.*, *Oren v. Comm'r*, 357 F.3d 854 (8th Cir. 2004); *Kerzner v. Comm'r*, 97 T.C.M. (CCH) 1375, 2009 WL 910674 (Apr. 6, 2009), the scrutiny of the "circular contemporaneous transaction" does not lie within the province of this court. Even if it did, the summary judgment evidence pertaining to the Trustee's preference claim in this case does not challenge the validity of Tate's capital contribution upon which his subsequent personal deduction of Slamdunk's losses was based. Thus, for the purposes of this analysis, the December 30,

---

[61] *See supra* note 14.

[62] PL'S. APP. I: 75. Mr. Pope testified that "Mike [Tate] individually had not advanced the monies. Consequently, all of the losses that came out of Slamdunk, 2011 through 2015, were suspended, meaning Mike could not deduct those losses on his personal tax return becaues he did not have basis." *Id*. (Pope depos. 22:17-21).

2016 process stands as a legitimate means by which Tate in various capacities engaged in a series of transactions which did, in fact and in law, constitute a proper capital contribution, thereby increasing his basis in Slamdunk's stock. Such actions provided a foundation for the proper pass-through of Slamdunk's net loss carryforwards to Tate and those deductions ultimately entitled him to a significant tax refund. Those facts are established by the summary judgment evidence. The parties are bound by them.

Yet the Defendants' position as to the preference claim ignores the requirements and consequences of a pass-through transaction and expressly contradicts the legitimacy of those transactions. The Defendants now assert that there could have been no preferential payment because the circular contemporaneous transaction occurred, and was intended to occur, without the necessity of any economic transfer actually occurring between the involved parties. However, that proposition undermines the integrity of the very process that Tate invoked. What he accomplished, as evidenced by his ultimate receipt of a significant individual tax refund, could not have been achieved as a matter of law without the tendering of a legitimate capital contribution to Slamdunk. "It is well established that a shareholder cannot increase his basis in his S corporation stock without making a corresponding economic outlay." *Reser v. Comm'r*, 112 F.3d 1258, 1264 (5th Cir. 1997); *accord*, *Estate of Leavitt v. Comm'r*, 875 F.2d 420, 422 (4th Cir. 1989) ["To increase the basis in the stock of a subchapter S corporation, there must be an economic outlay on the part of the shareholder."]. As another court explained,

> Before the taxpayer may increase his basis, there must have occurred some transaction which when fully consummated left the taxpayer poorer in a

> material sense. . . . Since *Perry*, 'economic outlay' has been the coin of the realm when it comes to assessing whether a transaction increases a taxpayer's basis."

*Maloof*, 456 F.3d at 649 (*citing Perry v. Comm'r*, 54 T.C. 1293, 1296, 1970 WL 2283 (1970)). As discussed earlier, S corporation losses may only be deducted by a shareholder to the extent that such a shareholder has an adjusted basis in his stock in that S corporation and/or an adjusted basis in any indebtedness of the S corporation to that shareholder.[63] Once that basis is exhausted, the pass-through of losses is suspended until such time as new capital is invested into the corporation by the shareholder.[64] That requires a transaction with an actual economic substance beyond the mere creation of tax benefits. In the context of evaluating tax deductions, the Internal Revenue Code "elevates substance over form, asking not what the surface of a transaction suggests but what the economic realities show," *Richardson v. Comm'r*, 509 F.3d 736, 740 (6th Cir. 2007), and a taxpayer only meets that test in that context "when he incurs a cost or is left poorer in a material sense after the transaction." *Maguire v. Comm'r*, 90 T.C. 206, 217, 2012 WL 2036153, at *4 (June 6, 2012). "To allow [subchapter S shareholders] to increase the

---

[63] This is because "Congress intended to limit a shareholder's ability to deduct an S corporation's losses by the amount the shareholder *invested* in the corporation." *Oren,* 357 F.3d at 857 (emphasis added).

[64] "A shareholder with inadequate basis in the shareholder's investment in an S corporation can increase basis by contributing cash to the corporation or by purchasing additional stock from the corporation. Shareholders taking either tack must be willing and able to place additional assets at the risk of the business." JAMES S. EUSTICE, JOEL D. KUNTZ, & JOHN A. BOGDANSKI, FEDERAL INCOME TAXATION OF S CORPORATIONS, ¶ 9.04[2][b] (5th ed. 2015), Westlaw WG&L (database updated Nov. 2020). Though not germane to the circumstances presented, basis can also be increased by the incurrence of certain indebtedness. *See, e.g.*, Treas. Reg. § 1.1366-2(a)(2)(iii), Ex. 1 (2014).

basis of their stock without a capital outlay . . . would provide them a means of avoiding these [statutory] limitations . . . and thereby erect a tax shelter that Congress never intended to create." *Estate of Leavitt v. Comm'r*, 90 T.C. 206, 217 (1988), *aff'd*, 875 F.2d 420 (4th Cir. 1989) (*citing Brown v. Comm'r*, 706 F.2d 755, 756 (6th Cir. 1983)). Accordingly,

> **[o]nly** where the shareholder provides **his own money** . . . to the S corporation, will basis increase. . . . [C]lose relationships among the parties are not fatal to the shareholder's claim of increased basis **<u>if</u>** other elements are present which clearly establish the bona fides of the transactions and their economic impact.

*Oren*, 357 F.3d at 858 (emphasis added).

Yet, after having claimed an increased basis under the foregoing principles, resulting in an authorized deduction of previously-suspended Slamdunk losses and thereby creating his entitlement to a sizable refund on his personal tax return, Tate now effectively seeks to renounce the bona fides of the December 30, 2016 transactions and, on behalf of himself and his surviving S corporation, to characterize his actions as a meaningless series of accounting entries devoid of economic reality, though that would eliminate the primary foundation upon which the pass-through of Slamdunk's losses to Tate was authorized. The only reality that matters, according to the Defendants, is that none of the three participants (though all controlled by Tate) had a bank account balance from which a transfer of $1.550 million could have occurred.

As an initial matter, Tate is estopped under the principles of quasi-estoppel from

contending that the payment which he tendered to Slamdunk on December 30, 2016 was anything other than a distinct infusion of personal funds that constituted a capital contribution to the assets of Slamdunk and thereafter became Slamdunk assets. Under Texas law, quasi-estoppel "forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." *Davidson v. Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991) (internal citations omitted) [concluding that a debtor was estopped in a bankruptcy nondischargeability case from contending that certain payments did not constitute alimony to a former spouse after he had obtained pre-petition tax deductions by characterizing payments as alimony on his tax returns]; *Jay v. Specialized Loan Servicing LLC*, 2020 WL 5637934, at *3 (E.D. Tex. Aug. 28, 2020). It is a procedural device or affirmative defense that "was developed to prevent a party from retaining a benefit by asserting a position to the disadvantage of another and then asserting a right which is inconsistent with that previous position." *Gil Ramirez Group, L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 414 (5th Cir. 2015). In other words, an estopped party is "forbidden to flip-flop between two legally permissible characterizations of certain payments depending on which was more immediately expedient." *Pennsylvania House, Inc. v. Juneau's Pennsylvania House, Inc.*, 791 F. Supp. 160, 162 (E.D. Tex. 1992). Quasi-estoppel principles are often invoked to estop parties from asserting a position in judicial proceedings that are contrary to declarations made under the penalty of perjury on their income tax returns. *See, e.g., Davidson*, 947 F.2d at 1297; *Robb-Fulton v. Robb* (*In*

*re Robb*), 23 F.3d 895, 898-99 (4th Cir. 1994); *Amtrust, Inc. v. Larson*, 388 F.3d 594, 601 (8th Cir. 2004); *Ginor v. Landsberg*, 159 F.3d 1346 (2d Cir. 1998) [party estopped from claiming that a wrap note was not a genuine debt after having obtained $14.5 million in tax deductions by representing the opposite to IRS in its tax return]; *Cent. States, Se. & Sw. Areas Pension Fund v. One Stop, Inc.*, 2007 WL 7705585, at *13 (N.D. Ill. July 18, 2007) [taxpayer estopped from assuming contradictory position from earlier tax return in which his tax liability was reduced through deduction of expenses and losses]. "The elements of quasi-estoppel are: (1) the party being estopped acquiesced to or benefited from a position inconsistent with his present position; (2) it would be unconscionable to allow the party being estopped to maintain his present position; and (3) the party being estopped had knowledge of all material facts at the time of the conduct on which estoppel is based." *Pirani v. Baharia* (*In re Pirani*), 579 B.R. 396, 406 (Bankr. E.D. Tex. 2017).

The summary judgment evidence clearly establishes the existence of those quasi-estoppel elements. Tate benefited from his characterization of the December 30, 2016 infusion of funds as a capital contribution to Slamdunk. Such a characterization was intentionally utilized by Tate to increase his basis in his Slamdunk stock, thereby authorizing him to deduct the accumulated Slamdunk losses due to the company's Subchapter S election, and his intentional action resulted in his receipt of a $304,981 refund on his personal tax return.[65] His choice to characterize his cash infusion into

---

[65] *See supra* note 35.

Slamdunk as an actual and effectual capital contribution was deliberate, calculated, and successful. It would now be unconscionable to allow Tate in this litigation to abandon those established facts in favor of a diametrically different stance that his act of depositing sums into Slamdunk's care, custody and control was inconsequential and had no real economic significance.

Even without the application of estoppel principles, the summary judgment evidence, even that tendered by the Defendants, refutes that revisionism. The bank statements reflect distinct, sequential transfers of $1.55 million which are denominated as separate "checking withdrawals" from and "checking deposits" to the accounts of : (1) Miken to Tate;[66] (2) Tate to Slamdunk;[67] and, most importantly, (3) Slamdunk to Miken.[68] The validity of these transfers was verified by Tate himself.[69] He attested to the legitimacy of the capital contribution under penalty of perjury in his tax return.[70] That sworn statement is corroborated by the sworn statements of the Debtor's own accountant and former director, John Pope. After confirming the suspended nature of Slamdunk's accumulated losses because Tate had no remaining basis in the company, Pope testified as follows:

---

[66] PL'S. APP. I: 113-15 (EX. 5); DEFS'. APP. II: 158-59 (EX. L) .

[67] PL'S. APP. I: 98-100 (EX. 1); DEFS'. APP. II: 160, 164 (EX. M).

[68] PL'S. APP. I: 101-03 (EX. 2); DEFS'. APP. II: 156-57 (EX. K); 170 (EX. N).

[69] PL'S. APP. I: 29-32 (Tate depos. 55:11-58:6).

[70] *Id*. at 30 (Tate depos. 56:1-24); PL'S. APP. II: 392.

A: (by Mr. Pope): Slamdunk owed Miken Oil $1,600,000 toward the end of 2016 which was cumulative of the advances to Slamdunk from Miken. An S corporation can pay distributions out to a shareholder. So what we did was we made a distribution to Mike [Tate] as the shareholder of Miken for $1,550,000. Mike put that in his checking account. It was then transferred to Slamdunk as additional paid-in capital.

Slamdunk then paid that $1,550,000 to Miken Oil as payment on the advances that Miken had made over the years. By doing that, Mike individually now had basis in the stock of Slamdunk Enterprises to where he could deduct all those accumulated losses that he could not have deducted on his personal tax returns in prior years.[71]

. . .
Q: (by Mr. Ritcheson): All right. And Mr. Tate didn't loan the money to Slamdunk Enterprises; he made it as a capital contribution. Right?
A: (by Mr. Pope): Correct.
Q: (by Mr. Ritcheson): So, from an accounting standpoint, what is a capital contribution?
A: (by Mr. Pope): A capital contribution is either when you buy stock initially in a corporation or you put in additional funds as additional paid in capital.
. . .
however many shares [of stock] are issued at whatever par value is, that shows up as common stock. Any additional funds put in over that par value is considered additional paid in capital.

Q: (by Mr. Ritcheson): And from an accounting standpoint, a (sic) paid in capital is different from a loan, right?
A: (by Mr. Pope): Yes, sir.
Q: (by Mr. Ritcheson): Because a loan has to be repaid, the paid in capital does not have to be repaid?
A: (by Mr. Pope): Correct.
Q: (by Mr. Ritcheson): And in this instance, Slamdunk Enterprises never made an agreement to repay Mike Tate that you know of for the $1,550,000?
A: (by Mr. Pope): That is correct.
Q: (by Mr. Ritcheson): Okay. When this was reported as a capital

---

[71] PL'S. APP. I: 75-76 (Pope depos. 22:22-23:11).

contribution to the Internal Revenue Service on Exhibit 13 for 2016 – how can I ask that? – that's what you intended to report, isn't it?
A: (by Mr. Pope): That is correct.
Q: (by Mr. Ritcheson): That's not a mistake, is it?
A: (by Mr. Pope): No, sir.
Q: (by Mr. Ritcheson): That was accurate in every sense of the word, right?
A: (by Mr. Pope): Yes, sir.[72]

. . .

Q: (by Mr. Ritcheson): I've got a question for you. So did Slamdunk Enterprises really pay Miken Oil $1,550,000 on that debt or was it just some sort of accounting gimmick to increase the tax bases (sic) for Mr. Tate?
A: (by Mr. Pope): It was to increase the tax basis for Mr. Tate, yes.
Q: (by Mr. Ritcheson): So it was an accounting gimmick?
A: (by Mr. Pope): No, sir.

[counsel objection]

A: (by Mr. Pope): No, sir, there was substantial authority to do that.
Q: (by Mr. Ritcheson): Was there really an amount paid to Miken Oil?
A: (by Mr. Pope): Yes, there was. There was cash transferred.
Q: (by Mr. Ritcheson): $1,550,000?
A: (by Mr. Pope): Yes, sir.
Q: (by Mr. Ritcheson): So when that's reported to the IRS that there was $1,550,000 paid to Miken Oil, that's accurate, isn't it?
A: (by Mr. Pope): Correct.[73]

Further, the summary judgment evidence reveals that, contrary to the Defendants' contentions, this was not a singular transaction. As the banking records attest, it was a series of transactions. These actions were not simultaneously performed. These actions by Tate were sequential in nature. They were sequential in nature because they had to be

---

[72] PL'S. APP. I: 82-84 [Pope depos. 35:16-37:5].

[73] PL'S. APP. I: 86-87 (Pope depos. 41:18-42:13).

in order to accomplish sequential results — the tendering of a capital contribution by Tate, the increase in Tate's basis in Slamdunk, and the release of the suspended Slamdunk losses which could then pass through the corporate entity and be eligible for deduction on Tate's individual income tax returns. This sequential sequence was verified by Mr. Pope under oath:

> Q: (by Mr. Ritcheson): All right. So did you provide assistance to Mr. Tate and Miken Oil and Slamdunk Enterprises in sort of structuring that series of transactions?
>
> A: (by Mr. Pope): Yes, I did. I told Mike that Miken has to pay him – he has to pay Slamdunk – Slamdunk has to pay Miken.[74]

Further, these actions were not performed by someone acting in a singular capacity. The actions were performed by a single individual, but, as Tate performed each transaction, he was acting in each instance in a distinct capacity on behalf of a different legal entity. At each sequential step, as each recipient held title to the transferred $1.550 million sum, separate and distinct business and financial options were available to Tate in the capacity in which he stood in each particular sequential stage. When Tate received the distribution/loan from Miken, he possessed behavioral options regarding his utilization of those funds. He elected to invest what were then his personal funds with Slamdunk as a capital contribution in order to achieve a personal goal — the receipt of a significant individual tax refund. He was not required to make that individual decision.

As Slamdunk took possession of the deposited sum, Tate changed hats. He was no

---

[74] PL'S. APP. I: 76 (Pope depos. 23:12-17).

longer acting in his individual capacity. He was "President Tate" — acting as the sole corporate officer of Slamdunk with all of the fiduciary responsibilities attached thereto. For a distinct period of time, the funds rested in Slamdunk's bank account as Tate contemplated his next action. He had options. As the sole corporate officer of Slamdunk, President Tate retained the managerial ability to control the actions of the Debtor upon its receipt of the capital contribution. While there may have been ramifications to others for any option he exercised at that point on behalf of Slamdunk, and particularly as Slamdunk sat on the precipice of a bankruptcy filing, President Tate had to make a choice about what to do with that deposit for the benefit of Slamdunk. There is no material dispute that President Tate, as the sole officer of Slamdunk, possessed the authority to direct the application of the capital contribution. There is no material dispute that he, as the sole officer of Slamdunk, exercised that authority by quickly transferring the entirety of those Slamdunk funds to his other closely-held corporation which was credited by that corporation as a significant reduction of the existing account owed by Slamdunk. No other creditor of Slamdunk shared in those capital contribution proceeds.

The degree of control which President Tate exercised on behalf of Slamdunk at that sequential moment is sufficient to document that the Debtor had an interest in the $1.55 million on deposit in its bank account prior to the time that the sum was transferred to Miken. "[I]n the context of voiding preferential transfers under § 547 of the Bankruptcy Code . . . , control over funds in an account is the predominant factor in determining an account's ownership." *Stettner*, 669 F.3d at 262. As the Fifth Circuit has

noted,

> [i]f the debtor determines the disposition of funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and the funds are assets of the estate. In this event, because the debtor controlled the funds and could have paid them to anyone, the money is treated as having belonged to her for purposes of preference law whether or not she actually owns it.

*Caillouet v. First Bank and Trust (In re Entringer Bakeries, Inc.)*, 548 F.3d 344, 350 (5th Cir. 2008) (quoting 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 6-7, at 522 (1992)). The summary judgment evidence establishes that, upon its receipt of the capital contribution from Tate, Slamdunk had "complete legal title, all indicia of ownership, and unfettered discretion to pay creditors of its own choosing, including its own creditors." *Southmark Corp. v. Grosz* (*Matter of Southmark Corp.*), 49 F.3d 1111, 1116 (5th Cir. 1995). In more common words, Slamdunk had control of its separate bank account into which the capital contribution was deposited. The fact that President Tate possessed the power to convey those sums to another of his closely-held corporations evidences such control. The demonstration of such control "is particularly important, as the primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment." *Id*. at 1117.

None of the Defendants' contentions change the conclusion that Slamdunk possessed sufficient control over the capital contribution in its bank account to create an

ownership interest in those funds. The likelihood that Tate would have never exercised that control to benefit Slamdunk's other creditors rather than in pursuit of his own self-interests changes nothing. Tate's contention that he would not have initiated the series of transfers at all had he known of the possibility that the subsequently-created bankruptcy estate of Slamdunk could retain recovery rights to the Miken payment is equally meaningless. Nor does the Court need to speculate about legal or financial consequences that might have arisen between Miken and Austin Bank had the capital contribution not been tendered to Miken. It is sufficient that, for reasons unspecified in the summary judgment record, the bank granted the equivalent of a provisional credit to Miken to initiate its distribution to Tate individually, and those funds were then subsequently transferred to Slamdunk as a capital contribution from Tate. The fact that President Tate transferred Slamdunk's money to Miken on account of an antecedent debt simply evidences the dominion and control which Slamdunk's president actually possessed over the capital contribution which had been placed in Slamdunk's bank account.[75] Finally,

[75] The Court also rejects any applicability of the "collapsing doctrine" in this context. The collapsing doctrine, also known as the single unified transaction theory, is an equitable doctrine used for analysis under the fraudulent conveyance laws in which a court breaks through a structure of a multi-step transaction to prevent its participants from protecting themselves from fraudulent transfer liability. It has a limited application to circumstances under which leveraged buyouts and other multi-step, sophisticated transactions are challenged on fraudulent transfer grounds. The multiple steps are "collapsed" and evaluated as one integrated transaction in order to assess whether a transferor received reasonably equivalent value and to reveal any fraudulent intent on behalf of the participants in the transactions. *See, e.g., HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995); *U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986); *Goodman v. H.I.G. Capital, LLC* (*In re Gulf Fleet Holdings, Inc.*), 491 B.R. 747, 771 (Bankr. W.D. La. 2013 [collecting cases]. Though the Defendants seek to utilize similar-sounding terminology from the collapsing doctrine jurisprudence and to conflate it with their "circular contemporaneous transaction," it simply has no application to the evaluation of whether Slamdunk possessed an ownership interest in the funds transferred to it by Tate as a capital contribution. There is certainly no indication in the summary judgment record that the Internal Revenue Service viewed

the fact that Slamdunk possessed the funds only briefly before Tate transferred them to Miken is of no consequence. "The preferential transfer look back is not time sensitive—the issue is whether any asset, regardless of how fleeting its presence in the bankrupt's estate during the relevant period of time, should be ratably apportioned among qualified creditors or permitted to benefit only a preferred creditor." *Parks v. FIA Card Servs., N.A. (In re Marshall*), 550 F.3d 1251, 1258 (10th Cir. 2008). Accordingly, the summary judgment evidence establishes that the Miken Payment constituted a transfer of an interest of the debtor in property.

This result may seem harsh. Although the December 30, 2016 transactions at the bank seem unusual, they may very well be commonplace among individuals conducting business through S-corporations. However, these transactions did not occur in a vacuum and the timing of the transactions in light of the timing of ultimate bankruptcy filing by Slamdunk is determinative. There is nothing inherently illegitimate about an S-corp shareholder seeking to maximize the pass-through tax benefits of the S-corp. election. There is nothing inherently illegitimate about an S-corporation exercising its discretion to pay a particular debt, even to an insider creditor—*until* such actions are performed in advance of a bankruptcy case initiated by that S-corporation. That changes everything. Concrete, sequential actions were taken by Tate in various capacities in order to achieve a specific objective. While creative attempts to create basis in an S-corporation are varied

---

this as a collapsed transaction instead of a distinct (and legitimate) capital contribution by Tate which paved the way for the deduction of Slamdunk's suspended losses.

and have been the subject of considerable litigation in various courts, when you elect to proceed with such a transaction in the light of an impending bankruptcy of an insolvent participant, you proceed at your peril. In this instance, Tate, as the sole corporate officer for Slamdunk, had already taken considerable actions toward a bankruptcy filing for his company as the December 30, 2016 activities were concocted and then consummated. Indeed, Slamdunk had already procured a bankruptcy attorney and the drafting of bankruptcy schedules had begun weeks prior to the December 30 transactions. Thus, the December 30 transactions knowingly took place in the face of a bankruptcy filing thought to be imminent, but which was delayed at Tate's sole insistence in an effort to extract the company's suspended losses for his personal benefit before initiating that filing. That is exactly the rationale for the creation of the insider concept in the bankruptcy avoidance arena. That is exactly why the Miken Payment must yield to the principles undergirding the preference concept.

The Trustee has successfully demonstrated that there is no genuine dispute as to any material fact pertaining to the Miken Payment and that the Trustee is entitled, at a minimum, to the entry of a partial summary judgment that each element of a preferential transfer under § 547(b) of the Bankruptcy Code has been established with regard to the Miken Payment in this case. In light of such determination, a summary judgment shall be issued in favor of the Trustee that the Miken Payment is avoided as a preferential transfer unless it can be shown that such a transfer is insulated from avoidance due to the viability of one of the affirmative defenses alleged by the Defendants under § 547(c) of the Bankruptcy Code.

**2. Constructive Fraudulent Transfer Analysis - TUFTA [Miken Payment]**

As an alternative ground of recovery, the Trustee also seeks to avoid the transfer of the Miken Payment as a constructive fraudulent transfer under § 24.006(b) of the Texas Uniform Fraudulent Transfer Act ("TUFTA").[76] That section provides that:

> [a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

5 TEX. BUS. & COM. CODE ANN. § 24.006(b) (West 2015). "TUFTA's purpose is to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016). "The Act is designed to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015).

The Court takes judicial notice of the claims filed in the Debtor's underlying bankruptcy case. The triggering creditor requirement under § 24.006 is satisfied by numerous unsecured claims, including Claim 1-1 which documents the Debtor's unsecured indebtedness to Charles N. Richardson Enterprises which was incurred in the

[76] "Section 544 of the Bankruptcy Code allows the trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws and confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case." *Anderson v. Mega Sys., L.L.C.* (*In re Mega Sys., L.L.C.*), 2007 WL 1643182, at *9, (Bankr.E.D. Tex. June 4, 2007).

summer of 2016 prior to the December 31, 2016 transfer at issue. Thus, the Trustee is authorized under § 544(b) of the Bankruptcy Code to utilize applicable Texas law to seek an avoidance of a fraudulent transfer.

As set forth in the preceding section, the Trustee's summary judgment evidence establishes that: (1) Miken was an insider at the time the Miken Payment was made; (2) that the Miken Payment was for an antecedent debt owed by Slamdunk that Miken actually credited upon receipt; (3) that Slamdunk was admittedly insolvent at the time of the transfer; and (4) that Miken had reasonable cause to believe that Slamdunk was insolvent, particularly in the face of creditor litigation, unpaid payroll taxes, and other financial setbacks against Slamdunk and the fact that Tate, as the controlling officer of both Miken and Slamdunk, was knowingly taking preparatory steps for a Slamdunk bankruptcy filing in the fall of 2016. The Defendants do not challenge the existence of any of those particular elements under § 24.006(b). They do, however, again assert that the nature of the circular contemporaneous transaction precludes any conclusion that a "transfer of an interest of the debtor in property" occurred in December 2016 that could qualify the Trustee to invoke § 544(b) or that the transaction could constitute a "transfer made by a debtor" for the purposes of § 24.006(b) of the Texas Uniform Fraudulent Transfer Act. For the reasons previously expressed in the preceding subsection,[77] the summary judgment evidence establishes that the Miken Payment constituted a transfer of

[77] *See supra* pp. 21-39.

an interest of the debtor in property and a "transfer made by a debtor" occurred for the purposes of § 24.006(b). Therefore, the summary judgment evidence establishes that there is no genuine dispute as to any material fact and that the Trustee is entitled to a partial summary judgment that all of the elements of § 24.006(b) have been successfully established. Accordingly, the Trustee is entitled to a summary judgment that the Miken Payment constituted a constructive fraudulent transfer under TUFTA § 24.006(b), unless either of the Defendants can demonstrate the existence of an affirmative defense under TUFTA to which either of them is entitled that would preclude the Trustee from avoiding that transfer.

### 3. Affirmative Defense: Contemporaneous Exchange for New Value [Miken Payment]

The Trustee also seeks summary judgment on the Defendants' asserted affirmative defense that, even if the preferential transfer elements are fulfilled, the Miken Payment is protected from avoidance by the Trustee as a contemporaneous exchange for new value given to the Debtor under 11 U.S.C. § 547(c)(1). There is no genuine dispute as to any material fact regarding the events resulting in the Miken Payment. The Trustee contends that such established facts regarding the particulars of the denominated "circular contemporaneous transaction" do not meet the requisite elements of § 547(c)(1). Based upon the analysis set forth in section IV(b)(2) *infra*,[78] which is incorporated herein, including the established facts that the "circular contemporaneous transaction" was

---

[78] See *infra* pp. 66-70.

actually a series of transactions taken by Tate in different capacities which were sequentially performed, that there was no exchange or reciprocal transfer directly between Miken and the Debtor, and that Miken did nothing to enhance the financial value of the Debtor or to offset the resulting depletion of the bankruptcy estate arising from the tendering of the Miken Payment, the Trustee has demonstrated that the tendered summary judgment evidence is insufficient to establish an essential element of the Defendants' affirmative defense under § 547(c)(1). Accordingly, the Trustee's motion for summary judgment on that basis shall be granted and the Defendants' affirmative defense that the Miken Payment is protected from avoidance by the Trustee as a contemporaneous exchange for new value shall be denied.

## B. The Guaranteed Lender Payments

### 1. Preference Analysis - 11 U.S.C. § 547(b) [Guaranteed Lender Payments]

The second general focus of the Trustee's preference action involves his request to avoid and recover from the Defendants, pursuant to 11 U.S.C. § 547 and Tex. Bus. & Com. Code § 24.006(b), the particular amounts of the Guaranteed Lender Payments which were made by Slamdunk in the year preceding the Petition Date. Slamdunk tendered twenty-three (23) payments to Chase Bank in that period totaling $94,537.37 on indebtedness which had been guaranteed by both Tate and Miken.[79] In a similar vein, Slamdunk tendered seven (7) payments to Austin Bank in that period totaling $70,777.01

[79] PL'S. APP. I: 229-45.

on indebtedness which Tate alone had guaranteed. The Trustee contends that in each instance the Estate is entitled to recover from Tate and/or Miken in each instance the sums by which the potential liability of each defendant to these lenders on their respective guaranties were reduced by the Guaranteed Lender Payments made by the Debtor.

The fundamentals of a trilateral preference claim are rooted in the Bankruptcy Code. The Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. § 101(5)(A). It further defines a "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]" 11 U.S.C. § 101(10)(A). Because a guarantor is entitled to reimbursement or subrogation from the primary obligor when he pays a guaranteed obligation, courts have recognized that a guarantor of a lending transaction is a creditor holding a contingent claim under the Bankruptcy Code. *See, e.g., Houston Heavy Equip. Co., Inc. v. Gould*, 198 B.R. 693, 694 (S.D. Tex. 1996); *Zucker v. Oconee Reg'l Health Care Found.* (*In re Oconee Reg'l Health Sys., Inc*.), 621 B.R. 64, 73 (Bankr. M.D. Ga. 2020). If a lender receives a direct payment from the primary obligor on its antecedent debt, then the guarantor will often realize a corresponding dollar-for-dollar reduction in the amount of his contingent liability on the guaranty. Thus, such a payment in that scenario can be "for the benefit of" the guarantor "because every reduction of the debt reduces the guarantor's potential

liability to the lender." *Osberg v. Halling* (*In re Halling*), 449 B.R. 911, 915 (Bankr. W.D. Wisc. 2011). However, that benefit must be demonstrated. It cannot be speculative nor hypothetical. "It is not enough that an insider be a creditor of the debtor in a general sense; the insider must have a 'claim' against the debtor attributable to the specific debt he or she guaranteed. *Southmark Corp. v. Southmark Personal Storage, Inc.* (*In re Southmark Corp.*), 993 F.2d 117, 120 (5th Cir. 1993). Accordingly, the Trustee must show that each transfer of the Debtor's property to each respective secured lender "resulted in a quantifiable monetary reduction in [that] insider-creditor's contingent claim against the debtor's chapter 7 estate to the detriment of other creditors of the same class." *Travelers Ins. Co. v. Cambridge Meridian Group, Inc. (In re Erin Food Services, Inc.*), 980 F.2d 792, 801 (1st Cir. 1992).

It is axiomatic that the Trustee must establish that there is no genuine factual dispute regarding each and every § 547(b) element in order to obtain a summary judgment that each Guaranteed Lender Payment was indeed preferential under § 547(b).[80] In this instance, the Defendants do not contest the existence of elements 1, 3, 4, and 5.[81] Thus, if the two remaining requirements are resolved in favor of the Trustee, then he will

---

[80] As a reminder, those elements in this insider context are: (1) a transfer of an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of antecedent debt; (4) made while the debtor was insolvent; (5) made between 90 days and one year before the date of the filing of the bankruptcy petition; and (6) that enabled the creditor to receive more than it would otherwise have received if the transfer had not been made and the case had proceeded under Chapter 7. 11 U.S.C. § 547(b).

[81] *Supplement to [Defendants'] Motion for Summary Judgment* ["*DEFS.' SUPP.*"] ¶¶ 4.12-4.13 at 10.

meet his *prima facie* burden to establish a preferential transfer as to each Guaranteed Lender Payment and the analysis would then shift to the preference defenses asserted by the respective Defendants in order to determine the avoidability of each of those transfers.

As to the challenged requirement regarding the existence of any benefit, the Defendants contend that the Trustee has failed to "include any evidence that these payments were in fact intended to benefit anyone other than Debtor."[82] However, because a preference "'is an infraction of the rule of equal distribution among all creditors,' . . . neither the intent nor motive of the parties is relevant in consideration of an alleged preference under § 547(b)." *Cullen Center Bank and Trust v. Hensley* (*In re Criswell*), 102 F.3d 1411, 1414 (5th Cir.1997) (quoting 4 COLLIER ON BANKRUPTCY ¶ 547.01, at p. 547-12, 13 (15th ed. 1996)). "It is the effect of the transaction, rather than the debtor's or creditor's intent, that is controlling. Therefore, what the parties might have intended to accomplish in this instance is immaterial; the effect of what was done is controlling." *Gladstone v. Bank of Am., N.A.* (*In re Vassau*), 499 B.R. 864, 868 (Bankr. S.D. Cal. 2013) (quoting *Official Comm. of Unsecured Creditors v. Sharp Elecs. Corp.* (*In re Phelps Techs., Inc.*), 245 B.R. 858, 867 (Bankr. W.D. Mo. 2000) (other citations and internal quotations omitted).

Notwithstanding the irrelevancy of the parties' intentions regarding the benefit conferred upon the guarantor, it is true that in a trilateral preference environment some

---

[82] DEFS.' SUPP. ¶ 4.13 at 10.

aspect of the benefit analysis, and whether there has actually been a quantifiable monetary reduction of the insider-guarantor's contingent claim to the detriment of other unsecured creditors, is inextricably linked to consideration of the sixth element – whether such Defendant as guarantor received more as a result of the alleged preferential transfer than it would have received in a Chapter 7 liquidation. This determination, based upon a required evaluation of the effects arising from the payment of a secured claim, can present greater evidentiary problems than the context of an unsecured creditor that receives prepetition payments.

Fortunately, Fifth Circuit jurisprudence presents some helpful guidance. Based primarily upon its earlier decision in *Krafsur v. Scurlock Permian Corp*. (*In re El Paso Refinery, LP*), 171 F.3d 249, 253 (5th Cir. 1999), this is how the Circuit recently described this determination process:

> To determine whether a trustee has established this requirement, a court typically uses the so-called "hypothetical Chapter 7 liquidation analysis" inherent in § 547(b)(5) itself. To do so, the court (1) constructs a hypothetical Chapter 7 liquidation in which the creditor retains the disputed transfers, viz., the transfers-retained hypothetical, and (2) constructs another in which the creditor returns those transfers, viz., the transfers-returned hypothetical. To establish the requirement of § 547(b)(5) under this analysis, the sum of (1) the disputed transfers and (2) the creditor's distribution in the transfers-retained hypothetical must be "more" than the creditor's distribution in the transfers-returned hypothetical.
>
> But a court may occasionally circumvent the often arduous

hypothetical Chapter 7 liquidation analysis by employing the abbreviated *El Paso Refinery* analysis. This analysis considers only the disputed transfer itself. It is premised on the truism that, if a creditor receives a transfer which, by its very nature, would not have been available to any of the other secured or unsecured creditors, it could never receive "more" under the hypothetical Chapter 7 liquidation analysis.[83] Specifically, the *El Paso Refinery* analysis states:

> To determine whether an undersecured creditor received a greater percentage recovery [read: "more"] on its debt than it would have under [C]hapter 7 the following two issues must first be resolved: (1) to what claim the [transfer] is applied and (2) from what source the [transfer] comes. Both aspects must be examined before the issue of greater percentage recovery can be decided.

[83] This truism is based upon a number of principles. First, there cannot be as a matter of law a preferential payment of a fully secured claim. If the value of the collateral is sufficient to fully secure the claim, then the claim would have been paid in full in the Chapter 7 case and the creditor would have been in the same situation as the one produced by the prepetition payment. *Unsecured Creditors Comm. v. Community Bank* (*In re Stinson Petroleum Co., Inc*.), 506 F. App'x. 305, 309 (5th Cir. 2013) (citing *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1034 (5th Cir.1987)). Secondly, on a debt that is undersecured, the payment could still be nonpreferential if it only reduced the secured portion of the indebtedness. In other words, "an undersecured creditor who receives prepetition payments does not receive a greater percentage recovery when the source of the payments is the creditor's own collateral." *El Paso Refinery, LP*, 171 F.3d at 253. As one court observed, "[t]here are only two ways to reduce the amount of a secured creditor's collateral: to return some or all of the collateral, or to make a payment from unencumbered property in exchange for a release of the lien on an equivalent amount of collateral. *Telesphere Liquidating Trust v. Galesi* (*In re Telesphere Commc'ns., Inc*.), 229 B.R. 173, 177 (Bankr. N.D. Ill. 1999). As the Fifth Circuit recognized in *El Paso Refinery*, "if the undersecured creditor applies the payment to the secured portion of the debt, the creditor effectively releases a portion of its collateral from its security interest, that is, its secured claim is reduced, freeing up a corresponding amount of collateral. In this situation, the creditor does not receive a greater percentage recovery." *El Paso Refinery*, 171 F.3d at 254. "A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest." *Id*. at 255. Finally, "[i]f a payment to an undersecured creditor ... is applied to the unsecured portion of the debt, then the undersecured creditor will have recovered a greater percentage on this claim if the estate cannot pay its unsecured creditors 100% of these claims. *Id*. at 254. "Payment of the unsecured portion of an undersecured claim can only be made from assets of the debtor that are not encumbered by the creditor's lien." *Telesphere*, 229 B.R. at 178.

> These are referred to as the application aspect and the source aspect, respectively.
>
> If the disputed transfer (1) reduced the creditor's collateral under the application aspect of the *El Paso Refinery* analysis or (2) was made from the debtor's collateral under the source aspect of that analysis, the trustee could never establish that the creditor received "more" under the hypothetical Chapter 7 liquidation analysis. But only in such an instance is the *El Paso Refinery* analysis dispositive. If, conversely, the disputed transfer (1) did not reduce the creditor's collateral under the application aspect and (2) was not made from the debtor's collateral under the source aspect, the trustee might still be able to establish that the creditor received "more" under the hypothetical Chapter 7 liquidation analysis. Simply put, the *El Paso Refinery* analysis provides a threshold. It is intended to aid the hypothetical Chapter 7 liquidation analysis under § 547(b)(5), not to replace it. Nor could it. As the hypothetical Chapter 7 liquidation analysis is embodied in § 547(b)(5), it must control.

*Garner v. Knoll, Inc*. (*In re Tusa-Expo Holdings, Inc*.), 811 F.3d 786, 792–93 (5th Cir. 2016).

In seeking summary judgment to establish the existence of a recoverable avoidable transfer, the Trustee must support his motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. The summary judgment evidence tendered by the Trustee regarding the sixth element – whether either Defendant received more as a result of each Guaranteed Lender Payment than each would have received in a Chapter 7 liquidation – is simply sparse. The parties collectively have provided some basic documentation: the two bank notes, the security agreements, the guaranties, ledgers

setting forth the stream of payments, and a number of related bankruptcy documents, including the schedules. While a liquidation analysis regarding an alleged preferential payment of a general unsecured claim may often be abridged,[84] simply relying upon affidavits, charts, and generic references to a court's docket, that approach is not sufficient for recovery of an alleged trilateral preference involving a secured claim. *See, e.g.*, *Williams v. McKesson Corp. (In re Quality Infusion Care, Inc.*), 2013 WL 6189948, at *9 (Bankr. S.D. Tex. Nov. 25, 2013). The evidence presented in this context is not particularized as to each lender and each transaction. There is no evidence presented regarding the value of each lender's collateral at each juncture nor developing the precise secured status of each lender at the time of each payment.[85] Though each lender enjoyed a lien on the Debtor's accounts, there is no evidence regarding the actual economic significance of those liens nor their priority. There is no evidence regarding the application of the payment proceeds. There is no targeted hypothetical liquidation analysis. The Trustee's motion in this regard relies primarily upon speculation and presumption. The directed verdict standard cannot be met in that manner. Accordingly**,**

---

[84] A plaintiff in such a case may not be required to "reconstruct a hypothetical Chapter 7 liquidation with the precision of a forensic accountant." *Loggins*, 513 B.R. at 707

[85] "To determine whether any particular claim is fully or only partially secured requires measuring (a) the amount of the claim subject to the security interest, and (b) the value of the collateral securing the claim. Both of these items may change between the time of an allegedly preferential transfer and the time of a bankruptcy filing." *Telesphere*, 229 B.R. at 178. "If a creditor is only partially secured ..., the secured status of the claim is measured by the value of the collateral at the time of the challenged transfer based upon the proceeds that the creditor could have realized in a commercially reasonable sale." *DeGiacomo v. Green* (*In re Inofin Inc.*), 512 B.R. 19, 94 (Bankr. D. Mass. 2014).

the Court concludes that the Trustee has failed to establish whether each Defendant: (1) actually received a benefit as a result of each Guaranteed Lender Payment; and (2) received more as a result of the tendering of the Guaranteed Lender Payments than each would have received in a Chapter 7 liquidation. Therefore, the Trustee's motion for summary judgment that the Guaranteed Lender Payments constituted preferential transfers under § 547 is denied. However, based upon the summary judgment evidence, the Trustee is entitled to a partial summary judgment that the existence of preference elements 1, 3, 4, and 5 have been established as to whether the Guaranteed Lender Payments constituted a preferential transfer under § 547 and that the Court shall proceed to determine whether each Defendant: (1) actually received a benefit as a result of each Guaranteed Lender Payment; and (2) received more as a result of the tendering of the Guaranteed Lender Payments than each would have received in a Chapter 7 liquidation at any trial of this adversary proceeding.

**2. Affirmative Defense: Contemporaneous Exchange for New Value [Guaranteed Lender Payments]**

The Trustee also seeks summary judgment regarding the Defendants' affirmative defense that the Guaranteed Lender Payments are protected from avoidance as a contemporaneous exchange for new value given to the Debtor under 11 U.S.C. §547(c)(1). The Trustee contends that the Defendants have failed to tender sufficient summary judgment evidence to demonstrate that the requisite elements of § 547(c)(1)

have been met with regard to the Guaranteed Lender Payments. As set forth more fully in section IV(b)(2) *infra*,[86] the Defendants are under a burden to establish *with specificity* that as to each Guaranteed Lender Payment: (1) new value was transferred by each Defendant to the Debtor; (2) the parties intended such new value and the corresponding reciprocal transfer by the Debtor to be a contemporaneous exchange; and (3) the exchange was in fact substantially contemporaneous. The Trustee tendered summary judgment evidence that, in response to an inquiry about what contemporaneous new value had been tendered to Slamdunk in conjunction with the Guaranteed Lender Payments, Tate testified only that "Defendant (sic) has paid debts which would otherwise be owed by Debtor."[87] No other summary judgment evidence has been tendered by the Defendants in support of their contemporaneous new value defense. Accordingly, based upon the legal principles set forth in section IV(b)(2) which are incorporated herein, since there is no summary judgment evidence that new value was tendered to the Debtor as a component of the Guaranteed Lender Payments, the Trustee has demonstrated that the Defendants have failed to establish an essential element of their § 547(c)(1) affirmative defense in this context. Accordingly, the Trustee's motion for summary judgment on this issue shall be granted and, based upon such summary judgment, the Defendants' affirmative defense that the Guaranteed Lender Payments are protected from avoidance as

---

[86] See *infra* pp. 66-70.

[87] PL'S. APP. I: 283 (EX. 48).

a contemporaneous exchange for new value under §547(c)(1) of the Bankruptcy Code will be denied.

### 3. Affirmative Defense: Ordinary Course of Business [Guaranteed Lender Payments]

The Trustee's Supplemental Motion further seeks summary judgment on the Defendants' affirmative defense under § 547(c)(2) that the Guaranteed Lender Payments constituted payments occurring in the ordinary course of the Debtor's business.[88] The ordinary course defense "is intended to protect recurring, customary credit transactions" that are incurred and paid in the preference period for the purpose of encouraging the continuation of business by suppliers with a person seeking to avoid a bankruptcy filing. *G.H. Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233, 240 (5th Cir. 2006). "In other words, the ordinary course of business defense provides a safe haven for a creditor who continues to conduct normal business on normal terms." *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.),* 296 F.3d 363, 367 (5th Cir. 2002). As previously stated, the burden of proof on an

---

[88] Section 547(c)(2) saves otherwise preferential transfers —

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was —

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms.

11 U.S.C.A. § 547(c)(2) (West 2016).

affirmative defense rests upon the Defendants and "[w]hether or not a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination . . . " *Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805, 806 (5th Cir. 1989); *SGSM Acquisition*, 439 F.3d at 240.

Of the three steps involved in the consideration of this affirmative defense as to the Guaranteed Lender Payments,[89] the Trustee appears to address steps one and two. Step one is whether the debt itself was incurred in the ordinary course of the business or financial affairs of the debtor and the transferee. "Courts examine the underlying debt for the normality of such occurrences in each party's business operations generally." *FBI Wind Down, Inc. Liquidating Trust v. All American Poly Corp.*, (*In re FBI Wind Down, Inc.*), 581 B.R. 116, 138 (Bankr. D. Del. 2018).

In that regard, the Trustee proffers that the relative rare number of Slamdunk debts guaranteed by one or both of the Defendants was not usual. However, such an analysis, even if true, does not actually address the first step—whether each of the challenged

---

[89] If the underlying indebtedness was incurred in the debtor's ordinary course of business, the transactions occurring in the preference period must be examined by a subjective test [§547(c)(2)(A)] and by an objective test [§547(c)(2)(B)]. *SGSM Acquisition,* 439 F.3d at 240. Generically speaking, the subjective test examines whether the transfers at issue were "ordinary as between the parties" and the objective test examines whether the transfers were "ordinary in the industry" or under "ordinary business terms." *Jagow v. Grunwald* (*In re Allied Carriers' Exch., Inc.*), 375 B.R. 610, 616 (B.A.P. 10th Cir. 2007).

After the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005, the transaction must satisfy either of the tests, but not both, in order to be protected from avoidance as a preferential transfer. The most-cited Fifth Circuit cases in this regard, *SGSM* and *Gulf City, supra* were decided prior to the enactment of BAPCPA. Once BAPCPA amended the ordinary course defense in § 547(c)(2) to read the elements of the defense in the alternative, rather than the conjunctive, the portion of those opinions requiring satisfaction of both the subjective and objective tests is no longer applicable. *See Entringer Bakeries, Inc.*, 548 F.3d at 351 n.9.

transfers "was in payment of a debt *incurred by the debtor* in the ordinary course of business or financial affairs *of the debtor* and the transferee." Notwithstanding the Trustee's ultimate reliance on the "benefit" received by the guarantors from the tendering of the payment by the Debtor, the transferee in the context of that particular phrase is the lender—not the guarantors. The payments were made to the lenders. Thus, the number of guaranteed debts existing in the Slamdunk universe is not germane. Conversely, there is no genuine factual dispute that Slamdunk had executed the promissory notes with each lender in fulfillment of its ongoing business operations and that each guaranty was required at the insistence of each lender. Such evidence is insufficient to negate the existence that the debt was incurred by the Debtor in the ordinary course of business.

Step two of the § 547(c)(2) analysis relates to the so-called "subjective test." "There is no precise legal test for evaluating whether a transfer complies with the subjective prong" and the analysis in that regard is fact-specific concerning the parties' conduct before and during the preference period. *Sommers v. Concrete Straightline Sawing, LLC (In re Contractor Technology, Ltd.)*, 2007 WL 4206211 at *2 (Bankr. S.D. Tex., Nov. 26, 2007). As one court observed,

> [c]ourts have considered a myriad of factors in this test, including: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5)

> whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating financial condition. No one factor is determinative. To determine whether transfers were in the ordinary course of business the Court must first determine what the ordinary course of business was and then compare the preferential transfers to it.

*Stanziale v. Southern Steel and Sply., LLC* (*In re Conex Holdings, LLC*), 518 B.R. 269, 280 (Bankr. D. Del. 2014). With regard to the subjective prong, the Trustee contends that: (1) the Debtor's poor payment record precludes any finding that each payment was in the ordinary course of business for the Debtor; and (2) Tate's degree of control over the payment of debts precludes any ordinary course finding.

The Trustee contends that the "disparities in amount and variations in dates of payment leave these [Guaranteed Lender] payments . . . anything but customary and ordinary."[90] However, given that the subjective test focuses solely on the prior dealings of debtor and creditor, a defendant is capable of establishing that late payments were the standard course of dealing between the parties. *Yurika Foods Corp. v. United Parcel Serv*. (*In re Yurika Foods Corp*.), 888 F.2d 42, 45 (6th Cir. 1989); *Wiscovitch-Rentas v. Triple-S Salud, Inc.* (*In re PMC Mktg. Corp*.), 499 B.R. 214, 219 (Bankr. D.P.R. 2013). "Late payments do not preclude a finding that the payment occurred during the ordinary course of business; in fact, a pattern of late payments can establish an ordinary course between the parties." *Miller v. Westfield Steel, Inc.* (*In re Elrod Holdings Corp*.), 426

---

[90] *Plaintiff's Response to Defendant's (sic) Supplemental Motion for Summary Judgment* ("*P'S SUPP. RESP*.") at 13, supplementing *Plaintiff's Supplemental Motion for Summary Judgment* ("*P'S SUPP. MOTION*") at 12.

B.R. 106, 111 (Bankr. D. Del. 2010). Of course, [w]hile it is possible to establish that the ordinary course of business between the parties included late payments, for any particular payment to qualify as ordinary, it must be consistent with the timing of other transactions. In other words, while the parties may be accustomed to somewhat late payments, abnormally late payments do not qualify as payments made in the ordinary course of business. *Jalbert v. Southern Strategy Group, LLC* (*In re Louisiana Pellets, Inc*.), 605 B.R. 726, 731 (Bankr. W.D. La. 2019). The Trustee's summary judgment evidence on this point is merely a comparison of the due dates under the notes and the Debtor's actual performance dates.[91] The information is insufficient to provide the necessary context. Thus, the tendered summary judgment evidence is insufficient to negate the possibility that the Defendants could meet the subjective prong of § 547(c)(2)(A) due to a history of late payments.

The Trustee further contends that the two Defendants exercised a degree of control over the Debtor's payment process during the period of the Guaranteed Lender Payments which precludes any fulfillment of the subjective test. According to the Trustee, "Tate was demonstrably orchestrating and prioritizing payments to certain creditors. Those whose claims were guaranteed by one or both of the Defendants received payments. The others did not."[92] While it may be plausible that Tate, as the sole officer of Slamdunk, could have prioritized payments to holders of guaranteed debt in a manner that might

[91] *Id*. at 12 and exhibits referenced thereby.

[92] *Id*. at 7.

threaten the availability of the ordinary course defense, *see, e.g.*, *Weisfelner v. LR2 Mgmt. K/S* (*In re Lyondell Chem. Co.*), 2015 WL 5560283, at *7 (Bankr. S.D.N.Y. Sept. 18, 2015), the tendered summary judgment evidence is inadequate to establish that proposition. Except for its acknowledged payment problems which had consistently plagued the Debtor for years and which had led to its indebtedness to Miken, the summary judgment evidence does not establish that there was a literal suspension or alteration of the Debtor's normal payment processes. No actual analysis of particular payments made within the totality of the Debtor's overall payment program was tendered from which the alleged prioritization can be demonstrated. Thus, the tendered summary judgment evidence is insufficient to negate the Defendants' potential application of the ordinary course defense under the subjective prong of § 547(c)(2)(A) due to the improper prioritization of the Guaranteed Lender Payments. Accordingly, the Trustee's Motion as supplemented, to the degree it seeks summary judgment on the Defendants' affirmative defense under § 547(c)(2) that the Guaranteed Lender Payments constituted payments occurring in the ordinary course of the Debtor's business, is denied.

**4. Constructive Fraudulent Transfer Analysis - TUFTA**

The Trustee also seeks summary judgment on his claim that the Guaranteed Lender Payments are subject to avoidance and recovery as a constructive fraudulent transfer under § 24.006(b) of the Texas Uniform Fraudulent Transfer Act. For the

reasons set forth in section IV(c)(2) *infra*,[93] the Court concludes that § 24.006(b) has no applicability to the Guaranteed Lender Payments arising in this case and that the Trustee cannot therefore invoke § 544(b)(1) of the Bankruptcy Code because the Guaranteed Lender Payments do not constitute a "transfer of an interest of the debtor in property . . . that is voidable under applicable law." Accordingly, the Plaintiff's motion for summary judgment as supplemented is denied as to this issue.

**C. The Slamdunk Shareholder Distributions**

The Trustee further seeks summary judgment against Tate for an avoidance and recovery of the Slamdunk Shareholder Distributions totaling $21,917.00 as a constructive fraudulent transfer under § 548(a)(1)(B) of the Bankruptcy Code arising from shareholder distributions paid to Tate by Slamdunk approximately six months prior to the bankruptcy petition date. A fraudulent transfer under § 548(a)(1)(B) entitles the trustee to avoid any transfer from the debtor if the following elements are established: (1) that the transfer was of an interest of the Debtor in property; (2) that the Debtor made the transfer on or within two years before the Petition Date;[94] (3) that the Debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) that the Debtor was insolvent on the date that the transfer was made. *Jenkins*, 617 B.R. at 102–03. "Fraud

---

[93] *See infra* pp. 77-81.

[94] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") extended the previous one-year reach-back period for fraudulent transfers under the Bankruptcy Code to two years.

upon creditors is presumed once the plaintiff establishes the requisite elements of the statute." *TSIC, Inc. v. Thalheimer* (*In re TSIC, Inc*.), 428 B.R. 103, 109 (Bankr. D. Del. 2010).

The Trustee's summary judgment evidence establishes that: (1) Slamdunk made two transfers of its property totaling $21,917.00 to Tate; (2) that such transfers occurred within a year of the petition date;[95] (3) the transfers were made at Tate's direction at a time that Slamdunk was insolvent; and (4) that Slamdunk failed to receive a reasonably equivalent value in exchange for the transfers.[96] These conclusions regarding the Trustee's § 548(a)(1)(B) claim are not challenged by the Defendants. There is no summary judgment evidence that the Debtor received any direct value from Tate in exchange for the transfers. Neither is there any summary judgment evidence that the Debtor received some type of indirect economic benefit from making the transfers to Tate. Because the summary judgment evidence establishes the requisite elements, summary judgment shall be granted to the Trustee on his § 548(a)(1)(B) claim for recovery of the $21,917.00 from Tate.

---

[95] PL'S. APP. I: 254-56 (Ex. 37).

[96] The Bankruptcy Code does not define "reasonably equivalent value." However, as one wise judge recently summarized:

> Reasonably equivalent value means the debtor has received value that is substantially comparable to the worth of the transferred property. There is no set minimum percentage or monetary amount necessary to constitute reasonably equivalent value. The debtor need not receive a dollar-for-dollar benefit, but rather a benefit within the range of an arm's-length transaction.

*Gilmour v. Conn. Gen. Life Ins. Co.* (*In re Victory Med. Ctr. Mid-Cities, LP*), 601 B.R. 739, 748 (Bankr. N.D. Tex. 2019).

**The Defendants' Common Law Defenses.**

In addition to the affirmative defenses arising under the applicable preference and fraudulent transfer statutes,[97] the respective amended answers of the Defendants assert various common law affirmative defenses against the claims asserted by the Trustee in his First Amended Complaint. They are claimed only "to the extent facts are discovered to support the affirmative defense."[98] The Defendants also assert that certain unspecified claims are barred by some unspecified state or federal statute of limitations or by the defense of laches.[99] The Trustee in his motion denies that there are any facts to support this litany of possible defenses and he seeks summary judgment against the Defendants as to all of these Common Law Defenses presented in the amended answer as well as to any limitations defense.

The Trustee has tendered summary judgment evidence consisting of the oral deposition testimony of Tate wherein Tate failed to identify any facts or circumstances which would support the application of the following particular affirmative defenses: *in pari delicto*, inequitable recovery, release, waiver, ratification, accord and satisfaction,

---

[97] *Defendant Tate's Answer to Plaintiff's First Amended Complaint* ("*TATE'S ANSWER*") ¶¶ 56-63 at 8-9; *Defendant Miken's Answer to Plaintiff's First Amended Complaint* ("*MIKEN'S ANSWER*") ¶¶ 56-57, 59-64 at 9-10. Miken's assertion that it is not a statutory insider of the Debtor is rejected as erroneous. *See supra* note 52.

[98] TATE'S ANSWER ¶ 49 at 8; MIKEN'S ANSWER ¶ 49 at 8.

[99] TATE'S ANSWER ¶ 55 at 9; MIKEN'S ANSWER ¶ 55 at 8. Excluding the statutory avoidance defenses which are addressed individually, the Court will refer to the remainder of these affirmative defenses for ease of reference as the "Common Law Defenses."

estoppel, setoff, and recoupment.[100] Tate candidly admitted under oath that he possessed no knowledge of any information that might pertain to those issues and that he would simply leave them to his attorneys to answer.[101] The Court further takes judicial notice of the filing of the Debtor's voluntary petition for relief under Chapter 7 of the Bankruptcy Code on August 1, 2017[102] and that the Trustee filed the original complaint in this particular adversary proceeding on September 19, 2018.[103] Accordingly, the Trustee's complaint was timely filed pursuant to § 546(a) of the Bankruptcy Code.

Therefore, subject to one reservation regarding a deferred issue,[104] since the Trustee as movant has tendered summary judgment evidence to negate the applicability of the affirmative defenses raised in the Tate deposition, and since neither Defendant has tendered any summary judgment evidence sufficient to create a genuine issue regarding the existence of any material fact to support the application of any of the Common Law Defenses asserted in their respective amended answers, the Trustee is awarded summary judgment against both Defendants on the following defenses: (1) failure to assert a claim

---

[100] PL'S. APP. I: 60-65 (Tate depos.).

[101] *Id*. at 60.

[102] *Voluntary Petition* filed by the Debtor on August 1, 2017 [dkt #1] in case no. 17-60566.

[103] *Pl's Original Complaint* filed in adv. proc. no 18-6006 [dkt #1].

[104] The Trustee has also tendered summary judgment evidence comprised of identical sworn responses to interrogatories in which each Defendant alleged a general applicability of unspecified Common Law Defenses to an alternative theory of recovery regarding the Miken Payment that has been asserted by the Trustee, but which is deferred by the Trustee's summary judgment motion in light of the Court's § 547 decision. *See infra* note 133. *See also,* PL'S. APP. I: 282 (Ex. 48) and PL'S. APP. I: 299 (Ex. 49). Any such defenses applicable to that particular alternative theory are therefore preserved.

upon which relief can be granted; (2) failure to plead with sufficient specificity; (3) inequitable recovery; (4) the doctrines of *in pari delicto*, unclean hands, unjust enrichment, and any other equitable doctrine; (5) the doctrines of release, waiver, ratification, accord and satisfaction, estoppel, judicial estoppel, setoff, recoupment, and/or equitable estoppel; (6) any state or federal statute of limitations or the doctrine of laches.

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS SUPPLEMENTED

### A. Admissibility of Summary Judgment Evidence

As an initial matter, the Trustee challenges certain aspects of the summary judgment evidence presented by the Defendants. The Trustee's first objection pertains to Exhibit AA— the affidavit of Mike Tate—challenges the validity of Tate utilizing a broad, single declarative sentence[105] to validate the twenty-one (21) statements contained in the Statement of Undisputed Material Facts presented in the Defendants' Motion.[106] The Trustee claims that such a format robs the sworn affidavit of any demonstration that Tate possesses personal knowledge as to the subject matters addressed in the affidavit.[107]

---

[105] Tate's single acknowledgment in Exhibit AA stated that:

> I have reviewed the Motion, including the section titled "II. Statement of Undisputed Material Facts," and the statements and factual descriptions contained therein are true and correct to the best of my knowledge.

[106] *P'S. RESP.* at 3-4; DEFS'. APP. II: 249-53 (Ex. AA).

[107] The objection also raises unspecified hearsay objections which are overruled for lack of any specificity as to the statements being challenged. "Where a hearsay objection is conclusory and scant at best, such objection is not properly made and should be summarily overruled." *Loomis v. Starkville Mississippi Pub. Sch. Dist.*, 150 F.Supp. 3d 730, 743 (N.D. Miss. 2015).

A summary judgment affidavit is not adjudged so strictly. Although personal knowledge is required by Rule 56(c)(4), there is no magic formula nor any set of magic words. Personal knowledge, in fact, "can be inferred if such knowledge reasonably falls within the person's 'sphere of responsibility,' particularly as a corporate officer. *SE Prop. Holdings, LLC v. Green* (*In re Green*), 968 F.3d 516, 524 (5th Cir. 2020). "Further, an affidavit can adequately support a motion for summary judgment when the affiant's personal knowledge is based on a review of [an] employer's business records and the affiant's position with the employer renders her competent to testify on the particular issue which the affidavit concerns." *MetroPCS v. Thomas,* 327 F.R.D. 600, 618 (N.D. Tex. 2018). That inference can be properly applied to many of the challenged statements. Nevertheless, though the objection overstates the impact of the truncated means utilized in the original Tate affidavit to demonstrate personal knowledge, the Defendants have tendered a new Tate affidavit as Exhibit GG[108] which clarifies the basis upon which Tate is competent to testify regarding the subject matter of his affidavit testimony. The court exercises its discretion under Fed. R. Civ. P. 56(e)(1) to allow the submission of Exhibit GG in supplementation of Exhibit AA and the Trustee's objection in this regard is overruled.

The Trustee's second evidentiary objection pertains to portions of Exhibit P–the expert report tendered by James Gomillion.[109] The Trustee seeks essentially to strike

[108] DEFS'. APP. II: 249-53 (EX. AA).

[109] P'S. RESP. at 4-5.

pages 5-9 of that report which is composed of third-party materials which Gomillion references as "information reviewed."[110] The Trustee objects to the admissibility of those attachments effectively on the basis of hearsay, notwithstanding the fact that Gomillion is tendered as an expert witness. No affidavit nor declaration from Gomillion is tendered and "unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56 . . . " *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001); *Arizpe v. Principal Life Ins. Co.*, 398 F. Supp.3d 27, 49 (N.D. Tex. 2019). Thus, no predicate was supplied from which it can be determined that the information constituted facts or data as contemplated by Fed. R. Evid. 703.[111] There is no explanation from Gomillion regarding how he used the information at all. Nor is there any explanation supplied under which the Court could reasonably admit the extraneous material as helpful to its determination regarding the probative value or weight to be given to the expert's opinion. The objection is therefore sustained.

The Court will address the Trustee's remaining evidentiary objections as a set. The Trustee objects to Exhibits T, X, and Z respectively on the alleged grounds that each document is unauthenticated, constitutes hearsay, and constitutes an improper summary under Fed. R. Evid. 1006. However, as to Exhibits T and X, the Court's recognition of new Exhibit GG[112] presents more detailed testimony from Tate which more properly

---

[110] PL'S. APP. II: 236-40.

[111] However, no objection was tendered to the remainder of the report.

[112] DEFS'. APP. IV: 268-273 (EX. GG).

authenticates the proffered exhibits. As to Exhibit Z, the Defendants have similarly presented a supplemental affidavit of John Pope—tendered as Exhibit HH[113]—whose testimony confirms that Exhibit Z contains his handwritten notes about the Austin Bank Transactions. Exhibit HH is admitted under Fed. R. Civ. P. 56(e)(1). Based upon the authorized supplementary affidavits, the Trustee's objection to Exhibits T, X, and Z are overruled.

**B. The Miken Payment**

**1. Preference Analysis - 11 U.S.C. § 547(b) [Miken Payment]**

The Defendants jointly seek a summary judgment on the Trustee's claim under § 547 of the Bankruptcy Code regarding the Miken Payment on the sole ground that the $1.55 million Miken Payment could not have constituted a preferential transfer because the denominated "circular contemporaneous transaction" cannot as a matter of law properly constitute a transfer of an interest of the Debtor in property. For the reasons previously set forth in section III(a)(1) herein,[114] the Court concludes that the Miken Payment constituted a transfer of an interest of the Debtor's property and that the Defendants' Motion for Summary Judgment as to that particular issue must be denied.

**2. Affirmative Defense: Contemporaneous Exchange for New Value [Miken Payment]**

The Defendants contend in their Motion for Summary Judgment that, even if the

---

[113] *Id*. at 274-75.

[114] *See supra* pp. 21-39.

preferential transfer elements are met, the Miken Payment is protected from avoidance by the Trustee as a contemporaneous exchange for new value[115] given to the Debtor under 11 U.S.C. §547(c)(1).[116] As this Court has previously observed,

> The purpose of the exception is to encourage creditors to continue to deal with troubled debtors, and transfers protected under § 547(c)(1) are not preferential because other creditors are not adversely affected if the debtor's estate receives new value. This affirmative defense is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the *debtor's estate* will not be depleted to the detriment of other creditors. In other words, the transfer is protected from avoidance because it has caused no net economic harm to the bankruptcy estate.

*Moser v. Bank of Tyler* (*In re Loggins*), 513 B.R. 682, 710-11 (Bankr. E.D. Tex. 2014) (emphasis in original)(citations and internal quotations omitted). "When evaluating a new value defense, the key question is whether the alleged preferential transfer

---

[115] "New value" is specifically defined by § 547(a)(2) as:

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

11 U.S.C.A. § 547(a)(2) (West 2016).

[116] The trustee may not avoid under this section a transfer —

> (1) to the extent that such transfer was —
>
> > (A) intended by the debtor and the creditor to and for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> >
> > (B) in fact a substantially contemporaneous exchange.

11 U.S.C.A. § 547(c)(1) (West 2016).

diminished the debtor's estate, i.e., whether the debtor in fact acquired a new asset that offset the loss in value to the estate when the debtor transferred existing assets to acquire the new asset at issue." *Campbell v. Hanover Ins. Co.* (*In re ESA Envtl. Specialists, Inc.*), 709 F.3d 388, 398 (4th Cir. 2013).

To establish its contemporaneous exchange defense, Miken, as the recipient of the preferential transfer, is required to demonstrate "intent, contemporaneousness, and new value." *Southmark Corp. v. Schulte, Roth & Zabel (In re Southmark Corp.),* 239 F.3d 365, at *3 (5th Cir. 2000) (unpublished). In other words, Miken must show that: (1) ***its*** transfer was for new value ***given to the Debtor***; (2) the parties intended the new value and the ***reciprocal*** transfer by the Debtor to be a contemporaneous exchange; and (3) the exchange was in fact substantially contemporaneous. Miken carries a specific burden to "prove with specificity the new value given to the debtor." *ESA Envtl. Specialists, Inc.*, 709 F.3d at 398.

The Defendants contend that the very nature of the circular contemporaneous transaction establishes those elements. To the Defendants, the fact that the "Debtor, Miken, and Tate each had a withdrawal slip and a deposit slip in the amount of $1,550,000.00 entered in each of their respective Austin Bank accounts"[117] and that "[n]o party, including Debtor, had only a withdrawal slip of $1,550,000.00,"[118] is sufficient to demonstrate that "new value was given to the Debtor in the same amount of the 'transfer'

---

[117] DEFS' MOTION ¶ 4.25 at 14.

[118] *Id.*

alleged by Trustee."[119]

However, as previously set forth in the analysis regarding the Debtor's interest in the transferred funds,[120] this was not a singular transaction. It was a series of transactions taken by Tate in different capacities which were sequentially performed in order to achieve Tate's ultimate goal of draining Slamdunk's suspended losses and receiving an enhanced individual tax refund. A stop sign must therefore be placed at the end of every transaction and, notwithstanding the otherwise legitimate goal of delivering a tax benefit to a S-corp's shareholder, the character and propriety of each transfer necessary to create that benefit must be evaluated at each juncture. In this instance, Miken made a shareholder distribution to Tate. Tate exercised his individual discretion over his personal funds to make a capital contribution to Slamdunk. Tate, in his capacity as the sole officer of Slamdunk, directed Slamdunk to tender all of that paid-in capital to pay an antecedent debt to Miken. There was no exchange or reciprocal transfer between Miken and the Debtor. Miken did nothing to enhance the financial value of the Debtor. Indeed, the evidence establishes that every participant in these transactions benefitted *except* the Debtor. Because Miken, as the "creditor" in this instance under the applied language of § 547(c)(1)(A), gave nothing to the Debtor that would offset the detrimental impact of the transfer, the transaction does not qualify as a contemporaneous exchange for new value. The Defendants have failed to tender summary judgment evidence to the contrary and,

[119] *Id.* at 14-15.

[120] *See supra* pp. 34-36.

accordingly, their motion for summary judgment upon their asserted affirmative defense that the Guaranteed Lender Payments are protected from avoidance as a contemporaneous exchange for new value under § 547(c)(1) of the Bankruptcy Code will be denied.

**3. Affirmative Defense: Subsequent New Value [Miken Payment]**

The Defendants further seek a partial summary judgment that portions of the December 30 transfer to Miken should be insulated from avoidance by the Trustee because subsequent new value was provided to the Debtor through various transactions which qualify for protection under § 547(c)(4) of the Bankruptcy Code.[121] The subsequent new value defense, also referenced as the "subsequent advance" defense, invokes the same definition of new value provided by § 547(a)(2) as that applied to a proposed contemporaneous exchange for new value. *Loggins*, 513 B.R. at 713. As explained by the Fifth Circuit,

> Two policy considerations support the exception. First, without the exception, a creditor who continues to extend credit to the debtor, perhaps in implicit reliance on prior payments, would merely be increasing his bankruptcy loss. Second, the limited protection provided by the subsequent advance rule encourages creditors to continue their revolving credit arrangements with financially troubled debtors, potentially helping the

---

[121] The trustee may not avoid under this section a transfer —

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor —
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C.A. §547(c)(4) (West 2016).

> debtor avoid bankruptcy altogether. Protecting the creditor who extends "revolving credit" to the debtor is not unfair to the other creditors of the bankrupt debtor because the preferential payments are replenished by the preferred creditor's extensions of new value to the debtor.

*Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1091 (5th Cir.1994) (citing *Kroh Bros. Dev. Co. v. Continental Constr. Eng'rs, Inc.* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir.1991) (other citations omitted). Thus, the subsequent advance defense "aims to protect creditors who have furnished and been paid for ongoing supplies or revolving credit to a debtor in distress, because such transactions fortify the debtor's business and may avert bankruptcy. At worst, the extensions of new value do not harm existing creditors." *SGSM Acquisition*, 439 F.3d at 241. The extension of new value in this context "need not be directly connected to the preceding preferential transfer in order to shelter it," *Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329, 333 (5th Cir. 1999), "but the determination of new value is still based upon the premise that an augmentation or material benefit to the debtor's estate has occurred that offsets the reduction in the estate caused by the preferential transfer." *Loggins*, 513 B.R. at 713.

Thus, "the purpose of Section 547(c)(4) is to encourage creditors to continue doing business with troubled debtors who may then be able to avoid bankruptcy altogether." *Rice v. Hills & Hills Farms P'ship* (*In re Turner Grain Merch., Inc.*), 596 B.R. 49, 57 (Bankr. E.D. Ark. 2018) (citing *Jones Truck Lines, Inc.*, 130 F.3d at 326). A creditor invoking this affirmative defense must establish the following: (1) the creditor must have

extended new value to the debtor or on debtor's behalf after receiving the preference; (2) the new value must be unsecured; and (3) the new value must remain unpaid after its transfer. *SGSM Acquisition*, 439 F.3d at 241. The relevant inquiry "is whether the new value replenishes the estate." *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 526 (8th Cir. 2002).

The Defendants list several transactions which they assert should be properly characterized as contributions of subsequent new value to the Debtor.[122] Though the evidence is unclear at times as to whether Miken was already under a legal obligation to pay a particular financial obligation or was merely the mechanism under which Tate addressed his own obligations, the Trustee has conceded that the applicable summary judgment evidence establishes that Miken is entitled to protect $87,364.12 of the $1.55 million transfer through this defense, leaving a balance of $1,462,635.08 .[123]

Certain other Miken payments which the Defendants contend are contributions of subsequent new value are contested. Though the Trustee conceded the applicability of the defense to certain pre-petition Miken payments to ETOS, Inc. occurring on the Debtor's behalf, he contests the applicability of the subsequent new value defense to three (3) other such ETOS payments of $1,800.54 each because they were tendered in the post-petition period. The Defendants further claim that post-petition payments totaling $69,812.48 made by Miken to LaFarge North America also qualify for the subsequent

[122] DEFS'. APP. I: 25-71 (EX. T, U, V, W, X and Y); DEFS'. APP. II: 245-47 (EX. S).

[123] PL'S. APP. III: 489.

new value defense to protect a portion of the $1.550 million payment from avoidance.[124]

The Trustee asserts in his objection to the Defendants' summary judgment motion that a post-petition payment to or for the benefit of a debtor does not qualify as subsequent new value for the purposes of § 547(a)(4) and cannot be used to shield a pre-petition preference payment from avoidance. The Defendants claim that the Fifth Circuit has implicitly recognized that post-petition payments can constitute new value because such transfers are not required to remain unpaid under the three elements articulated in *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1091 (5th Cir.1994). Yet the *Toyota* case did not involve post-petition transfers and the Court has been unable to locate any Fifth Circuit decision which addresses a post-petition payment. The text of § 547(c)(4) does not specifically address the topic either. It only specifies that new value be given to a debtor subsequent to a preferential payment. "However, the vast majority of courts that have considered this issue have concluded that new value advanced after the petition date should not be considered in a creditor's new value defense." *Friedman's Liquidating Trust v. Roth Staffing Cos. LP (In re Friedman's, Inc.)*, 738 F.3d 547, 557 (3d Cir. 2013). As one court has observed,

> The plain language of Section 547 closes the preference window at the petition date, limiting the § 547(c)(4) defense to new value supplied and payments made before the debtor crosses into bankruptcy. Post-petition goods or services provided to a debtor do not qualify as "new value" for purposes of Section 547(c)(4).

---

[124] DEFS'. APP. I: 40-55 (EX. V).

*Miller v. A&M Oil Co., Inc.* (*In re Smith Min. & Material, LLC*), 405 B.R. 589, 594 (Bankr. W.D. Ky. 2009). Most courts addressing the issue appear to have agreed with the Eighth Circuit's conclusion that the specific words in the text of § 547(c)(4)—"new value to or for the benefit of the debtor"—"imply that subsequent advances of new value are only those given pre-petition, because any post-petition advances are given to the debtor's *estate*, not to the debtor." *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.*), 850 F.2d 1275, 1284 (8th Cir.1988) [emphasis in original]. *See also, Chiasson v. Strachan Shipping Co.* (*In re Massan Shipping Indus., Inc*.), 272 B.R. 625, 632 (E.D. La. 2001); *Wiscovitch-Rentas v. PDCM Assoc., S.E.* (*In re PMC Mktg. Corp*.), 518 B.R. 150, 157 (B.A.P. 1st Cir. 2014); *Dery v. Karafa* (*In re Dearborn Bancorp, Inc*.), 583 B.R. 395, 429 (Bankr. E.D. Mich. 2018); *Official Comm. of Unsecured Creditors v. Tyson Foods, Inc.* (*In re Quantum Foods, LLC*), 554 B.R. 729, 732 (Bankr. D. Del. 2016);[125] *Turner Grain Merch., Inc.*, 596 B.R. at 57; *Gonzales v. Sun Life Ins. Co.* (*In re Furr's Supermarkets, Inc*.), 485 B.R. 672, 735 (Bankr. D.N.M. 2012);

---

[125] In explaining the foundation for its Third Circuit precedent in *Friedman's*, the *Quantum Foods* court observed:

> *Friedman's* gives no fewer than five reasons why the preference calculation should be cutoff at the petition date: [1] otherwise the analysis would be perpetually open-ended, [2] the title of § 547 is "Preferences," which suggests it concerns activity occurring during the preference period only, [3] the "hypothetical liquidation test" must be performed as of the petition date, [4] the statute of limitations for filing a preference avoidance action under § 547 in a voluntary case begins to run on the petition date, and [5] extending the preference analysis past the petition date would be inconsistent with the "improvement-in-position" test articulated in § 547(c)(5).

*Id*. at 733.

*Maxwell v. IDC* (*In re marchFirst, Inc*.), 381 B.R. 689, 698 (Bankr. N.D. Ill. 2008); *Rocor Intern., Inc. v. Alta AH&L* (*In re Rocor Intern., Inc.*), 352 B.R. 319, 333 (Bankr. W.D. Okla. 2006); *Brown v. Kitchenmaster (In re Hertzler Halstead Hospital*), 334 B.R. 276, 290 (Bankr. D. Kan. 2005); *Phoenix Rest. Group, Inc. v. Ajilon Prof'l Staffing, LLC (In re Phoenix Rest. Group, Inc*.), 317 B.R. 491, 496 (Bankr. M.D. Tenn. 2004); *Field v. Md. Motor Truck Assoc., Worker's Comp. Self-Ins. Group (In re George Transfer, Inc*.), 259 B.R. 89, 96 (Bankr. D. Md. 2001); *Clark v. Frank B. Hall & Co.* (*In re Sharoff Food Serv., Inc*.), 179 B.R. 669, 678 (Bankr. D. Colo. 1995).

Based upon the reasoning expressed in the foregoing jurisprudence, and because the filing of a petition and the resulting invocation of the automatic stay eliminates the *raison d'être* undergirding the Fifth Circuit's rationale that § 547(c)(4) is to protect creditors who assist a debtor in distress so that a bankruptcy case may be potentially averted, the post-petition payments tendered by Miken to ETOS, Inc. and to LaFarge North America in the aggregate sum of $75,214.10 fail to qualify, as a matter of law, as subsequent new value which was rendered to the Debtor for the purposes of § 547(a)(4). Therefore, the component of the Defendants' motion which seeks the application of the subsequent new value defense in order to shield a portion of the Miken Payment from avoidance in an amount equivalent to the post-petition payments by Miken to ETOS, Inc. and to LaFarge North America must be denied. However, the Trustee did not technically request summary judgment on this portion of this affirmative defense. Thus, in light of the determination that the referenced post-petition payments to ETOS and LaFarge cannot

qualify as subsequent new value as a matter of law, the Court gives notice under FED. R. CIV. P. 56(f) of its intent to enter summary judgment for the Trustee on that issue.

## C. The Guaranteed Lender Payments

### 1. Preference Analysis - 11 U.S.C. § 547(b) [Guaranteed Lender Payments]

The Defendants further seek a summary judgment on the Trustee's claim that the Guaranteed Lender Payments constitute avoidable preferential transfers under § 547 of the Bankruptcy Code. The Court addressed the Defendants' contentions regarding the beneficial objectives of those payments in the context of the Trustee's motion.[126] As for consideration of the sixth element under § 547(b) in this trilateral environment—whether either of the Defendants received a quantifiable monetary reduction of its contingent guaranty claim against the Debtor to the detriment of other unsecured creditors as a result of the Guaranteed Lender Payments—the Defendants' evidentiary presentation suffers from the same maladies as discussed with regard to the Trustee's motion.[127] Those deficiencies preclude the Defendants from establishing that there is no genuine dispute regarding the material facts necessary for determination of the final § 547(b) element. There remain genuine disputes of material fact by and among the parties regarding the nature of each lender's secured claim, the impact of each Guaranteed Lender Payment, and whether any such payment enabled either guarantor to receive more than in a Chapter

---

[126] *See supra* p. 46.

[127] *See supra* pp. 49-51.

7 liquidation. Accordingly, with regard to the avoidability and recovery of the Guaranteed Lender Payments as preferential payments under § 547, the Defendants' motion for summary judgment as supplemented must be denied.

**2. Constructive Fraudulent Transfer Analysis - TUFTA [Lender Payments]**

The Defendants further move for summary judgment on the Trustee's claim that the Guaranteed Lender Payments are subject to avoidance and recovery as a constructive fraudulent transfer under § 24.006(b) of the Texas Uniform Fraudulent Transfer Act. The Defendants contend that, unlike § 547(b) of the Bankruptcy Code, this TUFTA subsection fails to encompass transfers "for the benefit of a creditor" and therefore does not authorize the avoidance and recovery of payments from insider-guarantors who realize a reduction in their guaranty exposures as a result of a debtor's direct payment to a lender. The Trustee asserts that such a payment is within the scope of § 24.006(b) because of the expansive nature of the defined term "transfer."

The place to begin, of course, is to look at the actual language of the statute.[128] Notwithstanding the breadth of what constitutes a transfer under TUFTA, § 24.006(b) only addresses a transfer "*made to* an insider." The Guaranteed Lender Payments were

---

[128] As a reminder, § 24.006(b) provides that:

> [a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

5 TEX. BUS. & COM. CODE ANN. § 24.006(b) (West 2015).

not made to an insider. They were made to third-party lenders to whom the Debtor owed an indebtedness and for whose benefit the insiders had guaranteed the payment of that indebtedness. Thus, unlike § 547(b)(1), the statute does not contemplate the beneficial effects of a transfer to another party.

It appears as though that was an inadvertent omission from the text of § 5(b) of the Uniform Fraudulent Transfer Act during the creation of that document to facilitate the transition from the Uniform Fraudulent Conveyances Act to the Uniform Fraudulent Transfer Act.[129] Section 4 of the UFCA, as the predecessor to UFTA § 5(b), would have reached these indirect beneficial effects realized by a guarantor. As one scholar explored after the promulgation of the UFTA, " . . . section 5(b) . . . could have included obligations and guaranties just as its predecessor enactment, UFCA section 4, had done. However, it failed to do so. It is not evident why this omission occurred." Phillip I. Blumberg, *Intragroup (Upstream, Cross-Stream, and Downstream) Guaranties Under the Uniform Fraudulent Transfer Act*, 9 CARDOZO L. REV. 685, 706 (1987).

After speculating as to a number of potential causes for that omission, including the fact that § 5(b) was adopted very late in the process, Professor Blumberg directly addressed the circumstance arising in this case from the consideration of the Guaranteed Lender Payments in light of TUFTA §24.006(b):

> Does section 5(b) apply where the debtor makes *713 a transfer in payment of the guaranteed obligation to a creditor who is a third party, and

[129] UNIF. FRAUDULENT TRANSFER ACT § 5(b), 7A U.L.A. 657 (1985).

> not an insider, but which benefits the insider through the reduction of the indebtedness on which the insider-guarantor is secondarily liable?
>
> Section 5(b) does not refer to such third-party transfers. It speaks only of a "transfer . . . made to an insider for an antecedent debt." ... In the face of this significant omission, the following question arises: Does section 5(b) include transfers to third parties of antecedent debt guaranteed by an insider?
>
> At first, it would seem difficult to conclude that the draftsmen of the UFTA who were faithfully following the very structure and language of section 547(b) of the Code in drafting UFTA section 5(b) were simply inadvertent in their omission of the crucial phrase "or for the benefit of," especially since it appears that they were otherwise tracking the language of section 547(b). Traditional rules of statutory construction would conclude that as a result of the omission of the phrase, the manifest intent was to exclude transfers to third parties.

*Id.* at 712-13.

Though Professor Blumberg then proceeds to enumerate reasons why the statute perhaps should be read as if the omission had not occurred, the guiding principles of statutory construction have shifted considerably since 1987. Federal courts have been instructed by the United States Supreme Court that:

> [t]he starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes. It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.

*Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (citations and internal quotations omitted). *See also, Jimenez v. Quarterman,* 555 U.S. 113, 118 (2009); *Dodd v. United*

*States*, 545 U.S. 353, 359 (2005). In *Lamie*, the Supreme Court rejected the suggestion that a word even inadvertently omitted from legislation could not be supplied by the courts in the absence of an absurd result. In the Court's mind, to read the word "attorney" in § 330(a)(1)(A) of the Bankruptcy Code to refer to "debtors' attorneys" in § 330(a)(1) "would have us read an absent word into the statute. That . . . would result not [in] a construction of [the] statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope." *Id*. at 538. As the Fifth Circuit stated recently, "[t]he principle that a matter not covered is not covered is so obvious that it seems absurd to recite it. A number of cases have identified the *casus omissus pro omisso habendus est* canon, under which a statute should not be read to include matter it does not include." *Envtl. Integrity Project v. United States Envtl. Prot. Agency*, 969 F.3d 529, 541 (5th Cir. 2020) (citations omitted).

The same interpretive principles are imposed under Texas law. As the Supreme Court of Texas has directed:

> ...it is cardinal law in Texas that a court construes a statute, first, by looking to the plain and common meaning of the statute's words. If the meaning of the statutory language is unambiguous, we adopt, with few exceptions, the interpretation supported by the plain meaning of the provision's words and terms. Further, if a statute is unambiguous, rules of construction or other extrinsic aids cannot be used to create ambiguity.

*Fitzgerald v. Advanced Spine Fixation Sys., Inc*., 996 S.W.2d 864, 865–66 (Tex. 1999) (internal quotations omitted). "We presume the legislature chose a statute's language with care, including each word chosen for a purpose while purposely omitting words not

chosen." *Hallmark Mktg. Co., LLC v. Hegar*, 488 S.W.3d 795, 798 (Tex. 2016). "This general rule applies unless enforcing the plain language of the statute as written would produce absurd results." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009).

By its plain language, the scope of § 24.006(b) is restricted to transfers "made to an insider." Therefore, this Texas statute has no applicability to the Guaranteed Lender Payments arising in this case and, under § 544(b)(1) of the Bankruptcy Code, it is not a "transfer of an interest of the debtor in property . . . that is voidable under applicable law." Accordingly, the Defendants' motion for summary judgment as supplemented is granted in this regard and Defendants are entitled to the entry of summary judgment on the Trustee's claim that the Guaranteed Lender Payments are subject to avoidance and recovery as a constructive fraudulent transfer under § 24.006(b) of the Texas Uniform Fraudulent Transfer Act.

## V. TRUSTEE'S ENTITLEMENT TO RECOVERY - 11 U.S.C. § 550

As a final component of his Motion for Summary Judgment as supplemented, the Trustee requests recovery of all avoided transfers. He asserts an entitlement to such recoveries under both § 550 of the Bankruptcy Code[130] and TUFTA § 24.008.[131] Once a

---

[130] The relevant portion of § 550 reads as follows:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided . . . , the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from —

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made ;

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from —

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate transferee of such transferee.

11 U.S.C.A. § 550 (West 2016).

[131] The relevant portion of Section 24.008 provides that:

(a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 24.009 of this code, may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; . . .

Section 24.009, in relevant portion, provides:
. . .

(b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 24.008(a)(1) of this code, the creditor may recover judgment for the value of the asset transferred, as adjusted under Subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) the first transferee of the asset or the person for whose benefit the transfer was made . . . .

(f) A transfer is not voidable under Section 24.006(b) of this code:

(1) to the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien;
(2) if made in the ordinary course of business or financial affairs of the debtor and the insider; or
(3) if made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor.

5 TEX. BUS. & COM. CODE ANN. § 24.008-24.009 (West 2015).

trustee has successfully avoided a preferential transfer under § 547 of the Bankruptcy Code or a fraudulent transfer under either § 548(a) or § 544(b) of the Bankruptcy Code, the trustee may recover the value of the transferred property from "the initial transferee" or any "entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). "The Fifth Circuit has held that an initial transferee is one who receives dominion and control over funds directly from the debtor." *Searcy v. Pharma-Safe Indus. Svcs., Inc.* (*In re Emas Chiyoda Subsea, Ltd.*), 2020 WL 1696105 at *7 (Bankr. S.D. Tex. Apr. 6, 2020) (citing *Criswell*, 102 F.3d at 1419). Similarly, "TUFTA not only creates liability against the person for whose benefit the transfer was made, such as the debtor, but also against the first transferee of the asset, or any subsequent transferee." *Katchadurian v. NGP Energy Capital Mgmt., LLC (In re Northstar Offshore Group, LLC*), 616 B.R. 695, 729 (Bankr. S.D. Tex. 2020) (quoting *Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). A trustee's recovery is, of course, limited to a single satisfaction. 11 U.S.C. § 550(d); *Segner v. Ruthven Oil & Gas, LLC* (*In re Provident Royalties, LLC*), 581 B.R. 185, 190 (Bankr. N.D. Tex. 2017).

There is no genuine dispute of material fact in this instance that, for the purposes of these two recovery statutes, Miken was the initial transferee and beneficial recipient of the adjusted amount of $1,462,635.88 arising from the Miken Payment and that Tate was the initial transferee and beneficial recipient of the $21,917.00 constituting the Slamdunk

Shareholder Distributions. Further, there is no genuine dispute of material fact that neither Miken nor Tate gave new value to the Debtor after the dates of those respective transfers or otherwise took those transfers pursuant to any effort to rehabilitate the Debtor.

Each Defendant, at least in their respective answers, claimed a good faith defense against the recovery of any avoided transfer under § 550(b), yet, as initial transferees, the Defendants are not entitled to the benefit of any protection under § 550(b)(1). *Morton v. Kievit (In re Vallecito Gas, LLC)*, 461 B.R. 358, 412 (Bankr. N.D. Tex. 2011); *Osherow v. Hensley* (*In re Pace*), 456 B.R. 253, 276 (Bankr. W.D. Tex. 2011). "The trustee may always recover from the initial transferee regardless of [that transferee's] good faith, value, or lack of knowledge of the voidability of the transfer." *Cruickshank v. Dixon* (*In re Blast Fitness Group, LLC*), 603 B.R. 219, 235 (Bankr. D. Mass. 2019) (citing *Richardson v. United States* (*In re Anton Noll, Inc*.), 277 B.R. 875, 878 (1st Cir. BAP 2002)). Additionally, because there is no evidentiary basis to support it, the Defendants have failed to create a genuine issue of material fact regarding any entitlement to any recovery protection otherwise provided by TUFTA § 24.009(f). Accordingly, the Trustee is entitled to a summary judgment on each Defendant's asserted defense to recovery of the avoided transfers under § 550(b) of the Bankruptcy Code and TUFTA §§ 24.008 and 24.009. The Trustee has demonstrated his entitlement to the recovery from Miken of the adjusted amounts of the Miken Payment and to the recovery of the Slamdunk Shareholder Distributions from Tate under the provisions of § 550(a).

## V. CONCLUSION

Based upon due consideration of the pleadings, the proper summary judgment evidence submitted by the parties, the relevant legal authorities, and for the reasons set forth herein, the Court concludes that the Motion for Summary Judgment as supplemented filed by Trustee-Plaintiff, Stephen J. Zayler, should be granted in part and denied in part, such that a summary judgment shall be awarded to the Trustee for the recovery of $1,462,635.88[132] from Defendant, Miken Oil, Inc., as a preferential transfer pursuant to 11 U.S.C. § 547 and as a constructive fraudulent transfer under 11 U.S.C. § 544(b) and Tex. Bus. & Com. Code § 24.006(b). Summary judgment shall also be awarded to the Trustee for the recovery of $21,917.00 from Defendant, Larry Mike Tate, arising from two constructively fraudulent transfers under § 548(a)(1)(B) of the Bankruptcy Code.[133] The Trustee's motion as supplemented will also be granted such that the following shall be denied: (1) the Defendants' asserted affirmative defense pertaining to the Miken Payment and the Guaranteed Lender Payments based upon an alleged contemporary exchange for new value; and (2) the Defendants' claims regarding the applicability of any of the following defenses: (i) a failure to assert a claim upon which

---

[132] This amount is subject to downward adjustment in an amount not exceeding $75,214.10, depending upon the resolution of the Rule 56(f) notice issued by the Court.

[133] In light of this ruling, the Court does not reach the Trustee's alternative claim, and any defenses asserted thereto, that the denominated "circular contemporaneous transaction" constituted an illusory and fraudulent boost to Tate's stockholder basis through which he engaged in a fraudulent transfer of the Debtor's accumulated loss carryforwards in derogation of the rights of the bankruptcy estate under 11 U.S.C. § 548 and TUFTA §§ 24.005 and 24.006.

relief can be granted; (ii) a failure to plead with sufficient specificity; (iii) inequitable recovery; (iv) the doctrines of *in pari delicto*, unclean hands, unjust enrichment, and any other equitable doctrine; (v) the doctrines of release, waiver, ratification, accord and satisfaction, estoppel, judicial estoppel, setoff, recoupment, and/or equitable estoppel; and (vi) any state or federal statute of limitations or the doctrine of laches. The remainder of the Trustee's motion as supplemented will be denied.

The Motion for Summary Judgment as supplemented filed jointly by the Defendants, Miken Oil, Inc. and Larry Mike Tate, shall be granted such that the Trustee's request to recover the Guaranteed Lender Payments as constructive fraudulent transfers under § 24.006(b) of the Texas Uniform Fraudulent Transfer Act shall be denied. The remainder of the Defendants' joint motion as supplemented will be denied.

Further, pursuant to the provisions of Fed. R. Civ. P. 56(f), and based upon the lack of any genuine dispute of material fact in the summary judgment record currently before the Court with respect to the particular issue, the Defendants shall have until Tuesday, February 16, 2021, to respond by written submission as to why the Court should not enter summary judgment for the Plaintiff on that limited portion of the Defendants' affirmative defense under § 547(a)(4) which asserts that a portion of the Miken Payment equivalent to the sum of $75,214.10, as derived from payments tendered by Miken in the post-petition period to ETOS, Inc. and to LaFarge North America,[134] should be protected

[134] *See supra* pp. 72-76.

from avoidance because such payments qualify as subsequent new value which was rendered to the Debtor.

Appropriate orders regarding the pending motions for summary judgment shall be entered in this adversary proceeding that are consistent with this opinion.

Signed on 01/29/2021

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE